UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - -X
SOUTH LYME PROPERTY OWNERS        :
ASSOCIATION, INC., CHARLES AND    :
VICTORIA PARSONS AND JOAN BYER,   :
       Plaintiffs               :
                                 :
VS                                : 3:00CV97(EBB)
                                 :
TOWN OF OLD LYME, TOWN OF OLD     :
LYME ZONING COMMISSION,           :
ERIC FRIES, GEORGE JAMES,         :
JANE MARSH, THOMAS RISOM,         :
WALTER SEIFERT, SHARON COLVIN AND :
MARILYN OZOLS,                    :
       Defendants               :
- - - - - - - - - - - - - - - - - -X

Deposition of ERIC FRIES taken at the offices of Halloran & Sage, 300 Plaza Middlesex, Middletown, Connecticut, before Audra Quinn, RPR, Licensed Shorthand Reporter #106, and Notary Public, in and for the State of Connecticut on August 25, 2003, at 9:13 a.m.



DEL VECCHIO REPORTING SERVICES, LLC
PROFESSIONAL SHORTHAND REPORTERS

117 RANDI DRIVE          100 PEARL ST., 14th FL.
MADISON, CT 06443        HARTFORD, CT 06103-4506
   203 245-9583             800 839-6867

EXHIBIT D

```
 1   provide that use of seasonal properties during winter
 2   months, and I'm paraphrasing, is a nonconforming use?
 3        A    (Witness reviewed.)
 4             I see a statement in here that says with
 5   specific regard to the enlargement of a nonconforming
 6   use that it would imply that occupancy of a seasonal
 7   use beyond the period of April 1 to November 15$^{th}$ and
 8   winterization, refurbishment or remodeling of a
 9   seasonal dwelling to accommodate other than seasonal
10   use would be considered the enlargement of a
11   nonconformity.
12        Q    Doesn't the use have to first become a
13   nonconforming use before those provisions regarding the
14   nonconforming use would apply?
15        A    Generally, that's true.
16        Q    And the schedule of uses that were effective
17   at that moment in time in which those amendments were
18   adopted expressly provide that residential use is
19   authorized regardless of duration.  Is that true?
20        A    It appears to be.
21        Q    Is it fair to say during your entire tenure
22   as a member of the Zoning Commission in Old Lyme there
23   was an effort by the town to try to limit the so-called
24   conversion of seasonal properties to year-round
25   properties?
```

1  A     Could you clarify what you mean by limit?

2  Q     Prohibit.

3  A     So if you -- would you rephrase this question
4  using prohibit instead of limit, then?

5  Q     Certainly.  During your entire tenure on this
6  Zoning Commission there were efforts by the town of Old
7  Lyme to prohibit conversion of properties the Zoning
8  Commission believed were seasonal to conversion as
9  year-round use?

10 A     I don't recall any effort to prohibit it.

11 Q     What were the efforts regarding seasonal
12 properties?

13 A     I would prefer to say that they were to
14 establish the controls to allow that conversion to take
15 place.  I don't ever remember any -- and this is based
16 on my recollection at this point in time, I don't ever
17 remember any situation that I participated in where my
18 opinion was that we were out to prohibit the
19 conversion.  Now, I could be wrong on that, but the
20 aspect is that we wanted to, certainly with the
21 regulations circa 1994, 1995, provide a process for
22 that to take place.

23 Q     Do you recall having received and reviewed
24 this document prepared during 1991 regarding -- titled,
25 "Enforcement of Seasonal Use Limitation for

```
 1      Q    Do you know why?
 2      A    Why?
 3      Q    Do you know why?
 4      A    I believe it was based on changes we made in
 5  our regulations on nonconformity.
 6      Q    And were those changes the changes that we
 7  pointed out under Tab B of Exhibit TR-36 and which 8.7
 8  was amended?
 9      A    I would assume it might be.  The only thing
10  is not having Dave's actual referral letters in front
11  of me I would have to assume it might be, and I want to
12  stress might.  I just don't recall this specific
13  correspondence or the testimony that Dave had before
14  our commission in that area.
15      Q    Was Mr. Royston involved in actually drafting
16  the amendments that were the subject of this public
17  hearing?
18      A    I don't recall.
19      Q    Do you recall any persons who were involved
20  in the actual drafting of the amendments in 1994?
21      A    I was heavily involved in it.
22      Q    You were?
23      A    Yes, I was.
24      Q    And what were you attempting to accomplish in
25  drafting those proposed amendments?
```

1    A    Right.

2    Q    Would you expect that the majority of the
3    properties of existing dwellings are located on lots
4    greater than 10,000 square feet?

5    A    I really can't render a decision on that.

6    Q    Did your Zoning Commission study that
7    question to determine whether or not your policy was,
8    in fact, going to have the effect of essentially
9    prohibiting most property owners affected in that zone
10   from converting versus, as you suggest, enabling
11   conversions subject to certain standards?

12   A    I don't recall that we discussed that.  We
13   may have discussed that.  I'd have to look at minutes
14   of past meetings to determine that.

15   Q    Do you recall ever asking any staff member to
16   evaluate how many properties in the R10 zone were --
17   actually contained dwellings on lots of less than
18   10,000 square feet?

19   A    I'm not saying I didn't, but I don't recall
20   that now.

21   Q    And other than, again, pointing to the fact
22   that that's the underlying zone, what issues of
23   character, as you stated, or other public health and
24   safety issues would be served by prohibiting a person
25   who owns an existing property and existing dwelling

1   don't remember the exact discussion that we had when we
2   started working on that particular piece of the
3   regulation.
4       Q   Well, this regulation is really not targeted
5   to try to determine the density of new development. I
6   mean, that is established by your existing zoning
7   standards.  Correct?
8       A   Yes.  Our R10 is the underlying zone.
9       Q   So the standards would not have the 10,000
10  square foot imposition of these regulations is not
11  something that would prevent new properties from being
12  built too close together, but, in fact, had to do with
13  whether or not existing properties that were already
14  there, whether they would be used during winter months.
15  Isn't that true?
16          MR. RADSHAW:  Object to the form of the
17      question.
18          You can answer.
19      A   We established 10,000 square feet as the
20  minimum lot size that a seasonal residence could be
21  converted to year-round, unless it could be shown as
22  being a pre-existing nonconforming use.
23  BY MR. SLATER:
24      Q   Understood. And I'm trying to get to what
25  public purposes or character issues, et cetera, would

1           MR. RADSHAW:  If you understand it, you
2      can answer.
3      A    I'd like a clarification, please.
4  BY MR. SLATER:
5      Q    Would you agree that these properties can all
6  be used at a hundred percent occupation between April
7  and November?  The septic systems and wells serve those
8  properties during that majority period of the year.
9  Correct?
10     A    Yes.  Or they have a public water supply.
11 It's not all wells.  In fact, I have no idea, maybe you
12 do, of what percentage of wells versus public water
13 supply.  I don't have that at my fingertips.
14     Q    What public health, safety or other issue
15 that was a legitimate concern for planning and
16 zoning -- Zoning Commission is served by telling those
17 persons who could use their property at full capacity
18 for that majority portion of the year stopping and
19 halting the use of the property for those few winter
20 months of the year?
21     A    Well, I think one of the things I've already
22 addressed is a character issue.  Now, let me clarify
23 that.  There, I think, is a distinct difference and I
24 feel that way in Old Lyme and I also feel that way on
25 other places I go and spend my summer holiday of what

1  constitutes a summer use or a seasonal use of a piece
2  of property is not necessarily what's appropriate for a
3  year-round use.  There's a lot of things, and seasonal
4  use is fine and beach use is fine, but I think there's
5  a lot of character issues that we have considered
6  relative to what's acceptable for a cottage versus
7  what's acceptable for a year-round residence.
8           Now, hopefully, I'm not being prejudicial
9  when I say that, but there is a character issue on that
10 with regard to character of how people live.  I think
11 there are issues that are different between something
12 you use on a seasonal basis and what you use as a
13 year-round residence.  I think that's also reflected in
14 some of the different areas of the shore community and
15 we try to take that into consideration.  Those were
16 considerations from the commission standpoint when we
17 did that.
18          You also have issues of use in the winter
19 months, entails more heating systems, potential for
20 having different systems in a building being used
21 during the winter months.  That's one of the reasons
22 why we certainly wanted to have a bona fide heating and
23 other mechanical systems being up to snuff.
24          But even within that context there's still an
25 aspect of certain amount of lot size to prevent spread

1  of fire, access to facilities and things of that
2  nature, and when we consider that, we thought 10,000
3  square feet was the right amount.
4      Q    Is there a public health and safety problem
5  with respect to fire aspect regarding the use of these
6  properties at very high capacity during the summer
7  months?
8      A    I'm sure there probably is, but one of the
9  things that's not in play necessarily is the heating
10 system.  And that was just one of the considerations we
11 had.
12          Now, do I think all of our considerations
13 were perfect and could be absolutely done on an
14 analytical basis?
15          No.  But we were very mindful of what we
16 thought the character of a year-round development would
17 be and the conclusion we came back with was we think
18 houses on 10,000 square feet was appropriate and that's
19 what we base it on.
20     Q    Can you elaborate a little bit more on what
21 you mean by character?
22     A    Yes, I can elaborate on the issue of
23 character.  You know, how close do you want year-round
24 residences.  That's one of the main things zoning asked
25 from a standpoint that's applied elsewhere in town.  In

# CERTIFICATE

I hereby certify that I am a Notary Public, in and for the state of Connecticut, duly commissioned and qualified to administer oaths.

I further certify that the deponent named in the foregoing deposition was by me duly sworn, and thereupon testified as appears in the foregoing deposition; that said deposition was taken by me stenographically in the presence of counsel and reduced to typewriting under my direction, and the foregoing is a true and accurate transcript of the testimony.

I further certify that I am neither of counsel nor attorney to either of the parties to said suit, nor am I an employee of either party to said suit, nor of either counsel in said suit, nor am I interested in the outcome of said cause.

Witness my hand and seal as Notary Public this ___4th___ day of ___September___, 2003.

_Audra Quinn_
Audra Quinn, RPR, LSR
Notary Public

My commission expires: 7/31/2006
LSR No. 106