UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


- - - - - - - - - - - - - - - -+
SOUTH LYME PROPERTY OWNERS          |
ASSOCIATION, INC.,
          Plaintiff                 |
                                      CIVIL NO.
CHARLES PARSONS,                    | 00-CV-97
          Plaintiff
VICTORIA PARSONS,                   |
          Plaintiff
JOAN BYER,                          |
          Plaintiff
                                    |
          v.
                                    |
TOWN OF OLD LYME
          Defendants.              | APRIL 12, 2000

- - - - - - - - - - - - - - - -+

VOLUME 1



Before:

      The Honorable ELLEN BREE BURNS,
      Senior U.S. District Court Judge

_COPY_

FALZARANO COURT REPORTERS
117 North Saddle Ridge
West Simsbury, CT 06092
860.651.0258

```
 1   APPEARANCES:

 2          For the Plaintiffs:

 3      Eisenberg, Anderson, Michalik & Lynch
        136 W. Main Street
 4      P.O. Box 2950
        New Britain, Connecticut 06050
 5      By:  KENNETH R. SLATER, JR., ESQ.
             860.229.4855
 6

 7          For the Defendants:

 8       Howd & Ludorf
         65 Wethersfield Avenue
 9       Hartford, Connecticut 06114
         By:  THOMAS R. GERARDE, ESQ.
10            860.249.1361

11       Also present:  ERIC KNAPP, ESQ.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (Hearing commenced:  10:45 a.m.)

 2

 3              MR. SLATER:  For the record, my name is

 4         Kenneth Slater.  I'm representing the

 5         Plaintiff, South Lyme Property Association, et

 6         al.  I'd like to call my first witness, Joseph

 7         Russo.

 8

 9              JOSEPH RUSSO, Witness, having been sworn

10         by the Court Clerk, was examined and testified

11         under oath as follows:

12

13              THE CLERK:  Would you state your name and

14         address, please, for the record.

15              THE WITNESS:  Joseph Russo, 3 Hartung

16         Place in Old Lyme.

17              THE CLERK:  Would you spell your last

18         names, please?

19              THE WITNESS: R-u-s-s-o.

20

21                   DIRECT EXAMINATION

22

23    BY MR. SLATER:

24         Q    Good morning, Mr. Russo.

25         A    Good morning.
```

1   months a residential use could be used?

2       A    If you are asking me if there are words, that's

3   impossible for me to say.

4       Q    Do you have a present recollection other than the

5   regulations that are provided in these documents that there

6   are other regulations?

7       A    I don't have a present recollection of any

8   particular words.  I couldn't tell you.  Whether there were

9   interpretations available or considered at that time, that

10  would be a different point.  But actual words and asking me

11  to remember them and recite them for you, I couldn't.

12      Q    You were a member the commission in 1995 when the

13  additional regulations outlined in Attachment C were adopted,

14  were you not?

15      A    Yep.

16      Q    What was your belief of the rationale, the reason

17  for adopting Section 21.2.4 and 21.2.5 relating to year-round

18  dwellings and seasonal dwellings?

19      A    We were really, in my opinion, trying to state as

20  clearly as possible and with sufficient clarity to convince

21  the superior court should we be taken back there again that

22  we didn't intend that seasonal uses be converted to

23  year-round when the potential for septic problems and -- we

24  felt that we needed to be far more implicit and provide a lot

25  more detail in the whole procedure in order to accomplish

1    that end.

2        Q    Why?

3        A    It is an overreaching desire in the Town of Old

4    Lyme to maintain the character of the town as a rural

5    community.  And as part of that, there has been a desire not

6    to move to the more suburban trend of sewer treatment plants

7    and large public water supplies and things like that.  There

8    is also very strong bias in protecting the environment and

9    preserving open space and preserving Long Island Sound and

10   public waters of the state and the sort of combined intention

11   is to make sure that there are no failing septic systems in

12   town.

13            And not only fail, but they don't -- stuff that's

14   put into the ground really doesn't cross over into a

15   neighbor's property; it doesn't seep into the aperture

16   doesn't disappear down into the stream, and it certainly

17   doesn't end up in Long Island Sound.  Our belief is or has

18   been that there has been an amazing amount of efforts put

19   into this town towards this goal.  You try to control the

20   conversion of the seasonal dwelling in the beach areas.

21            They've been constructed at a density that is too

22   intense; that if they were all converted to year-round use,

23   the area would never be able to regenerate during those off

24   months, and there would be pollution of the water supply;

25   there would be pollution of your neighbors' wells; there

1    would be more contribution of pollution to Long Island Sound.

2    It's a long-term concern in the town.  It's discussed in

3    every land use commission, has been ever since I was on the

4    commission, and even before then.

5         I think it's -- they -- it's not meaning to be

6    punitive to any particular property owner.  It just sort of

7    happens that those areas of the town that are now designated

8    R-10 were laid out way back before zoning in very small lots,

9    sort of all in a checkerboard.  In fact, I think some of the

10   lots were laid out deliberately knowing that zoning was about

11   to be adopted.  But they're very, very small, and they sit on

12   ground that is quite permeable to water which allows the flow

13   of whatever you put into it to travel faster.

14        We've had difficulties with DEP.  I think there was

15   actually an ordinance in 1991 that we do something about one

16   of the beach areas because there had been too many problems

17   with people's septic systems malfunctioning.  I know that

18   town's commission has various professional reports and

19   studies, and the town sort of has been a whole collective

20   part of the plan and development, pretty consistently since

21   1980 has been to pursue this multifaceted objective of sewer

22   avoidance, avoiding, really, septic failure so that the State

23   would not order us to install the sewage treatment plant.

24        That is what the State, at least up until the

25   recent past was wanting to do.  And so there are many things

 1   that were done, not -- this is not the only thing that was

 2   done.  But I think there is a belief on the part of the

 3   zoning commission that they had accomplished their goal

 4   better than they had, and there were a couple of court

 5   decisions that went adversely to the commission where

 6   seasonal users were actually allowed, even though we thought

 7   the regulations were not going to permit it.  When that

 8   happens, you go back to the drawing board, and you try to be

 9   more explicit in your regulations to deal with what we

10   believe was a misinterpretation of our regulations, so that

11   we would achieve the objection, which was to have people --

12   have fewer conversions on the beach area so that we don't

13   have these problems.

14          There are many private wells in the beach area.

15   There are public water supplies, but that's not certainly --

16   not the only water supply there.  There are a lot of private

17   wells, even the public water supply are from wells that are

18   in the area.  And there are a number of public water supply

19   wells in these tiny little community water supplies that got

20   polluted.  So it's a known problem that the town really

21   wanted to address so we feel we cannot allow unlimited

22   conversion to year-round to people.  We will very quickly be

23   in a problem where we can't handle the failing septic system

24   to individual properties, and that one person, one neighbor,

25   will be affecting that person and another neighbor.  We are

1    protecting neighbors against neighbors too.

2        Q    You identified a number of reasons that might be

3    behind the basis for this new set of regulations.  I'd like

4    to discuss them separately.  You mentioned the character of

5    the community.  Can you articulate why persons residing in

6    the homes be allowed to reside there between April and

7    November, why the character of the community would be changed

8    if those people who own those properties were allowed to live

9    there for an additional month of the year?

10       A    I mean, there -- in a certain way, the population

11   has a big increase in the summer.  There's really -- when you

12   say from April to November as a resident, it's really not

13   those times.  It's a much more confined period of time than

14   when those properties are heavily occupied.  You see it in

15   terms of an increase in the traffic, and, you know, it's not

16   quite the sleepy town that it was.  Everyone comes and

17   occupies those seasonal cottages.  On the other hand, it

18   seems like a magazine.

19           People will come to the shore and want to go into

20   the water in the summer months when it's warm enough to swim.

21   People want to lie on the beach.  I realized that I actually

22   like it -- to think that people would be able to enjoy it in

23   that way.  And as long as the environment wouldn't be

24   adversely affected, that particular use which is a very

25   specific thing, those five or six communities that have

1    existed, plus the one in town, it's really part of the town

2    too that we have those seasonal communities, and that those

3    have been a childhood memory for lots and lots of people in

4    the state.  That's part of the town's character.  That is

5    available as that particular thing.  So it's our belief that

6    we can continue to let that happen.  But if you say, well,

7    let all those people stay there all year long, there's going

8    to be other problems.

9        Q    Putting aside the septic question, and getting back

10   to my question which is character -- you'd agree that under

11   your existing regulations, a property owner in a residential

12   zone would have an unfettered right to use the dwelling

13   between the nonwinter months; that is --

14       A    Unfettered provided the septic system doesn't fail.

15       Q    Which agency is responsible for dealing with septic

16   failures?

17       A    We have sanitarians, we have the water control

18   authority, and we have the Department of Health.

19       Q    And it's the public health code that deals with the

20   septic issues, I assume?

21       A    We have a public health code and a town health

22   code.

23       Q    Again, going back to nonseptic issues, you

24   mentioned character of the community.  How would the use of

25   these residential properties during winter months adversely

```
 1    affect the character of the Town of Old Lyme?
 2         A    Well, the rural character of the town, at least in
 3    every other month other than July and August, has a certain
 4    quietness to it and a nondense development and a low level of
 5    activity, and that's certainly a major part of Old Lyme
 6    during all other months except for July and August.  So if
 7    you're asking me whether that may contribute to what town's
 8    residents who are year-round identify as the rural character
 9    of a small town character, yes, it is.  For ten out of the
10    twelve months of the year, it is a quiet place to reside, and
11    there are not many people, and the density of residential
12    development is rather thin and spaced.  It's part of the
13    character of the town.
14         Q    You've heard of the expression "beach people"?
15         A    I suppose.
16         Q    What is your understanding of that phrase?  Have
17    you heard it used in Old Lyme?
18         A    I mean, I could make up one.
19         Q    I'm not asking you that.  I'm asking you whether
20    you've heard that term used and whether you understand it --
21         A    I don't think I would have a clear understanding of
22    what you meant by that.  I mean, I actually live in -- I live
23    near the beach too, although I'm a year-round resident.
24         Q    Is there anything about the winter months that
25    using these properties would have an effect on the town that
```

1  is different and apart from the effect of using these

2  properties in the summer?

3      A    Effect on the town?  You mean town services?  I

4  mean, you have to be more specific.

5      Q    For the purposes of planning and zoning -- the

6  reason for adopting these regulations in 1995 to -- as you

7  described for further clarifying and restricting the ability

8  to convert to year-round use.  Is there anything about those

9  months of the year that are of concern because your

10  regulations permit as a right the use of the properties

11  between April and November; do they not?

12              MR. GERARDE:  Your Honor, I object.  First of

13          all, it's a compound question.  I think it's a

14          mischaracterization of Ms. Marsh's testimony to

15          say that regulations permit as a right the use.

16          She qualified -- she explained what's in the

17          schedule.  She said that there are a number of

18          other things.  If the only question that he

19          wants answered is the last question, I object

20          to that on that basis.

21  BY MR. SLATER:

22      Q    I don't mean to get into details about whether a

23  particular property is the right building size and those

24  details and regulations, I'm talking strictly with use.

25  Residential property under your current regulation can be

1    than 20,000 square feet in excess of 20 years in our town,

2    that we have a regulation that essentially allows for after a

3    separate date, you can't develop it unless --

4        Q    My question is -- and I'm not sure what your answer

5    --

6        A    I answered yes, but I'm saying why.

7        Q    Why what?

8        A    You said, was it ever considered that all the

9    development that would be permitted would be seasonal use.  I

10   can see the first sentence of the second paragraph under

11   discussion and modification Schedule A says, modified version

12   as an R-10 column, and the only permit use in R-10 would be

13   seasonal use.

14       Q    Do you remember now?  Does that refresh your

15   recollection?

16       A    Yes.

17       Q    Is it your understanding that if seasonal use was

18   the only permitted use of an R-10 zone that if the commission

19   adopted that regulation at that point in time, the only

20   persons who could use property on a year-round basis would be

21   those who had an existing nonconforming year-round use?

22       A    Yes.

23       Q    Did your commission adopt that provision?

24       A    No.

25       Q    Do you know why not?

1      A    I believe that we felt it was overly restricted.

2  There was certainly a desire not to have -- the R-10 in our

3  opinion is -- 10,000 square feet is too small a lot to

4  support a septic system.  We've had information from DEP for

5  a period of twenty years that whenever there are no sewage

6  plants, no community sewage systems, that in the best of

7  circumstances with optimum conditions that you need three

8  quarters of an acre.  We have 10,000 square feet, which is a

9  quarter of that, and so, in general, we don't consider that

10  to be a suitable sized lot.

11      Q    Understand that.  Tell me what would be too

12  restrictive about the adoption of the provision that your

13  commission would provide that seasonal use is the only

14  permitted use in the R-10 zone?

15      A    We believe that there are a lot of people who could

16  potentially use it year round without causing these problems.

17  This may be proven wrong.  You may not be correct in it.

18  Obviously, there can still be pollution.  And we may be

19  proven wrong, but we believe that we could adopt a lower

20  standard and rely on our Department of Heath, and that

21  potentially we could still accommodate some year-round use to

22  come into existence that wasn't already in existence.  It was

23  trying to have some latitude to allow for people that own

24  that property in that area to achieve two goals at once.

25          One goal is to try to avoid these future problems

1    that we believe are real, and yet to recognize to some degree

2    that people own property, and if they can show the

3    sanitarian, hey, I've got 10,000 square feet and they can

4    show the sanitarian that things are going to be all right,

5    that they will take the chance.  It may not be correct, but

6    it's how we ended up going.

7        Q    The regulations that you adopted in 1995 provided

8    January 1, 1992 as the date in which a property owner could

9    establish a nonconforming use; is that correct?

10       A    Yes.

11       Q    Why was that date adopted when the regulation that

12   may oppose the addition of requirements was adopted in 1995?

13       A    We believe -- again, we go back to this original

14   belief, we believed that these properties were seasonal use

15   characteristics on an otherwise nonconforming lot was also

16   restricted to that.  I think you just couldn't expand it

17   year-round, and that that was an expansion on a nonconforming

18   use.  That was the belief that -- we had court cases that

19   discouraged us in that belief.  We had changes that we made

20   in 1992 to respond to that.  And we believed that at that

21   point, that issue was addressed.

22       Q    Do you believe that the changes you made in 1992

23   were made in response to the court cases, or the changes you

24   made in 1995?

25       A    '92.  We believed in 1995, to use that date, that

1    people that owned property as of 1992 already knew that we
2    considered conversion of the seasonal dwellings and we
3    wouldn't be doing anything to somebody that would prejudice
4    their rights or surprise them with anything else.  That was a
5    legitimate date to chose.  We could have -- earlier drafts
6    had earlier dates.

7        Q    What earlier dates?  Do you recall?

8        A    I couldn't tell you.  I know there were some.
9    There were earlier dates considered.

10       Q    One of those dates was the first date showing it
11   was adopted?

12       A    Yes.  I imagine that was one of the choices.  I
13   mean, there was all kinds of discussions that took place.  If
14   I recall, it was a long period of time.  My memory is not as
15   great as you think it should be.  That date was settled on.
16   I know we sought advice from our counsel.  We were advised
17   that that date was a suitable date.  There was also a
18   consideration that if you're asking somebody to prove that
19   they used a property year-round, they're not going to retain
20   the utility bills and telephone bills and other things that
21   you might ask for a long period of time.  They're not going
22   to have them from 1958.  And so, there's a burden that falls
23   on someone that if you adopt a date of more recent origin,
24   it's not so burdensome on them.  I think we settled on that
25   date for a whole host of reasons.  We were advised by our

1    counsel that that was an appropriate date for us to use.

2        Q    The regulations also included a provision that the

3    zoning enforcement officer could in her discretion determine

4    whether or not properties were seasonal.  I'm referring to

5    the 1995 amendments.  Is that true?

6        A    I don't call it in her discretion.  That sounds

7    like it's her choice and she can flip a coin.  There is no --

8        Q    I would refer you to Article 21.2.5, Subparagraph

9    B.  This is going to be -- actually, that's a good point.

10                MR. SLATER:  I would offer these 1993 minutes

11            into evidence.

12                MR. GERARDE:  No objection, your Honor.

13                THE COURT:  Thank you.

14                THE CLERK:  Plaintiff's Exhibit 5, meeting

15            minutes.

16

17                (Plaintiffs' Exhibit 5:

18                 Marked for identification.)

19

20    BY MR. SLATER:

21        Q    Have you referred to the paragraph I'm referencing?

22        A    I'm not sure.  Tell me.

23        Q    In the 1995 amendments, I'm referencing

24    Article 21.2.5, Paragraph B.  I'd ask you to read the first

25    sentence into the record.

```
1        A    "For the purpose of administration of this section,
2   the zoning enforcement officer of the Town of Old Lyme may
3   designate from time to time those properties on which he has
4   made an affirmative determination that there is located
5   thereon a seasonal-use dwelling."
6        Q    My question is:  Didn't you adopt a regulation that
7   gave the zoning enforcement officer the discretion to issue
8   seasonal notice on properties?
9        A    To issue the notices, yes.  I thought you said to
10  make the determination.  She has the discretion as to when
11  she is able to get enough information in order to make that
12  determination, because, obviously, you can't do them all on
13  one day.  There is a lot of information-gathering that takes
14  place in order to make that determination.  She can decide
15  when.
16       Q    My question is:  Is there any provision of your
17  regulations that orders the zoning enforcement officer to
18  evaluate and issue seasonal determination?
19       A    We have a policy and procedure in order to do that.
20       Q    Does the policy and procedure mandate that she does
21  that?
22       A    She has to do it?
23       Q    Yes.
24       A    No.  It says at her timeframe.
25       Q    In her discretion.
```

1    A    It's not that -- you see, the determination is when

2    she does it is in her discretion, when she can work it into

3    her load.

4    Q    Who has the discretion of making the actual

5    determination?

6    A    It's not just discretion.  It's that she has to

7    consider information.  What I understood your question was

8    that she can decide off the cuff, I don't like this, man,

9    I'll make him seasonal.  She has to do information-gathering

10    in order to make a decision.

11    Q    But you would agree like any other enforcement

12    provision of the regulations, any enforcement action, that

13    it's in the enforcement officer's discretion when and what

14    cases to exercise that authority.

15    A    Right.  And she does so on the basis of

16    information.

17    Q    And there's no mandate in the regulations to do

18    that.  It's left to her enforcement discretion?

19    A    Yes.  Now we're understanding each other.

20    Q    Did you adopt -- you mentioned a procedure or

21    policy.  What policy is that?

22    A    I believe there was a policy adopted as to how the

23    zoning enforcement officer would do this.  I know she would

24    notify the owners, how long they had to respond, and things

25    like that.  It was adopted shortly after this regulation.

```
 1        Q    Would you agree that the ultimate question for the

 2   zoning enforcement officer is whether or not the property was

 3   being used during those winter months prior to January 1,

 4   1992?

 5        A    Yes.

 6                  MR. SLATER:  I have no further questions of

 7             this witness, your Honor.

 8                  MR. GERARDE:  Your Honor, I am mindful of

 9             the hour.  The only issue I would raise to the

10             Court is, I believe Ms. Marsh has an

11             appointment at 2:00.  Since I only have about

12             fifteen minutes of questioning, I was wondering

13             if we could impose on the lunch hour with the

14             Court's indulgence.

15                  THE COURT:  That's fine with me.

16

17                       CROSS-EXAMINATION

18

19   BY MR. GERARDE:

20        Q    Good afternoon, Ms. Marsh.  You indicated on direct

21   examination that you served for roughly the 1980s on the town

22   planning commission, and then you moved to zoning at the end

23   of 1991 just before 1992; is that right?

24        A    That's right.

25        Q    When you were on the planning commission, did you
```

1   participate at all in the preparation of the town plan of

2   development?

3         A    Yes, I did.

4         Q    Would you just give us a general idea of what your

5   participation was in creating the town plan development?

6         A    I probably had a hand in some of the wording there,

7   and I certainly participated in public hearings.  We

8   submitted surveys among town people, and, of course, had

9   many, many meetings in the town plan.  We discussed, we would

10  find, and then expose to the public comment again.  It was a

11  whole process.

12        Q    Did there come a time when the planning commission

13  submitted the proposed town plan to the Connecticut

14  Department of Environmental Protection for the purpose of

15  obtaining a determination as to whether or not your town plan

16  was consistent with the Connecticut Coastal Management Act?

17        A    Yes.

18        Q    Did you receive a response back from the DEP?

19        A    I believe we did.

20        Q    I'm going to show you this document.

21        A    This looks like it.

22        Q    Do you recognize this as the communication from the

23  DEP to the Old Lyme planning commission --

24        A    Yes, I do.

25        Q    -- regarding the town plan?

```
 1              MR. GERARDE:  I'd ask that this be marked as
 2         an exhibit.  I have a copy for you.
 3              MR. SLATER:  No objection.
 4              MR. GERARDE:  Excuse me just a moment,
 5         your Honor.
 6              THE COURT:  Thank you.
 7              THE CLERK:  Defendant's Exhibit H, letter
 8         dated March 19, 1990.
 9
10              (Defendant's Exhibit H:
11               Marked for identification.)
12
13  BY MR. GERARDE:
14      Q    Ms. Marsh, I'm going to show you Defendant's
15  Exhibit H.
16              THE COURT:  I have it, sir.
17              MR. GERARDE:  I'm sorry.  I have another
18         copy for your Honor.
19  BY MR. GERARDE:
20      Q    I direct your attention to the top of Page 3 and
21  ask you to read that, the first paragraph at the top.
22      A    "We strongly endorse plan policies regarding strict
23  controls upon expansion and/or winterization of seasonal
24  dwellings in the beach areas so as to ensure that all
25  relevant health and building codes are met.  Additionally,
```

1    such conversions should only be allowed where adverse impacts

2    to coastal resources have been found to be acceptable through

3    the coastal site plan review process.  We also encourage the

4    town's efforts to assess the status of individual seasonal

5    properties to facilitate the establishment of a formal

6    procedure for addressing requests for expanded use and to

7    further future enforcement activities."

8        Q    What is the date this letter was --

9        A    March 19, 1990.

10       Q    The date on the letter is March 19, 1990?

11       A    Yes.

12       Q    I'm going to show you another document and ask you

13   if you recognize it.

14       A    Yes.  That's the 1990 town plan development which

15   was the activity we were discussing.

16       Q    When was that town plan of development adopted?

17       A    Says it was adopted March 22, 1990, and I believe

18   it.

19            MR. GERARDE:  I will offer this as the next

20            exhibit.

21            MR. SLATER:  No objection, your Honor.

22            THE COURT:  Thank you.

23            THE CLERK:  Defendant's Exhibit I, 1990

24            town plan development.

25

1            (Defendant's Exhibit I:

2            Marked for identification.)

3

4    BY MR. GERARDE:

5        Q    Ms. Marsh, showing you what's been marked as

6    Defendant's Exhibit I, the town plan of development, and ask

7    you to open to Page 11.  Directing your attention to

8    Letter E, public utilities dash public health and safety.

9    Would you indicate what's written there in the preamble?

10       A    "The provision of public sewers and waters is one

11   of the most significant issues facing Old Lyme.  82 percent

12   of residents answering the plan questionnaire supported a

13   town-wide sewer avoidance program.  Almost 60 percent did not

14   want the town to plan for public water.  Future development

15   must be controlled so as to prevent the creation of health

16   and safety problems necessitating public sewers and water."

17       Q    What I'd like you to do is indicate what the plan

18   was that was developed town-wide in this area by indicating

19   to the Court what follows in the next six paragraphs.

20       A    "Develop and enforce a mandatory sewer avoidance

21   program, including education, on-site inspections, and a

22   systematic maintenance and pumping program for septic

23   systems."  And it indicates which department might be

24   responsible for it.

25            2.  "Amend zoning regulations to prohibit creation

1    of new building lots of less than 30,000 square feet of
2    buildable area to avoid creation of future sewage disposal
3    problems."
4        Number 3.  "Protect present and future ground water
5    supplies through enforcement of water resources district
6    regulations."
7        4.  "Identify a suitable long-term means of
8    disposal for septic sludge as an essential part of a
9    mandatory sewer avoidance program."
10        5.  "Prohibit expansion or winterization of
11    seasonal dwellings unless all relevant health and building
12    codes can be met.  Adopt a town ordinance or zoning amendment
13    to establish a procedure and criteria for additions and
14    winterization.  Prosecute violators."
15        Number 6.  "Consider installation of community
16    water systems in nonbeach areas with identified septic
17    disposal problems as a possible means of long-term sewer
18    avoidance in those areas."
19        Q    Now, I'd like to focus you on Item 5, prohibiting
20    the expansion of winterization of seasonal dwellings unless
21    all relevant health and building codes can be met.  It also
22    says adopt a town ordinance or zoning amendment to establish
23    a procedure and criteria for additions and winterization.
24    This plan was adopted in March of 1990, and you joined the
25    zoning commission in late 1991; is that right?

1      A    Right.

2      Q    And in connection with this policy, would it be a

3   fair characterization of the January 1, 1992 amendment that

4   that were in furtherance of this town plan policy to prohibit

5   expansion unless all relevant building codes can be met into

6   adopting an amendment to establish a procedure and criteria

7   for additions?

8      A    Yes.

9      Q    Now, Joint Exhibit A is the zoning regulations and

10  Attachment B would be the ones that were effective on

11  January 1, 1992.  I'd like to direct your attention to

12  Attachment B, which is the January 1, 1992 regulations.

13     A    Right.

14     Q    Section 8.8.1.

15     A    Okay.

16     Q    Now, section is titled, Enlargement, and I would

17  like to direct your attention to the second sentence in this

18  paragraph.  It indicates, "No building or other structures

19  located on a lot which does not conform to the requirements

20  of these regulations regarding lot area, shape, and frontage,

21  building bulk and coverage, shall be enlarged or extended."

22  Is that a regulation that was new?  In other words, is that

23  provision new in 1992?

24     A    Yes.  I believe it was.

25     Q    Just so we're clear on the terminology, and you've

1           MR. GERARDE:  Your Honor, the reason for

2       the offer is, I agree with counsel that this

3       zoning board is not required to consider this

4       like they are the town plan.  However, the

5       issue before your Honor is whether or not our

6       zoning amendments are related to the public

7       health, safety, and welfare, and I think

8       consistency with the regional plan is relevant

9       to that issue.

10          THE COURT:  Not required, but does not

11      preclude them from considering.

12          MR. GERARDE:  Correct.

13          THE COURT:  I'm going to overrule the

14      objection.

15          MR. GERARDE:  Thank you.

16          THE CLERK:  Defendant's Exhibit K, plan of

17      development.

18

19          (Defendant's Exhibit K:

20           Marked for identification.)

21

22  BY MR. GERARDE:

23      Q   Ms. Marsh, I'd like to show you Exhibit K, and ask

24  you to turn to Page 43, regional plan of development.

25      A   Okay.

1        Q    Directing your attention to the third full

2   paragraph approximately two-thirds of the way through,

3   there's a sentence that begins with protection of public

4   health and safety in an established residential area.

5        A    Yes.

6        Q    Would you read what the regional plan agency has

7   said as a matter of policy on this issue into the record,

8   please, from that point to the end of the paragraph.

9        A    "Protection of public health and safety should be

10  of a paramount concern when any new development is proposed

11  in developed residential areas.  Unless septic system and

12  water quality problems already exist that cannot be dealt

13  with successfully through on-site corrections, each town

14  should pursue an active sewer avoidance program using both

15  education and inspection to assure that health problems

16  involving expensive infrastructure corrections are not

17  allowed to develop."

18       Q    Thank you.  If you would, I would like you to turn

19  to the 1995 amendment.

20       A    Could I just interrupt?

21       Q    Yes.

22       A    I believe that it's getting very close to the time

23  that if I don't call my office, there's going to be a lot of

24  angry people.

25       Q    I'm on the last leg of what I had planned.

1    paid relevant to land use going back to approximately 1980.

2    I'm a certified zoning enforcement officer.  I'm an acting

3    zoning enforcement officer for the Town of Westbrook on an

4    on-and-off basis.

5        Q    During what period -- I understand your position is

6    on an on and off basis, but what was the start and end of

7    your association with the Town of Westbrook?

8        A    In the capacity of acting enforcement officer?

9        Q    Yes.

10       A    During the period of time approximately between,

11   probably, 1985, 1986, through 1991.

12       Q    I'd like to show you Joint Exhibit 1.  I'd like to

13   direct you to Attachment C.  There are regulations which are

14   codified under Section 21.2, Subsections 4 and 5.

15   Specifically, I'd ask you under Section 21.2.5, Paragraph B,

16   are you afforded the authority to make designations as to

17   whether particular properties in the Town of Old Lyme are

18   seasonal?

19       A    Yes.

20       Q    Has the zoning commission directed you to undertake

21   seasonal notifications and seasonal determinations, or have

22   you done that within your discretion of authority as an

23   enforcement officer?

24       A    The zoning commission has directed me to undertake

25   a view of the properties to determine seasonal or year-round

1    use.

2        Q     What direction did the zoning commission give you?

3    Did they tell you any particular area, any particular zone,

4    any -- what, if anything, have they directed in terms of your

5    undertaking determinations described under that Paragraph B,

6    Section 21.2.5?

7        A     Generally, starting with the smaller, the R-10

8    regional beach and lake area.  I started in the beach area,

9    and will continue to the regional beach area.

10       Q     Did the zoning commission set any procedures or

11   policies of how you undertake the process of issuing a

12   seasonal determination, or has that been something that

13   you've done in your discretion.

14       A     The zoning commission set a policy.

15       Q     Do you have a copy of that policy?

16       A     In my hands?

17       Q     In your possession today.  I heard it referenced

18   earlier.

19       A     I didn't bring a copy with me, if that's your

20   question.

21       Q     You don't have a copy in your possession.  Can you

22   describe what the policy says?

23       A     Yes.  It's a policy whereby after review of the

24   information available, I send a preliminary notice to the

25   property owner by regular mail indicating that I have made

1    the preliminary determination of the property if it is

2    seasonal-use property listing those types of reference which

3    I review to make that determination, and then offering the

4    property owner 60 days to provide additional documentation if

5    he believes my determination is in error, or if he has

6    additional information that I may not be aware of.

7         Q    Is the ultimate question --

8         A    You wanted the whole policy?

9         Q    I'm sorry.  I thought you were finished.  Go ahead.

10        A    Following that 60 days or sometime following that

11   60 days, but not prior, a second notice is sent to the

12   property owner certified mail saying that I have made a final

13   determination.  Of course, prior to that, I would review any

14   information that the property owner would present or anything

15   else that may become available.  If none is presented to

16   change my determination, then I issue a final determination

17   listing those properties that -- those items that I reviewed

18   and additional information and explaining to the property

19   owners that legally they have 30 days to appeal the order and

20   send formal notice to the ZPA.  If no appeal is taken, then

21   following that, I proceed to file a seasonal-use only

22   determination on the letter.

23        Q    Does the policy describe to you what evidence you

24   should consider to determine whether or not a property has

25   been used as a year-round dwelling prior to January 1, 1992?

1    A    Policy doesn't specifically list things that can be

2    considered.  You know, I've discussed the types of things I

3    do consider, or if it can be discussed with the commission,

4    but they're not listed in the policy, no.

5    Q    Do you undertake an investigation of -- through an

6    actual interview of the property owner as to whether or not

7    the property was used on a year-round basis prior to

8    January 1, 1992?

9    A    I don't schedule interviews with property owners,

10   however, if I have discussions with property owners perhaps

11   as a result of an inquiry or permit application, then I

12   consider that information or I consider information that the

13   -- I frequently talk to property owners after the preliminary

14   notice is sent, and then, you know, receive information that

15   way.

16   Q    Let's focus on the preliminary notice.  What is

17   your ordinary protocol for issuing, for determining whether

18   or not a property has been used on a year-round basis prior

19   to January 1, 1992?

20             MR. GERARDE:  Your Honor, I'm going to object.

21          Is this preliminary --

22             MR. SLATER:  Preliminary.

23             MR. GERARDE:  Thank you.

24             THE WITNESS:  I go by the information

25          available to me in my files.  I obtain a copy

1          of the assessment card for my file, review that
2          information and any other information that I
3          have in the street file for that address or any
4          other information that's available on a town
5          record.
6    BY MR. SLATER:
7       Q    What other town records would you look at?
8       A    Those are generally the primary ones.  Sometimes it
9    might be a building permit application that I'm aware of or
10   something that may not be in my file.  I don't go through
11   every building permit.
12      Q    Ordinarily, your determination of whether property
13   has been used on a year-round basis prior to January 1, 1992
14   is through review of those public records, correct?
15          MR. GERARDE:  Your Honor, I'm going to object.
16          There's a preliminary determination and a final
17          determination.  I think the question should
18          make clear which determination he's referring
19          to.
20          THE COURT:  Preliminary, right?
21          MR. SLATER:  Yes.  I might not have
22          included that in the question, but I intended
23          to.
24          MR. GERARDE:  Thank you.
25          THE WITNESS:  It's based on the

1   Mr. Lapila?

2       A    As a result of the preliminary determination?

3       Q    Any time after the preliminary but prior to your

4   issuance of any final determination.

5       A    I don't believe so.  I believe after that telephone

6   conversation in which I explained the types of information

7   that would be the type of information that he could provide

8   in order for me to make a finding of year-round use, I don't

9   believe I heard anymore from him until the final

10  determination.

11      Q    What kind of information could he provide to you?

12      A    I provide information to people on the types of

13  documentation that can be provided letting them know that

14  anything that can document any year-round use at some point

15  that is not specifically discontinued -- in this case, the

16  removal of heat is an indication of a discontinuance, but

17  things like electric bills, oil delivery records, an old

18  telephone bill that has a long distance call from the

19  property sometime during the winter, school records of

20  children there, a letter from the post office saying they had

21  year-round mail delivery.

22      Q    These are records for prior to January 1992 that

23  the property would have had to save after --

24      A    I explained to him that I only need one example of

25  some kind of documentation of year-round use.  Those are not

1    the only ones that I will accept.  Those are examples.  I've

2    sat down and talked with people who said, you know, you have

3    really trouble finding the types of records and kind of,

4    like, ask them how the property was used in order to give

5    them an idea of what they might be able to find.  In one

6    instance, I accepted a letter from an employer of a cousin of

7    a owner who lived there prior to 1992.  And so there are all

8    kinds of different documents.  Those are -- a lease if it was

9    a year-round.

10    Q    How about testimony from the owner, he tells you

11    that, in fact, they lived there or lived there periodically

12    during those periods of time, but they don't have a single

13    record of heating bills, etc., that you would be asking for?

14    What do you do in that context?

15    A    Continue to work with them to come up with some

16    kind of a document.

17    Q    And if none exists?  No document exists, but the

18    property owner tells you that they, in fact, would sleep at

19    the residence from periods of time between November and April

20    prior to January 1992, that context?

21    A    It's my experience that there is some kind of --

22    some piece of documentation available if the property was

23    actually used.

24    Q    So are you suggesting that in that context, they

25    don't have a single document, but tell you they used the

1    property during that period of time, you make the finding

2    that the property was, in fact, seasonal?

3                    MR. GERARDE:  Your Honor, I'm going to offer

4               an objection.  This is not related to a

5               specific property.  It's hypothetical.  There

6               is no factual basis in our case that this

7               scenario exists.  I think it's an unfair

8               question to the witness.  There's no foundation

9               to the answer.

10                   MR. SLATER:  I think it's an appropriate

11              question to ask the zoning enforcement officer.

12                   THE COURT:  I'm getting the impression

13              that she's not had that experience.  She says

14              her experience is that they all come up with

15              one piece of documentation.  Have you ever had

16              an instance, ma'am, where the only information

17              you had was the undocumented claim by the owner

18              that he resided there or someone resided there?

19                   THE WITNESS:  I can't remember a specific.

20              It's not -- it could have been the case in the

21              person who went away and there was no further

22              discussion.  They do, however, have an

23              opportunity at the next stage if they think

24              they should have been able to convince me and

25              they didn't, to appear before the zoning board

1                              INDEX

2                        MORNING SESSION

3    WITNESS                                    PAGE

4    JOSEPH RUSSO

5    Direct Examination by Mr. Slater              3
     Cross-Examination by Mr. Gerarde            10
6

7    JANE MARSH

8    Direct Examination by Mr. Slater            25
     Cross-Examination by Mr. Gerarde            85
9    Redirect Examination by Mr. Slater         107

10                       AFTERNOON SESSION

11   WALTER KENT

12   Direct Examination by Mr. Slater           111
     Cross-Examination by Mr. Gerarde           125
13
     RONALD ROSE
14
     Direct Examination by Mr. Slater           131
15   Cross-Examination by Mr. Gerarde           139
     Direct Examination by Mr. Gerarde          141
16   Cross-Examination by Mr. Slater            144

17   MARILYN OZOLS

18   Direct Examination by Mr. Slater           148

19

20

21

22

23

24

25

1

<u>PLAINTIFFS' EXHIBITS</u>

2

3

| <u>EXHIBIT</u> | <u>IDENTIFICATION</u> | <u>PAGE</u> |
|---|---|---|
| 1 | certificate of incorporation | 5 |
| 2 | organization and first report | 7 |
| 3 | bylaws | 8 |
| 4 | member list | 9 |
| 5 | meeting minutes | 82 |
| 6 | street card | 114 |
| 7 | street card for Hartford Avenue | 117 |
| 8 | street card for Brookside | 117 |
| 9 | street card for Breen Avenue | 118 |
| 10 | street card for Hartung | 118 |
| 11 | street card for Corsino | 118 |
| 12 | Town of Old Lyme documents | 137 |
| 13 | health department records | 138 |
| 14 | Swan Avenue package | 162 |

DEFENDANT'S EXHIBITS

| A | photographs | 11 |
|---|---|---|
| B | photographs | 11 |
| C | photographs | 11 |
| D | photographs | 11 |
| E | building permits | 15 |
| F | building permits | 15 |
| G | building permits | 15 |
| H | letter dated March 19, 2000 | 87 |
| I | 1990 town plan development | 89 |
| J | letter dated August 29, 1994 | 97 |
| K | plan of development | 101 |

18

19

20

21

22

23

24

25

CERTIFICATE

1
2
3
4
5
6          I hereby certify that the foregoing 186 pages
7    are a complete and accurate computer-aided transcription of
8    my original stenotype notes taken of the case re: SOUTH LYME
9    PROPERTY OWNERS ASSOCIATION, INC., ET AL V. TOWN OF OLD LYME,
10   which was held on April 12, 2000.
11
12
13
14
15        Cheryl Poehls, Notary Public
          Hartford County, State of Connecticut
16        My commission expires March 31, 2003
17
18
19
20
21
22
23
24
25