1
2

3       - - - - - - - - - - - - - - - x
SOUTH LYME PROPERTY,            | CASE NO.
4
                    Plaintiffs,  | 3-00-CV-97
5
        vs.                      |
6
OLD LYME,                       | December 3, 2001
7
            Defendant.           |
8       - - - - - - - - - - - - - - - x

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

9                                Federal Building
                                 141 Church Street
10                               New Haven, Connecticut

11

12

13      HEARING TO DISSOLVE PRELIMINARY INJUNCTION

14   Before:

15         The Honorable ELLEN BREE BURNS,
           Senior U.S. District Court Judge
16

17

18                       **COPY.**

19

20

21

22

23              Tracy K. Costello
           FALZARANO COURT REPORTERS
24            117 N. Saddle Ridge
           West Simsbury, CT 06092
25              860.651.0258

1    APPEARANCES:

2              For the Plaintiffs:

3         EISENBERG, ANDERSON, MICHALIK & LYNCH, LLP
          137 West Main Street
4         P.O. Box 2950
          New Britain, CT 06050-2950
5         860.229.4855

6              BY:  KENNETH R. SLATER, JR., ESQUIRE
                   Also Present:  JERRY COHANE
7

8              For the Defendants:
9
          HOWD & LUDORF
10        65 Wethersfield Avenue
          Hartford, CT 06114
11        860.249.1361

12             BY:  THOMAS GERARDE, ESQUIRE
                   JOHN RADSHAW, III, ESQUIRE
13

14        BRANSE & WILLIS
          41-C New London Turnpike
15        Glastonbury, CT 06033
          860.659.3735
16
               BY:  ERIC KNAPP, ESQUIRE
17

18

19

20

21

22

23

24

25

1           (Hearing commenced:  10:45 a.m.)

2        THE COURT:  Good morning.

3        MR. GERARDE:  Good morning, your Honor.

4        MR. SLATER:  Good morning, your Honor.

5        THE COURT:  I have a jury which is

6  deliberating, and we may be interrupted from

7  time to time with questions or a verdict,

8  hopefully, at some point.  As soon as he

9  brings me the file, we'll get started.

10       The Defendants may proceed.  Are the

11  Defendants ready to proceed?

12       MR. GERARDE:  Yes, we are, your Honor.

13  Your Honor, good morning.  Attorney

14  Thomas Gerarde from Howd & Ludorf for the

15  Defendants.  It's our motion to dissolve the

16  preliminary injunction that your Honor issued

17  in this matter in October, I believe, of the

18  year 2000.

19       I have spoken with Attorney Slater and

20  we believe this to be, in a sense, a

21  continuation of that hearing as your Honor

22  retained jurisdiction over that judgment.  So

23  we wouldn't be reinventing that record.  That

24  record exists.  We have changed facts, in our

25  view, and will be calling one witness to

1    at the first hearing involving this matter.

2        A    Yes, I do.

3        Q    And that testimony had to do with a program of

4    seasonal use determination that was being implemented in

5    the Town of Old Lyme.  Is that right?

6        A    That's correct.

7        Q    And are you still familiar with the program as it

8    exists today in Old Lyme?

9        A    Yes, I am.

10       Q    And have any changes occurred in the program over

11   the past several months?

12       A    Yes.

13       Q    Would you indicate to the Court, as an overview,

14   at this point what those changes have been?

15       A    The process has changed in that there is no

16   longer a preliminary determination.  There is a review of

17   all available records, familiarty with the property at its

18   location, and then a letter is sent to the property owner

19   indicating that a preliminary investigation of that

20   property has commenced, and inviting their participation

21   and additional information to be submitted by them, or

22   personal contact from them.

23       Q    All right.  Thank you.  I have the exhibits that

24   I'm going to show you in just a minute, but I note that the

25   word "determination" is now being replaced with

1    "investigation."  Would you explain that to the Court,

2    please?

3        A    That there is no determination made preliminarily

4    in any way.  The investigation is initiated, all the

5    available records, available information in Town Hall,

6    familiarty with the neighborhood, review of what the

7    property looks like, discussion with persons who might be

8    there, if they're available and in the neighborhood, all of

9    those things would be part of the preliminary

10   investigation.  The owner then may send a letter explaining

11   that this investigation has been initiated, and requesting

12   additional investigation or contact.

13       Q    Thank you.  May I approach the witness, your

14   Honor?  I'd like to show you what has been marked as

15   Exhibit A and ask if you can identify that, please.

16       A    This is a form letter that is sent to the

17   property owner to notify them that the investigation has

18   been started.

19       Q    All right.  I see that -- I'm sorry.  Does your

20   Honor have a bench copy?

21                THE COURT:  This was attached to your

22            Memorandum, I believe, as Exhibit A.

23                MR. GERARDE:  Yes, that's right.

24                THE COURT:  I have it.

25

```
 1   BY MR. GERARDE:

 2       Q    Shortly after the second paragraph of this

 3   letter, there's a space in the letter for insertion of

 4   whatever information is available.  Is that right?

 5       A    That's correct.

 6       Q    And there was an issue of a seasonal

 7   determination that was indicated in Health Department

 8   records that was raised at the first hearing in this

 9   matter.  If there's a seasonal stamp on any of the Health

10   Department records, is that something you consider to be

11   useful evidence in terms of this investigation?

12       A    No.

13       Q    The last sentence of the first page indicates,

14   "As my investigation is still under way, my belief that

15   your property is seasonal is not a final determination or

16   decision."  Is that a change from the previous

17   circumstances in which you were making a preliminary

18   determination under the old rules?

19       A    In that it's really merely a statement of belief

20   based on the information before me at the time.

21       Q    But in other words, is there any determination

22   being made at this time?

23       A    No.

24       Q    Now, I'd like to show you what has been marked as

25   Exhibit B.  Can you identify that for the Court?
```

1       A       This is the information that is sent along with

2   the letter indicating to the property owner the types of

3   information that might be useful to grandfather the

4   property, or to indicate that the property is a year-round

5   use.

6       Q       All right.  And in your experience, has this type

7   of information been provided by persons in support of a

8   claim that it was not -- excuse me, a home they owned was

9   occupied prior to June of 1995?

10      A       Yes.

11      Q       Let me ask you this.  This information that is in

12  paragraph 2A of Exhibit B that addressses heating oil

13  bills, electric bills, is that information you could get on

14  your own without the assistance of the homeowner?

15      A       No.  The companies that would be submitting that

16  information would not release it to me without the property

17  owner.  It's the type of information the owner can request

18  from the company or from the school, or would have a copy

19  of of it at least, but it is not something I could obtain

20  on my own.

21      Q       And if you look to the second page, there's a

22  paragraph B of -- I'm sorry, subparagraph B of paragraph 2.

23  You indicate that written statements and affidavits would

24  also be accepted in your determination?

25      A       That's correct.

1    Q    And would you give an indication to the Court of

2    what type of written statement or affidavit you'd be likely

3    to consider?

4    A    I'd be looking for something from someone who, as

5    it says here, was familiar with the property, knew that

6    there had been someone there on a regular basis prior to

7    1995, or had some personal knowledge to indicate the

8    preexisting year-round use.

9    Q    All right.  Or an indication from the postal

10   service that there was year-round mail delivery?

11   A    That's correct.

12   Q    Just so I'm clear about the regular occupancy, if

13   a family went to Florida for a few months each winter, does

14   that defeat their ability to qualify for regular occupancy?

15   A    No, it does not.

16   Q    Now, the information that's contained -- I'm

17   sorry -- the categories of information that are set forth

18   in paragraph 2, both the information in 2A, as well as the

19   information in 2B, is that meant to be exclusive?

20   A    No.  Those are meant to be suggestions or ideas

21   of information that might be presented.  The last paragraph

22   indicates clearly, I hope, that there are always other ways

23   of indicating year-round use, that if the property owner

24   contacts me, we can discuss that.  Perhaps I can give them

25   other ideas of something that might be acceptable that they

1    may be able to produce if they indicate that they can't

2    tell from this -- that they will not be able to provide any

3    of this information.

4        Q    So the record is clear, you're on the third page

5    of Exhibit B, paragraph 9.  Is that right?

6        A    Yes.

7        Q    And it's the second sentence which reads, "There

8    are also new ways of meeting the criteria set forth above

9    and the Zoning Enforcement Officer will be happy to give

10   you his or her thoughts concerning the evidence you

11   obtain."  Is that the policy currently?

12       A    Yes, it is.

13       Q    And if you go back to page 2, paragraph 3

14   indicates, "The Zoning Enforcement Officer will consider

15   all the evidence you present, as well as any other evidence

16   that you've obtained on your own before making the final

17   determination."  Is that the policy?

18       A    Yes, it is.  All evidence is considered.

19       Q    There was testimony at the earlier hearing about

20   affidavits of homeowners and neighbors not being

21   considered.  Would any such affidavits from a homeowner or

22   a neighbor be considered under the current policy before

23   making a final determination?

24       A    Yes, they will.

25       Q    If you had a situation where you did not receive

1    any response from a homeowner regarding additional

2    information, but in your travels around town you saw that

3    the house had some evidence that it was occupied -- there

4    was a car in the driveway, there were lights on -- would

5    you attempt to contact the homeowner?

6       A    Yes, I would.  The letter invites their

7    contacting me, but I'm in these neighborhoods or the ZEO

8    would be in these neighborhoods on a regular basis, and any

9    property that was under consideration or being investigated

10   at that time could certainly make an effort to pay careful

11   attention to.  So if at any point in time there appeared to

12   be occupants while we were there, that would be an

13   opportunity to knock on the door and inquire if the owner

14   or the occupant at that time had any additional information

15   or anything that they might be aware of.

16      Q    In terms of considering other evidence which

17   might not be one of the traditional forms that are

18   identified in paragraph 2, have you ever considered any

19   photographs?

20      A    Yes, I have.  I've used Christmas pictures in the

21   house in question, children who are now considerably older

22   indicating that they were celebrating Christmas in that

23   house prior to 1995 -- checking Christmas pictures.  So a

24   number of them have been able to produce pictures that have

25   been able to show they were there at Christmas during the

1    years in question.

2         Q    All right.  And --

3         A    That's just one example that I can think of.

4         Q    Let me ask it this way.  Is there anything you

5    can identify that you would not consider prior to making a

6    final determination, if it was submitted by one of the

7    homeowners?

8         A    No.  Anything submitted would be considered.

9         Q    I'd like to show you Exhibit 3.  It's entitled,

10   "A final determination letter," but I would like you to

11   identify it.

12              THE COURT:  I believe the other exhibits

13         were A and B; you said 3, then?

14              MR. GERARDE:  Then I should say C.  I'm

15         very sorry.

16   BY MR. GERARDE:

17        Q    Are you able to identify Exhibit C?

18        A    Yes.  This is a letter of final determination

19   seasonal use.  This would be sent after all the information

20   was considered from the preliminary investigation, if it

21   was determined at that point in time that it still appeared

22   to be a seasonal-use dwelling.

23        Q    And in the third full paragraph of Exhibit C, you

24   begin with, "You were sent a preliminary investigation

25   letter."  And the date would be left blank in order to be

1    filled in.  Is the reference to the preliminary

2    investigation letter a reference to what we have marked as

3    Exhibit A?

4         A    Yes, it is.

5         Q    Does that underscore the notion that this process

6    that you begin by sending this letter is not a

7    determination of any kind, but simply a preliminary

8    investigation alert?

9         A    I believe so.  Yes.

10        Q    Is that how you consider it as you move forward?

11        A    Yes, it is.

12        Q    Now, going back to Exhibit B, paragraph 4 advises

13   the homeowners that if there was a determination that the

14   property was year-round, it would be so designated.  If

15   there's a determination it would be seasonal -- I'm sorry,

16   if it was seasonal, it would also be so designated.  Do you

17   indicate to the homeowners anything about what rights they

18   have once this final determination has been made?

19        A    Yes.  It includes in here that they have the

20   right of appeal to the Zoning Board of Appeals, and it

21   bolds the time limits so they're fully aware of the fact

22   that there are time constraints on the appeal; forms are

23   available.

24        Q    In paragraph 6 of Exhibit B, is that what you're

25   referring to?

1    A    Yes.

2    Q    Where it's bolded that they have a 30-day

3    deadline within which to appeal any determination you make?

4    A    Right.

5    Q    And is there further advice on what may happen to

6    them once they are at the Zoning Board of Appeals?

7    A    It explains in number 7 that the Zoning Board of

8    Appeals will take a fresh look at all the facts as

9    presented to them, and then make a decision based on that

10   information as presented to them at the hearing.

11   Q    Okay.  And what about what happens to them once

12   the Zoning Board of Appeals has issued its ruling?  Do you

13   give them any advise on that?

14   A    Yes.  Eight goes on to explain that should they

15   disagree with the decision of the Zoning Board of Appeals,

16   they still have an additional appeal right to the Superior

17   Court.

18   Q    All right.  And then once again, the deadline is

19   underlined there.  It says within 15 days of the

20   publication of the ZBA's decision, they would have to file

21   their appeal with the Judicial District of New London?

22   A    That's correct.

23   Q    Now, since the injunction issued in October of

24   2000, the systematic determination of seasonal versus

25   year-round has not proceeded.  Is that correct?

1    A    That's correct.

2    Q    However, have there been opportunities to make

3  the judgment about whether a specific property is seasonal

4  or year-round?

5    A    There have been some requests from property

6  owners seeking a determination for their property.

7    Q    Would you indicate to the Court what the types of

8  evidence submitted in connection with those requests by

9  homeowners was and how you react to that?

10    A    In some cases, the request -- well, in all cases

11  the request would begin an investigation of any town

12  records, in addition to anything that the applicant or the

13  owner may be able to provide.  In most cases, it was just a

14  request without substantial additional information provided

15  by the owner.  So it was a search of the files to indicate

16  if we already had enough evidence or information in our

17  records to consider it to be a year-round use dwelling.

18    Q    Are you able to give me any examples of specific

19  properties in Old Lyme where that process is under way?

20    A    One that's under way is, I believe, 8 Hawk's

21  Nest.  That's one where our files have some familiarty of

22  that area.  I know that that end of that road where the

23  community beach is, was built, generally, as year-round

24  dwellings.

25         Going back to look in the file, there's an

1    indication of a building permit initially being issued for

2    a house with oil heat, there was a temporary C.O. issued at

3    the time of construction, I believe it was back in the

4    '70s, saying that one of the conditions was the completion

5    of the heating system.  It would be my interpretation that

6    this property was originally built as a year-round use

7    dwelling, and would have been used as such.

8        Q    Are you able to tell me any other ways that by

9    looking at the information available at the Town Hall you

10   were able to make assessments about year-round use?

11       A    There's another one.  I believe it is on Salt Air

12   where, going back through the file and some of the initial

13   comments in the zoning file, the previous Assistant Zoning

14   Enforcement Officer actually documented what she considered

15   to be an illegal conversion in the late '80s, indicating

16   that that property was used in the winter months.  That

17   actually now substantiates a year-round use although it may

18   have been illegal at the time prior to 1995.

19       Q    And so that would make it qualified for the

20   year-round determination?

21       A    Yes.

22       Q    I don't have any other questions at this time.

23   Thank you.

24            THE COURT:  I do have one.  The last

25            hearing, and my recollection of the case is

1   nonconforming buildings or lots?

2         A     I'm familiar with processes where certain uses

3   have to be registered.

4         Q     Are you aware of that in the context of

5   nonconforming uses, nonconforming lots, nonconforming

6   buildings?

7         A     I'm not sure exactly what you mean.

8         Q     Are you aware that municipalities in Connecticut

9   -- strike that.  Is it fair to say that this process, this

10  systematic process is for the purposes of identifying those

11  properties that have legitimate nonconforming rights for

12  year-round use versus those that do not?

13        A     Yes.

14        Q     And are you familiar that other municipalities

15  have employed procedures whereby property owners would

16  register if they claimed a nonconforming use or

17  nonconforming lot as opposed to a process implemented in

18  Old Lyme where you'd make the determination?

19                  MR. GERARDE:  Your Honor, I object to the

20              relevance as to what other towns might be

21              doing to determine what a nonconforming use

22              is.

23                  MR. SLATER:  Your Honor, this is

24              directly relevant under the Matthew's test,

25              exhibits of other procedures which are less

1          likely to result in an erroneous

2          determination.

3               THE COURT:  I'm overruling the

4          objection.  I'm going to ask are you

5          suggesting that the inquiry is initiated then

6          by the property owner?

7               MR. SLATER:  What I'm suggesting is

8          towns have adopted a system in which they

9          have adopted either an ordinance or a policy

10         notifying property owners that if they have a

11         nonconforming use, the property owner must

12         register that by filling out a form

13         regularly, something.  So it's initiated in

14         the sense that the policy is adopted by the

15         town, but that the property owners themselves

16         would file an indication of the nonconforming

17         use.

18    BY MR. SLATER:

19         Q    Are you familiar with that kind of a procedure?

20         A    Yes.  That kind of procedure leaves it entirely

21    up to the owner to be -- to understand that it's his

22    responsibility, to know what a nonconforming use is, and to

23    take the initiative to come forward and register it or he

24    doesn't have it.  So I would think that that would be more

25    onerous than this.

1    Q    Onerous to whom?

2    A    The property owner because it would all be placed

3    on his shoulders to recognize this and to come forward.

4    Q    Would you agree then it would be less onerous on

5    your part?

6    A    It would probably be less work for the Town's

7    part because the assumption there would be anyone who

8    didn't register the nonconforming use wasn't entitled to

9    it.

10    Q    Exactly.  I have no further questions.

11             MR. GERARDE:  Brief follow up, with the

12             Court's permission.

13             THE COURT:  Certainly.

14

15                    REDIRECT EXAMINATION

16    BY MR. GERARDE:

17    Q    Ms. Ozols, you indicated that this process that

18    results in the letter that we've marked as Exhibit A being

19    sent is really just the starting point of the determination

20    process.  Is that right?

21    A    That's correct.

22    Q    And in order to begin, since everything has to

23    begin somewhere, what you do is look at what records you

24    have available to you?

25    A    That's right.

1    Q    In some cases there's much more useful

2    information than in others.  Is that right?

3    A    That's right.

4    Q    And you wouldn't be making a final determination

5    based on information such as the information we dealt with

6    in the last injunction hearing that was found on the

7    Assessor's card, that really didn't bear on whether or not

8    someone was actually using the property?

9    A    That's correct.

10   Q    And the policy that has changed as it exists

11   today emphasizes contacts with the homeowner?

12                MR. SLATER:  Objection, your Honor.  The

13            policy speaks for itself.

14            THE COURT:  I'll sustain the objection.

15                MR. GERARDE:  If I might be heard, your

16            Honor.  The policy is what Ms. Ozols is

17            testifying on is a combination of what her

18            direction is from the Zoning Commission, as

19            well as what documents would be forwarded.

20            This isn't a written policy that we're

21            sending out to the homeowners; these are

22            letters with advice in them.  I think she's

23            testifying as to what her new emphasis is and

24            what her direction is.

25            THE COURT:  Well, she's testifying as to

CERTIFICATE

 1

 2

 3          I hereby certify that the foregoing 49 pages are

 4     a complete and accurate computer-aided transcription of my

 5     original stenotype notes taken in the Hearing to Dissolve

 6     Preliminary Injunction, in re:  South Lyme Property versus

 7     Old Lyme, which was held before the Honorable

 8     Ellen Bree Burns, Senior U.S. District Court Judge, held at

 9     the United States District Court, 141 Church Street, New

10     Haven, Connecticut, on December 3, 2001.

11

12

13                    _____

14                    Tracy K. Costello
                       Court Reporter

15

16

17

18

19

20

21

22

23

24

25

INDEX

                                                           Page

WITNESS:

Marilyn Ozols

            Direct Examination by Mr. Gerarde          4

            Cross-Examination by Mr. Slater            17

            Redirect Examination by Mr. Gerarde        41


                        EXHIBITS
                  (Received in Evidence)

Plaintiffs' Exhibits

    1        Documents regarding 14 Salt Air Road       20

    2        Documents regarding 84 Hartford Avenue
             (Marked for Identification only)           34



Defendant's Exhibits

    A        Form Letter                                4

    B        Information Letter to Property Owners       4

    C        Letter of Final Determination,
             Seasonal Use                               4