```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF CONNECTICUT


- - - - - - - - - - - - - - - - - -X
SOUTH LYME PROPERTY OWNERS          :
ASSOCIATION, INC., CHARLES AND      :
VICTORIA PARSONS AND JOAN BYER,     :
             Plaintiffs             :
                                    :
VS                                  :  3:00CV97(EBB)
                                    :
TOWN OF OLD LYME, TOWN OF OLD       :
LYME ZONING COMMISSION,             :
ERIC FRIES, GEORGE JAMES,           :
JANE MARSH, THOMAS RISOM,           :
WALTER SEIFERT, SHARON COLVIN AND   :
MARILYN OZOLS,                      :
             Defendants             :
- - - - - - - - - - - - - - - - - -X
```

Deposition of MARILYN OZOLS taken at the offices of Halloran & Sage, 225 Asylum Street, Hartford, Connecticut, before Audra Quinn, RPR, Licensed Shorthand Reporter #106, and Notary Public, in and for the State of Connecticut on September 30, 2003, at 10:10 a.m.



DEL VECCHIO REPORTING SERVICES, LLC
PROFESSIONAL SHORTHAND REPORTERS

| 117 RANDI DRIVE | 100 PEARL ST., 14th FL. |
|---|---|
| MADISON, CT 06443 | HARTFORD, CT 06103-4506 |
| 203 245-9583 | 800 839-6867 |

EXHIBIT C-2

A P P E A R A N C E S:

ON BEHALF OF THE PLAINTIFFS:

KENNETH R. SLATER, JR., ESQ.
HALLORAN & SAGE
225 Asylum Street
Hartford, Connecticut  06103


ON BEHALF OF THE DEFENDANTS:

JOHN J. RADSHAW, III, ESQ.
HOWD & LUDORF
65 Wethersfield Avenue
Hartford, Connecticut  06114-1190


ON BEHALF OF THE DEFENDANT:

ERIC KNAPP, ESQ.
BRANSE & WILLIS
41-C New London Turnpike
Glastonbury, Connecticut 06033

```
 1                    MARILYN OZOLS,
 2         having first been duly sworn,
 3         deposed and testified as follows:
 4    DIRECT EXAMINATION
 5    BY MR. SLATER:
 6         Q    Good morning.
 7         A    Morning.
 8         Q    Just for the record so we don't need to
 9    reiterate, this deposition will be subject to the same
10    rules and stipulations that we agreed to at the start
11    of your deposition.
12              Just to give us some background, the point of
13    time when we finished last time, I asked whether you
14    had knowledge of communities in Connecticut that were
15    located on the Long Island Sound where the towns do not
16    implement a zoning regulation that would restrict
17    off-season use of the property.
18              Do you remember what towns you were familiar
19    with that exist along the Sound that do not have any
20    zoning regulation that would restrict off-season use?
21         A    I believe I said Westbrook and Madison if
22    you're speaking specifically zoning regulation.
23         Q    Are there other ordinances in those towns
24    that would restrict off-season use that are not zoning
25    regulations?
```

1   separated enforcement efforts of the town from other
2   zoning matters?
3       A    There was no file organization system,
4   period.
5       Q    Did you establish the zoning filing system
6   that you were speaking about earlier based on the
7   filing categorized by road?
8       A    Yes.
9       Q    And based on that system that you
10  established, would you -- would there be any separation
11  between zoning matters involving a person applying for
12  a zoning permit versus efforts by the zoning
13  enforcement office to enforce a regulation?
14      A    No.
15      Q    Did you become generally familiar with the
16  zoning enforcement efforts by the town prior to your
17  tenure when you established this filing system?
18      A    I'm not sure the two parts of that go
19  together.
20      Q    Is it fair to assume that in establishing a
21  system you had to cull through the records of the town
22  and organize the records to fit into the new filing
23  system that you established. Is that fair to say?
24      A    Not exactly. It was primarily a filing
25  system from that point forward and then there were some

```
 1   old files by street address that were just taken and
 2   inserted into the new filing format.
 3       Q    If after your filing system was established
 4   and a particular property became an issue, either
 5   through a zoning application or for a seasonal
 6   determination or an enforcement action, would you
 7   review the historical records that existed prior to
 8   your establishing the filing system to determine if any
 9   existing records related to that property?
10       A    Yes.
11       Q    And through --
12       A    If they had been found and put in the file.
13       Q    If they had already been found and put in the
14   file?
15       A    Right.
16       Q    But it wouldn't be your process if, for
17   example, a property owner on Hartford Avenue asks for a
18   seasonal determination on their property at a point in
19   time after you've established the new filing system.
20   You would look in the -- if there were any records
21   existing in your new filing system, but you would not
22   at that point in time go back and look through all the
23   historical records to see if a document existed with
24   respect to that property?
25       A    At that point in time we had cleaned the
```

1  boxes and file drawers and anything that was identified
2  by a street address was put in the file.
3      Q    And in that process of identifying all of the
4  historical documents and putting them in the files for
5  the particular streets, is it fair to say you became
6  generally familiar with enforcement actions that had
7  been taken by the town prior to your tenure?
8      A    Not necessarily.
9      Q    After you completed this filing system, is it
10 fair to say that all the historical documents either
11 ended up into a file for the particular property that
12 they related to or they ended up in a pile of
13 unidentified documents.  Is that the two categories?
14     A    Yes.
15     Q    When you left the employ of the town of Old
16 Lyme, was there still a pile of the unidentified
17 documents or were those discarded when you couldn't
18 identify where they belonged?
19     A    There may have been a small pile of
20 unidentified documents, but nothing substantial.
21     Q    During your tenure as a zoning enforcement
22 officer, and again, I'm not asking for a specific
23 number or percentage, but how would you describe the
24 amount of time you spent under the enforcement duties
25 of that position dealing with the seasonal use issue?

1    A    A very small amount of time.

2    Q    What was the majority of your enforcement
3 efforts devoted to?

4    A    Violations that were either by complaint or
5 by observing construction without zoning approval.

6    Q    What was your typical process if you became
7 aware of a zoning violation?

8    A    There was not a significant amount of time to
9 devote to zoning violations, but the process for a
10 zoning violation was to first list -- first issue an
11 informal notice of zoning violation to the property
12 owner and give them an opportunity to come in and
13 correct it.  If that did not happen, then a cease and
14 desist order to discontinue would be issued.

15    Q    You described that you devoted a small,
16 relatively small amount of time to enforcement efforts.
17 What was the majority of your time devoted to during
18 your tenure as zoning enforcement officer of the town
19 of Old Lyme?

20    A    Reviewing applications for zoning permits,
21 dealing with questions from the public and reviewing
22 major applications for the Zoning Commission.

23    Q    Did a process exist in the town of Old Lyme
24 that building officials of the town -- actually, strike
25 that.

1        During your tenure, who served as the
2   building official or what person served as building
3   officials for the town of Old Lyme?
4        A    Joe Hart was building official when I
5   started.  When he retired Ron Rose became building
6   official, and there were during that period of time a
7   few assistant building officials.
8        Q    Was there a procedure in which that office
9   would submit a request to determine from your office as
10  to whether development or proposed building permit
11  required zoning approval or complied with the zoning
12  regulations?
13       A    We instituted a separate zoning permit
14  process that was required prior to a building permit.
15       Q    Would that apply to all development or
16  particular categories of development?
17       A    Pretty much to all development, but not
18  necessarily to like an electrical permit or something
19  like that.
20       Q    Would any building permit that proposes new
21  construction, whether it be residential, commercial or
22  industrial, require a zoning permit under this new
23  system?
24       A    Yes.
25       Q    Do you know when the new system was

```
 1   established?
 2       A    Relatively soon after I started working
 3   there.
 4       Q    Again, generally speaking, I'm not asking for
 5   a percentage or specific number, during a typical year
 6   in your tenure as zoning enforcement officer, can you
 7   estimate how many informal zoning violation letters
 8   were issued by your office?
 9       A    Probably not very many simply because of the
10   time factor.
11       Q    Can you quantify at all not very many?  Are
12   we talking about less than a dozen, less than 20?  And
13   again, I'm not trying to hold you to a specific number,
14   but just a general sense.
15       A    Maybe 20 to 30 because I don't -- maybe 20 to
16   30.
17       Q    And I'll say it again, I'm not trying to hold
18   you to specifics.  I'm looking for a general sense of
19   what your memory was of a typical year of enforcement.
20            How about actual formal cease and desists
21   following the informal process, do you have a sense
22   about how often you'd have to resort to that process in
23   a typical year?
24       A    Probably not more than a dozen times.
25       Q    Was there a particular window of time during
```

1  your tenure of serving as zoning enforcement officer in
2  Old Lyme that there was a particular high amount of
3  development applications and the same development
4  applications would be either building permits or zoning
5  applications that required your office's review?
6      A    No.
7      Q    It would be fair to say that it seemed
8  relatively steady, each year was similar to the year
9  before and after during your period of time?
10     A    Yes.
11     Q    Once the zoning permit process was put in
12 place, would your review and determination in issuing a
13 zoning permit, would that be filed under the same
14 filing system, the particular property address located
15 in your files by street?
16     A    Yes.
17     Q    You suggested that the amount of time you
18 spent on the seasonal use issue was a relatively small
19 part.  Would that also be true during the period of
20 time in which you were undertaking the systematic
21 street-by-street determinations of seasonal use?
22     A    Yes.
23     Q    And even during that period of time a
24 majority of your time was spent in reviewing
25 applications for new development or major zoning

Case 3:00-cv-00097-EBB    Document 108-8    Filed 02/20/2007    Page 11 of 13

53

```
 1  applications?
 2      A    And answering questions from the public, yes.
 3      Q    What office hours -- strike that.
 4           What were your total weekly hours during
 5  your tenure as the zoning enforcement officer for Old
 6  Lyme?
 7           MR. RADSHAW:  Object to the form of the
 8           question.  Please really think --
 9  BY MR. SLATER:
10      Q    I won't have her read it back.
11           What were your hours as an employee of the
12  town of Old Lyme?
13      A    Officially 30 hours.  I kept records and
14  frequently worked 40 to 50.
15      Q    During the week, were there particular hours
16  that you established for inquiries from the public?
17      A    No.
18      Q    Was your week divided at all in terms of days
19  that you actually were in the zoning office versus
20  being out on inspections or attending to matters
21  outside of the town hall?
22      A    I usually tried to get to inspections at
23  least once a week.
24      Q    And that was not a particular day?  It varied
25  from week to week?
```

DEL VECCHIO REPORTING
(203) 245-9583

```
 1                      J U R A T

 2          I have read the foregoing 109 pages and

 3       hereby acknowledge the same to be a true and

 4       correct record of the testimony.

 5

 6

 7

 8                       _____

 9                              MARILYN OZOLS

10

11   Subscribed and sworn to

12   _____.

13   Before me this _____ day of

14   _____,2003.

15

16

17

18

19   _____

20   Notary Public

21   My Commission Expires:

22

23

24

25
```

C E R T I F I C A T E

I hereby certify that I am a Notary Public, in and for the state of Connecticut, duly commissioned and qualified to administer oaths.

I further certify that the deponent named in the foregoing deposition was by me duly sworn, and thereupon testified as appears in the foregoing deposition; that said deposition was taken by me stenographically in the presence of counsel and reduced to typewriting under my direction, and the foregoing is a true and accurate transcript of the testimony.

I further certify that I am neither of counsel nor attorney to either of the parties to said suit, nor am I an employee of either party to said suit, nor of either counsel in said suit, nor am I interested in the outcome of said cause.

Witness my hand and seal as Notary Public this 15th day of October, 2003.

_____
Audra Quinn, RPR, LSR
Notary Public

My commission expires: 7/31/2006
LSR No. 106