UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


- - - - - - - - - - - - - - - -X
SOUTH LYME PROPERTY OWNERS          :
ASSOCIATION, INC., CHARLES AND      :
VICTORIA PARSONS AND JOAN BYER,     :
                Plaintiffs          :
                                    :
VS                                  : 3:00CV97(EBB)
                                    :
TOWN OF OLD LYME, TOWN OF OLD       :
LYME ZONING COMMISSION,             :
ERIC FRIES, GEORGE JAMES,           :
JANE MARSH, THOMAS RISOM,           :
WALTER SEIFERT, SHARON COLVIN AND   :
MARILYN OZOLS,                      :
                Defendants          :
- - - - - - - - - - - - - - - -X




        Deposition of RONALD ROSE taken at the
        offices of Halloran & Sage, 300 Plaza
        Middlesex, Middletown, Connecticut, before
        Audra Quinn, RPR, Licensed Shorthand Reporter
        #106, and Notary Public, in and for the State
        of Connecticut on November 21, 2003, at
        1:00 p.m.




        DEL VECCHIO REPORTING SERVICES, LLC
        PROFESSIONAL SHORTHAND REPORTERS
                117 RANDI DRIVE
              MADISON, CT 06443
                203 245-9583

HARTFORD                              STAMFORD

EXHIBIT C-7

A P P E A R A N C E S:

ON BEHALF OF THE PLAINTIFFS:

KENNETH R. SLATER, JR., ESQ.
HALLORAN & SAGE
225 Asylum Street
Hartford, Connecticut   06103


ON BEHALF OF THE DEFENDANTS:

JOHN J. RADSHAW, III, ESQ.
HOWD & LUDORF
65 Wethersfield Avenue
Hartford, Connecticut   06114-1190

1               RONALD ROSE,

2   residing at 14 Honey Hill, East Haddam, Connecticut,

3   having first been duly sworn, deposed and testified as

4   follows:

5   DIRECT EXAMINATION

6   BY MR. SLATER:

7       Q    Good afternoon, Mr. Rose.

8       A    Good afternoon.

9            MR. SLATER:  Before we begin, just

10           indicate again for the record that the

11           deposition will be taken in accordance with

12           the ordinary stipulations with the rights to

13           read and sign being reserved.

14           MR. RADSHAW:  That's correct.

15      Q    Mr. Rose, have you been deposed before?

16      A    Yes.

17      Q    In what context?

18      A    God --

19      Q    Let me cut you off.  How many times have you

20  been deposed?

21      A    Twice.

22      Q    I'll come back to ask you some details about

23  that, but I'll just set some ground rules down which

24  you're probably familiar with.  All our words are being

25  taken down, so I would ask even though in many

1    ground before it gets in the groundwater.

2        Q    What is a separation distance under the

3    Public Health Code?

4        A    In regards to what?

5        Q    Are there several kinds of separation

6    distances employed by the Public Health Code?

7        A    Yes.

8        Q    And could you explain what they are?

9        A    Off lot line, separation from lot lines

10    unless it's a repair, you have to give exceptions,

11    distances from groundwater, distances from ledge.

12        Q    You've identified distance from a property

13    line as a separation distance.  Can you explain what

14    that requirement is in the Public Health Code?

15        A    That is based on -- it's ten feet.  That's

16    based on new construction.  For repairs you're allowed

17    to go closer with an exception.

18        Q    And that separation distance is the

19    separation distance the system is located to a property

20    boundary?

21            MR. RADSHAW:  Object to the form of the

22            question.

23            You can answer.

24        A    Yes.

25

1    BY MR. SLATER:

2        Q    And what are the other separation distances

3    employed by the code?

4        A    If you have curtain drains; if you do not

5    have curtain drains; if there's a water line; if

6    there's a storm drain.  Those are other separations

7    that are required, distances that are required.

8        Q    Does the Public Health Code require

9    calculation of separating distance from water supplies?

10       A    Yes.

11       Q    What is the separation distance between a

12   newly constructed septic system and a water supply?

13       A    Repair or new house?

14       Q    Tell me both, please.

15       A    If the building is new, it's 75 feet from a

16   well.  If it's an existing dwelling, you're allowed to

17   go back to what the previous code said, which was

18   50 feet, with an exception from the State Health

19   Department.

20       Q    What is the relationship or factors that a

21   lot size would have upon the ability of obtaining

22   approval for a construction of a new code-complying

23   septic system?

24            MR. RADSHAW:  Object to the form of the

25            question.

1            You can answer.

2      A    A number of things.  Whether it has footing

3   drains, whether it has a well, whether it has -- how

4   far is it off the lot line.  This is for a new

5   dwelling.  Those things call for consideration.

6   BY MR. SLATER:

7      Q    How does it relate to the actual size of the

8   lot?

9            Let me put it another way.  Can the size of a

10  lot be a constraining factor in obtaining approval for

11  construction of a new septic system?

12     A    Of course.

13     Q    And why is that a factor in employing the

14  Public Health Code?

15     A    If you have a 50-by-50 lot -- can I give an

16  example?

17            MR. RADSHAW:  Of course you can.

18     A    If you have a 50-by-50 lot and you want to

19  put a 40-by-40 house on it, where are you going to put

20  your well that you have to be 75 feet from and where

21  are you going to put your septic system.

22            Now, even based on that for a new system, if

23  there's no groundwater or no ledge and the soils meet

24  one in ten and you're building a three-bedroom house,

25  you need 460 feet of leaching.  You get 10 feet off the

1    property line, 50 feet wide, 10 off each side, that

2    gives you 30 feet.  30 times 9 only gives you 327

3    square feet.  You need 460 for a three-bedroom house.

4    You don't have enough room.  So all of that comes into

5    consideration.

6         Q     Would you say it is a general understanding

7    of the Public Health Code that under those

8    circumstances the waste water would not receive

9    adequate treatment?

10        A     I would assume that, yes.

11        Q     You indicated earlier in the deposition that

12    when I referred to an order of the Department of

13    Environmental Protection that there's not been any

14    demonstration that there's pollution by the Town of Old

15    Lyme.  What is your basis for that statement?

16        A     We've been doing -- we have monitoring pipes

17    in place during the last three years.  We've been

18    sampling those test wells and the testing that we've

19    been doing for checking septic systems, having a pump

20    out system in place in effect over the last three

21    years.  That's what we base it on.

22        Q     What role have you played in the groundwater

23    monitoring program adopted by the Town of Old Lyme in

24    response to the order that's been identified as MFR-1?

25        A     If you take paragraph eight, we instituted a

1    pump out schedule.  Paragraph B, we have a tracking

2    system in place that we track systems that we know have

3    problems and see that they're corrected, which is also

4    for C, the maintenance of septic systems.  I think

5    that's what we've accomplished in the last three

6    years.

7        Q    What role have you had in accomplishing those

8    responses to A and B that you've just identified?

9        A    I oversee that it's done with follow-ups.

10       Q    Are you familiar with the Sewer Avoidance

11   Plan adopted by the Town of Old Lyme?

12       A    I'm sure I am, but I don't -- I can't picture

13   that as a Sewage Avoidance Plan.

14       Q    Picture what as a Sewage Avoidance Plan?

15       A    I know I've read it, I've seen it.  I just

16   can't picture it in my head right now.

17       Q    You mentioned a few moments ago that there

18   was a water monitoring program underway?

19       A    Yes.

20       Q    Who is overseeing that monitoring program and

21   why?

22       A    I have the -- we've hired an outside

23   consultant firm, Jacobson, to do the -- install the

24   test pipes and to run the samples.  I believe it's now

25   we're doing it four times a year, each of the pipes and

 1   sending it to a lab and turning the calculations over

 2   to the town, what the findings were, the different

 3   locations.  We're in the process now of mapping the

 4   locations and those that are high, when they were

 5   high -- this has been going on for three years -- what

 6   corrections we have made because they've changed, you

 7   know, to the cleaner water in the ground.

 8           The tank pump-out, they're on their last

 9   seven years, the last year that everyone in town has to

10   have their system pumped and checked and any

11   deficiencies corrected.  We've got about 80 percent of

12   that accomplished.

13           Other than that, we're now working on the

14   brooks and streams that come through the town to find

15   any pollutions or any sewage or other things that are

16   placed in those from dwellings.  As a matter of fact,

17   we just approved that last night to get involved in

18   that again.

19           That's all I can think of offhand.

20       Q   Why?  Why is any of this being accomplished?

21               MR. RADSHAW:  Object to the form of the

22           question.

23               But you can answer it.

24       A   The simple fact is that I think the systems

25   were neglected in the Town of Old Lyme and I think

1    we're trying to have to straighten it out.  I think

2    that's our main objective is to keep the groundwater

3    clean and the drinking water clean and the Sound clean

4    and I think this is necessary.  It's been neglected and

5    not only neglected by the town, but I think it was

6    neglected by the homeowners.

7         Q    And is it your testimony that this effort

8    was -- was this groundwater monitoring effort in

9    response to the State of Connecticut's order or was

10   this done for other reasons?

11        A    I cannot say whether it was or wasn't.  I

12   just know that since I've been involved in it, that's

13   the course of action that the Water Pollution Control

14   Authority has chosen to take and that's what we've been

15   doing.

16        Q    Going back before going to other areas, you

17   were referring to a biomat.  What is a biomat?

18        A    Best way I can describe a biomat is if you're

19   doing a trench system, and also a gallery, it's like

20   the lint you take out of the dryer.  Over a period of

21   time that builds up over the bottom of a system and

22   it's just like the hairs in your nose take certain

23   particles out of the air.  The more hair you have in

24   your nose and the lungs the less particles that can get

25   in to cause you sickness.  I'm trying to make a

1    correlation between that and a biomat in a system.

2        Q    Is that also sometimes referred to as a

3    crust?

4        A    I've never referred to it as a crust.  A

5    crust is usually what somebody finds in the top of a

6    septic tank.

7        Q    Does the biomat serve as you describe in a

8    way as a filter?

9        A    I wouldn't call it a filter.  Yes, I'd call

10   it a filter, but also a way of slowing down the sewage

11   going into the ground.  So you don't overtax the

12   underlying soils.

13       Q    Are you aware of studies that suggest that

14   resting septic systems for extended periods of time

15   result in a breakdown of that biomat?

16       A    There's a few studies out there.  I'm not

17   really familiar with them, but different reports that I

18   receive.  Everyone has their own opinion of whether

19   it's a good thing or a bad thing.  It works, it doesn't

20   work.  That's above me.  The professors and --

21       Q    Do you recall any professors or any reports

22   that you've ever read that suggested that the biomat is

23   a bad thing in a septic system?

24       A    Only in relation to groundwater in this

25   respect that it's a good thing to slow down the

1   percolation rate, but if groundwater is not a problem,

2   depends on what theory you want to go on.  If you go on

3   with the theory that dilution is a solution to

4   pollution, then you're one group.  If you're on the

5   other side of the coin is that if you keep it in the

6   ground soils long enough that it come out pure.  Some

7   people say 15 feet through sand, some people say

8   75 feet.  You can get as many papers agreeing with it

9   one way as you can another way.

10       Q    And the differing philosophies about dilution

11   or treatment times in soil, what are those differing

12   views?  How do those differing views relate to the

13   effectiveness of a biomat?

14       A    Some people feel -- there are articles

15   written that say that the biomat -- that you want to

16   insert air into the systems to get rid of the biomat so

17   that the sewage doesn't sit to get it into the

18   groundwater.

19           I can't -- you know, I don't see it either

20   way, to be honest with you.  My feeling is that I think

21   if we follow the health code and keep it in the ground

22   and stay above groundwater and above ledge, it will be

23   treated and that's what we have to do.  Of course you

24   can overtax it, but I only can follow the health code.

25                   MR. RADSHAW:  Can we take a five-minute

1      Q     I understand your position.

2            What distinguishes the densely populated

3      areas of the shoreline communities in Old Lyme from the

4      densely populated areas in some of the other

5      communities along the shoreline that you would agree

6      require sewage treatment?

7      A     That I -- rephrase that.

8      Q     You recognize that you used Bridgeport as an

9      example that based on the density of development it's

10     clear to you that you have to treat the waste water by

11     way of a sewer treatment facility.  Is that correct?

12     A     Correct.

13     Q     And what distinguishes the densely populated

14     areas of Old Lyme from that area?

15     A     I think mainly the age of the buildings on

16     that shoreline in Bridgeport and in that area.  They

17     were mostly mill towns or whatever you want to call it.

18     The homes were built for homes, not for seasonal

19     cottages and I think that makes the difference.  It got

20     to a point where because they were occupied and there

21     were so many three decker apartments and so forth and

22     so on that the sewer treatment plant used to be the

23     answer.

24     Q     So is the distinction what you described as

25     the seasonal nature of the Old Lyme beach communities

1    or --

2        A    Size of the lots more or less.  I don't

3    think -- in the Bridgeport area, the three or four

4    family houses or ten, twelve bedroom houses cannot meet

5    the health code as it's written today.  Point of Woods

6    has the same basic problem and the other areas have the

7    same problem that distances and separation distances

8    trying to get the area for it, they just don't have

9    it.

10       Q    Would you agree that a majority of the homes

11   located in the beach communities could not comply with

12   the Public Health Code if they were to be constructed

13   on those size lots today?

14       A    They wouldn't be allowed to be constructed on

15   those size lots today.

16       Q    Why not?

17       A    Because the size of the lot and what they

18   want to put in.  You can't put 12 bedrooms for a lot

19   that you may be able to put a three-bedroom septic

20   system in.

21       Q    But you believe that these properties are not

22   causing pollution when they're being used at those

23   densities in the Town of Old Lyme?

24       A    I think right now we're very fortunate that

25   the ground is able to absorb and take care of the beach

1  areas at this time.  I don't know how long it's going

2  to last, but right now I think that yes, there are.

3  It's working out well.

4      Q    Why would you think -- how many years have

5  these properties been occupied in those beach

6  communities?

7      A    I'd say just use 1938 because I have seen

8  pictures of the hurricane in 1938.  Some before that

9  and they were designed and built for seasonal dwellings

10  and I think the original owners of the properties, if

11  you go through the deeds, stated that.  It's been

12  stated in some of the deeds that this is a seasonal

13  cottage, this is a seasonal dwelling.

14      Q    My question is how long have these

15  communities been in existence?

16      A    Fifty years, sixty years.

17      Q    And you have reason to believe that there's

18  going to be some point if they are operating without a

19  problem up to this point in your view that the soils

20  will not be able to handle them at some point in the

21  future?

22      A    I think if they change to a full year time

23  basis and they don't put in a septic system that meets

24  the health code, yes, I think they probably will have a

25  problem.

1     Q    What is your basis for conclusion that the

2  number of months of the year would pose a problem in

3  terms of their --

4     A    I'm not saying the months of the year.  What

5  I'm saying is that the systems that are underdesigned

6  and are not designed to comply with the health code

7  because of the studies that have been done, if they

8  could get a system in there, I wouldn't have no problem

9  with it.  But they have to meet the health code.  If

10  they can't meet the health code, eventually it's going

11  to have a problem.

12     Q    How would you describe the occupancy of these

13  properties during summer months in the beach

14  communities?

15           MR. RADSHAW:  Object to the form of the

16           question.

17           You can answer.

18     A    That somebody who owns the cottage that

19  realize they can get a thousand dollars a week and puts

20  ten people in a cottage that's designed for maybe three

21  and they tax the hell out of the septic and the soils,

22  those that have septic systems, and I think

23  eventually -- right now the soils and what we have for

24  cesspools and so forth and so on are taking care of it

25  because of dilution or other reasons.

1    Q    My question is how would you describe the

2    occupancy of the beach communities?

3    A    Seasonal.

4    Q    Not describing your obvious intention of

5    trying to point that out on your own as often as

6    possible.  My question is:  Is the occupancy, is it

7    high or low in the summer months?

8    A    Very high, very high, very high.

9    Q    What period of time during the year are these

10   communities being operated or being used at a very high

11   occupancy?

12   A    Probably April to the first of September,

13   October.

14   Q    And do you believe there's a pollution

15   problem caused by those systems being used at a very

16   high occupancy during that period of time?

17   A    Those that have taken care of their septic

18   systems, no.  Those that have not, yes.

19   Q    And I think you've already suggested that if

20   those same property owners who used it for that window

21   of time continued to use their properties, there would

22   be a pollution problem.  Is that correct?

23   A    Not if they have a septic system that meets

24   the code.  I think I said that, I added that in there.

25   Q    Do these systems meet the code?

1      A     Some of them do, some of them do not.

2      Q     You describe -- you estimate around

3   60 percent of the properties are on lots of 5,000

4   square foot or less.

5      A     You can say that.

6      Q     What percentage of properties on lots of

7   5,000 square feet or less would you expect a code

8   complying system would be located?

9                    MR. RADSHAW:  I think you

10                mischaracterized his testimony.

11                    THE WITNESS:  Can I answer that?

12                    MR. SLATER:  Could you please describe

13                how you think I mischaracterized it?

14                    MR. RADSHAW:  He said 60 percent were

15                about 5,000 and 20 percent were 5,000 or

16                less.  So if you're talking about majority,

17                the correct amount 80 percent would be what

18                he believes to be 5,000 or less.

19   BY MR. SLATER:

20      Q     Of the 80 percent that are 5,000 or less

21   square feet, how many of those would you anticipate,

22   and I'm asking of course for an estimate, not an actual

23   number, but would be able to demonstrate that they

24   could locate a code-complying system on those lots?

25      A     Based on the questions you asked, I can't

1    give you an answer for that because there's too many

2    things that are outstanding on it, that have not been

3    clarified.  For example, how many bedrooms.  Do you

4    have 12 bedrooms?  Do you have two bedrooms?  Do you

5    have five bedrooms?  What do you have there for water?

6    Do you have a well?  So all of those things would have

7    to get put into the equation.  So I just can't answer

8    you.

9        Q    When is the last time you've approved

10   installation of a code-complying septic system on a lot

11   of 5,000 square foot or less?

12       A    Probably two weeks ago.

13       Q    And where was that property located?

14       A    I believe it was Swan Avenue, 43 Swan Avenue.

15       Q    Can you describe the property?

16       A    Other than it had groundwater was deep

17   enough, had fairly good sandy soils, was a

18   three-bedroom house.  The gentleman who owned it

19   previously had lived there forever, at least 50 years.

20   He had a cesspool.  He died.  They come into the town

21   hall to go year round.  Zoning approved it for year

22   round based on the continuous use.  We did a septic

23   system that met the code.

24       Q    Traditional system?

25       A    Traditional system, and a system approved by

1    the state health code, and reduced the bedroom size and

2    we approved it.

3        Q    Reduced the bedroom size to what?

4        A    Off the top of my head, I think it was four

5    and they brought it down to three or something like

6    that.

7        Q    Can you estimate how many properties less

8    than 5,000 square foot you have authorized the

9    construction of a code complying septic system in the

10   Town of Old Lyme?

11       A    Off the top of my head, no.

12       Q    More than a dozen?

13       A    I would say probably a dozen.

14       Q    Do you have a sense of how many instances

15   you've determined that a code-compliant system could

16   not be located on the property when an inquiry was made

17   by the property owner?

18       A    Probably three dozen, 36, 40, somewhere in

19   there.

20       Q    Would you expect that what you've seen so far

21   is a pretty good representation, that is that you might

22   expect, and I understand the variables that you've

23   already described, but one out of four of the lots that

24   you would review for installing a code-complying system

25   on a 5,000 square foot lot or smaller would meet the

1   Public Health Code?

2        A     Rephrase that question, please.

3        Q     Am I right in believing that you --

4   estimating that you've approved approximately a dozen

5   code-complying systems on lots of 5,000 square foot or

6   less and that you've determined in probably three dozen

7   cases that properties that are 5,000 square foot or

8   less could not accommodate a code-complying system, do

9   you have a sense that that's a pretty good

10  representation of what you find in the beach

11  communities, one out of four that would seek to install

12  such a system would meet the code?

13       A     I'd say that's approximately right.

14       Q     With respect to those lots that could not

15  accommodate a code-complying system, you'd agree that

16  there are many of those properties being used at high

17  occupancy during the summer months currently in the

18  town of Old Lyme?

19       A     Yes.

20       Q     And do I also understand your testimony that

21  based on the pump-out systems and other methods the

22  town is employing, you don't believe that the use of

23  those properties during the summer months are causing a

24  pollution problem in the town of Old Lyme.  Is that

25  fair to say?

1    A    Not that I've been able to find, no.

2    Q    What is your basis for believing that using

3    those properties for additional periods of time would

4    cause a pollution problem for the town of Old Lyme?

5    A    Because they can't meet the health code.

6    Q    They don't meet the health code now, do

7    they?

8    A    No.  But that's where the difficulty comes in

9    because I can only approve if somebody has a problem.

10   If there's no problem, I can't get involved in it.

11   Q    I'm not asking you about approvals.  I'm

12   asking you about pollution.

13   A    I'm trying to answer that.

14   Q    Okay.  But I want to make sure we get the

15   right question.  I'm not asking you whether or not

16   you'd approve it.  My question is if you have already

17   stated that these systems that are being currently

18   utilized that there are properties that couldn't

19   accommodate a code-complying system being used at high

20   occupancy during summer months, I think you've already

21   testified that use of those properties on a year-round

22   basis or for a longer period of time would cause a

23   pollution problem.  Is that fairly characterizing your

24   testimony?

25   A    Yes.

1       Q    What is your basis for that conclusion?

2       A    Because they don't have the system in there

3  that would meet the health code, number one.  And

4  forgetting that, I just think that over a period of

5  time when the winter sets in with high groundwater that

6  you start picking up pollutants coming from someplace

7  in that area, from one of our test wells and that's

8  basically what I'm basing it on.  It just doesn't work.

9  I mean, you have a problem.

10           Just for your -- adding to this, maybe that's

11  the wrong thing to say.  The state now is looking -- I

12  have a number of systems in this area that are

13  cesspools which definitely over a period of time will

14  pollute the groundwater because they're working in

15  groundwater, because that used to be the exception 40

16  years ago that the tides would clean it and the tides

17  would flush it out.

18           And now we're finding that those systems --

19  the younger group that's buying these homes are coming

20  in and changing those to get some sort of system in as

21  a repair, not to change the use of the building, but to

22  come in as a repair.  So we're aware of this, and most

23  of the homes where people don't care and that's where

24  we're finding out by the testing we're doing, pump outs

25  that we're doing, those are going to have to be

```
1                          J U R A T

2              I have read the foregoing 111 pages and

3              hereby acknowledge the same to be a true and

4              correct record of the testimony.

5

6

7

8                          _____

9                          RONALD ROSE

10

11   Subscribed and sworn to

12   _____.

13   Before me this _____ day of

14   _____,2003.

15

16

17

18

19   _____

20   Notary Public

21   My Commission Expires:

22

23

24

25
```

1

2                    C E R T I F I C A T E

3

4        I hereby certify that I am a Notary Public, in and

5    for the state of Connecticut, duly commissioned and

6    qualified to administer oaths.

7        I further certify that the deponent named in the

8    foregoing deposition was by me duly sworn, and

9    thereupon testified as appears in the foregoing

10   deposition; that said deposition was taken by me

11   stenographically in the presence of counsel and reduced

12   to typewriting under my direction, and the foregoing is

13   a true and accurate transcript of the testimony.

14       I further certify that I am neither of counsel nor

15   attorney to either of the parties to said suit, nor am

16   I an employee of either party to said suit, nor of

17   either counsel in said suit, nor am I interested in the

18   outcome of said cause.

19       Witness my hand and seal as Notary Public this

20   _9th_ day of _December_____, 2003.

21

22                            _Audra Quinn_____
                              Audra Quinn, RPR, LSR
23                            Notary Public

24   My commission expires:   7/31/2006
     LSR No. 106
25