# COPY

1

1    UNITED STATES DISTRICT COURT
         DISTRICT OF CONNECTICUT
2

3    SOUTH LYME PROPERTY OWNERS          CIVIL ACTION NO.
         ASSOCIATION, INC.,              300CV97 (EBB)
         CHARLES AND VICTORIA PARSONS
4    AND JOAN BYER

5        VS.                             JULY 26, 2006

6    TOWN OF OLD LYME, TOWN OF OLD LYME
         ZONING COMMISSION, ERIC FRIES,
7    GEORGE JAMES, JANE MARSH, THOMAS RISOM,
         WALTER SEIFERT, SHARON COLVIN,
8    AND MARILYN OZOLS

9            DEPOSITION OF: CHARLES PARSONS

10   APPEARANCES:

11   Attorneys for the Plaintiffs:

12       HALLORAN & SAGE
             One Goodwin Square
13           225 Asylum Street
             Hartford, Connecticut 06103
14           (860) 522-6103
         BY: KENNETH R. SLATER, JR., ESQUIRE
15

16   Attorneys for Town of Old Lyme, Town of Old Lyme
         Zoning Commission, Eric Fries, George James,
         Jane Marsh, Thomas Risom, Walter Seifert,
17       Sharon Colvin, and Marilyn Ozols:

18       HOWD & LUDORF
             65 Wethersfield Avenue
19           Hartford, Connecticut 06114-1190
             (860) 249-1361
20       BY:  JOHN J. RADSHAW, III, ESQUIRE
             MARK E. VILLENEUVE, ESQUIRE
21

22   Also present:  Victoria Parsons

23                 Wendy J. Leard
               Registered Merit Reporter
                 CSR # 00039
24   NIZIANKIEWICZ & MILLER REPORTING SERVICES
                 972 Tolland Street
25       East Hartford, Connecticut 06108-1533
                 (860) 291-9191

EXHIBIT D-1

```
 1                . . . Deposition of CHARLES PARSONS,

 2    taken on behalf of the defendant in the

 3    hereinbefore entitled action, pursuant to the

 4    Federal Rules of Civil Procedure, before Wendy J.

 5    Leard, RMR, duly qualified Notary Public in and

 6    for the State of Connecticut, held at the law

 7    offices of HOWD & LUDORF, 65 Wethersfield Avenue,

 8    Hartford, Connecticut, commencing at 9:16 a.m., on

 9    Wednesday, July 26, 2006.

10

11               S T I P U L A T I O N S

12

13        It is hereby stipulated and agreed by and

14    among counsel for the respective parties that all

15    formalities in connection with the taking of this

16    deposition, including time, place, sufficiency of

17    notice and the authority of the officer before

18    whom it is being taken may be and are hereby

19    waived.

20

21        It is further stipulated and agreed that

22    objections, other than as to form, are reserved to

23    the time of trial and that the reading and signing

24    of the deposition is not waived.

25
```

3

1          It is further stipulated and agreed

2      that the proof of the qualifications of the

3     notary public before whom the deposition is being

4     taken is hereby waived.

5

6          CHARLES PARSONS, Deponent, having first been

7     duly sworn, deposes and states as follows:

8

9                    DIRECT EXAMINATION

10    BY MR. RADSHAW:

11        Q    Good morning, Mr. Parsons.

12             My name is John Radshaw, and I represent

13    the defendants in the present case.

14             You know you're a plaintiff in this

15    action, right?

16        A    Yes.

17        Q    Okay.  Would you please state your name

18    and your residential address for the record,

19    please.

20        A    Charles R. Parsons.  11 Brookside Avenue,

21    Old Lyme, Connecticut 06371.

22        Q    And how long have you lived at

23    11 Brookside Avenue?

24        A    Off and on for eight years.

25        Q    Okay.

11

1    Q    And I suspect you had to take a class for

2    the boating license, correct?

3    A    Correct.

4    Q    Okay.  You haven't taken any other

5    courses, like a real estate course or that kind of

6    thing, or any other educational seminars or

7    anything like that between college and the present

8    day, other than OSHA and boating, that you can

9    think of?

10   A    No, I haven't.

11   Q    Okay.  All right.

12        Now, at the present time, Mr. Parsons, do

13   you own any real property?  In the state of

14   Connecticut.

15   A    No, I don't.

16   Q    Okay.  You don't own any real property

17   whatsoever?

18   A    No, I don't.

19   Q    When's the last time you owned a piece of

20   real property in the state of Connecticut, if you

21   did at any time?

22   A    I guess it was December 2005.

23   Q    Okay.  And what piece of property did you

24   own in December of 2005?

25   A    11 Brookside Avenue.

1    Q    Okay.

2    A    And --

3    Q    Go ahead.

4    A    And 660 Shuttle Meadow Avenue.

5    Q    Other than those two pieces of property,

6    have you owned any other real property in the

7    state of Connecticut?

8    A    No, I haven't.

9    Q    Okay.  So you've never --

10    A    Well, 1487 Stanley Street.

11    Q    Okay.  Other than 11 Brookside in Old

12    Lyme, 660 Shuttle Meadow Ave. in New Britain, and

13    1487 Stanley in New Britain, have you owned any

14    other real property at any time in the state of

15    Connecticut?

16    A    No, I haven't.

17    Q    Okay.

18            MR. RADSHAW:  Would you mark that.

19            (Defendants' Exhibit 1, marked for

20                identification-described in index)

21    BY MR. RADSHAW:

22    Q    Mr. Parsons, I'm going to show you a

23    document that's been marked as Defendants'

24    Exhibit 1.  It's 23 pages in length.  It's on the

25    pleading paper of Eisenberg, Anderson, Michalik &

24

1    That's when you sold that piece of property?

2        A    Correct.

3        Q    And you purchased or part of the purchase

4    of 660 Shuttle Meadow in about 2000?

5        A    Correct.

6        Q    And you owned that continuously until

7    December 2005?

8        A    I've -- yeah, that is correct.  That is --

9    660 Shuttle Meadow, that's correct.

10       Q    Okay.  It's the kind of thing if I went

11   down to the land records and looked, I'd see a

12   deed to you in about 2000, and then I'd see a deed

13   of sale at some point --

14       A    To her, right.

15       Q    -- in 2005.  Okay.

16            And what about Brookside, when did you

17   acquire an interest in -- first acquire an

18   interest in Brookside?

19       A    I don't recollect that piece of property.

20   I've transferred back and forth numerous times,

21   so . . .

22       Q    Well, how many times have you transferred

23   it back and forth?

24            When -- well, let me ask you another

25   question.

25

1          When's the first time you acquired an
2    interest in 11 Brookside Avenue?
3      A    I would say in 2000.
4      Q    Okay.  And how long did you hold that
5    property -- an interest in that property until you
6    first transferred that interest away?
7      A    I think until 2003.
8      Q    Okay.  And then from 2003, with the
9    transfer away, how long was it until you received
10   another transfer of that interest?
11     A    I think it came right back, like
12   within -- I think it came back in 2004.
13     Q    Okay.
14     A    And then went back to her in 2005.
15     Q    Okay.  Can you explain to me why you
16   transferred it back and forth?
17     A    No, I can't.  It's all to do with my
18   businesses and the bonding companies and moving
19   assets.
20     Q    Okay.  So because you own single-member
21   LLCs, perhaps, you don't want to have too many
22   assets in your name should you -- a business fail?
23     A    Correct.
24          MR. SLATER:  Objection as to form.
25          I would just ask you to pause just a

```
 1    BY MR. RADSHAW:

 2        Q    How is that?

 3        A    Because I had a well.

 4        Q    Okay.  And is that -- when was that well

 5    put in?

 6        A    I have no idea.

 7        Q    It existed at the time you purchased the

 8    house?

 9        A    Correct.

10        Q    Now, you said you purchased the home

11    sometime in the early part of 1997.

12        A    July of '97.

13        Q    Okay.

14               MR. RADSHAW:  Would you mark that as

15               an exhibit, please.

16                  (Defendants' Exhibit 2, marked for

17                   identification-described in index)

18               MR. RADSHAW:  Let's go back on the

19               record.

20    BY MR. RADSHAW:

21        Q    Mr. Parsons, I'm going to show you a

22    document that's been marked as Defendants'

23    Exhibit 2.  It's on the letterhead of the Town of

24    Old Lyme.

25               The first item is a copy -- first part of
```

1    the document is a copy of a letter from Marilyn

2    Ozols, O-Z-O-L-S, to Victoria Parsons dated

3    August 10, 1998.

4            MR. RADSHAW:  Would you mark that one

5        Exhibit 3, please.

6            (Defendants' Exhibit 3, marked for

7                identification-described in index)

8    BY MR. RADSHAW:

9    Q    Mr. Parsons, I was right all along; is the

10   one I wanted.

11          It's a letter on the letterhead of Town of

12   Old Lyme dated September 29, 1997; it's marked as

13   Exhibit Number 3.

14          It's directed to Victoria Parsons at 1487

15   Stanley Street.  It's signed by Marilyn Ozols,

16   zoning enforcement officer.

17          Have you seen that document?

18   A    (Reviewing document)

19          Yes, I have.

20   Q    When's the first time you saw that

21   document?

22   A    October of 1997.

23   Q    Okay.  How did it come to your attention?

24   A    Through the mail.

25   Q    Okay.  I mean, do you have a habit of

53

1    opening mail addressed to your wife?

2        A    No.

3        Q    So did you just bust open the mailbox,

4    take it out and read it or -- you know, how is it

5    that you found out about this letter?

6        A    My wife showed me the letter.

7        Q    And what did you talk about at the time

8    you -- she showed you the letter?

9        A    What did --

10       Q    What did she tell you?

11       A    She goes "I received a letter from the

12   town of Old Lyme.  Look at it."

13       Q    Okay.  And did you have a conversation

14   after that about the letter?

15       A    No.

16       Q    You didn't talk about anything?

17       A    About the letter?

18       Q    Yeah.

19       A    No.  I showed it to my attorney.

20       Q    You didn't express your opinion to your

21   wife about the letter at that time?

22       A    No.

23       Q    Okay.  What was the next thing you did?

24       A    Showed to it my attorney.

25            MR. SLATER:  Objection to the form.

54

1          Please pause just a second.

2    BY MR. RADSHAW:

3        Q    Okay.  And who was your attorney at that

4    time?

5        A    Robert Karanian.

6        Q    Okay.  And Attorney Karanian, where did he

7    have an office at that time?

8        A    New Britain, Connecticut.

9        Q    Okay.  And does he still have an office

10   there?

11       A    Yes.

12       Q    And you still use him as your attorney?

13       A    Yes.

14       Q    Do you use him for both personal and

15   business matters?

16       A    Yes.

17       Q    I'm not going to ask you about any

18   conversations you may have had with Attorney

19   Karanian, but I just want to ask you just a couple

20   of questions about that.

21            You say you used him for your business

22   representation, right?

23       A    Correct.

24       Q    Okay.  Do you also use him, like, for

25   example, for your will and that sort of thing?

55

1     A    No.

2     Q    Okay.  Do you have a separate attorney for

3    that?

4     A    Yes.

5     Q    Who is that?

6     A    Paul Czepiga.

7     Q    Where does Paul Czepiga practice?

8     A    Newington, Connecticut.

9     Q    And is he still there in Newington?

10    A    Yes, he is.

11    Q    Did you or anyone else, if you know,

12   respond in any way to this communication --

13    A    No.

14    Q    -- marked as Exhibit -- I'm sorry.

15         -- marked as Exhibit 3?

16    A    No.

17    Q    Okay.  Actually, can you keep that one

18   there in front of you.

19         Now, when you first got the letter that's

20   been marked as Exhibit 3, I mean, you took the

21   opportunity to read it, right?

22    A    Correct.

23    Q    Okay.  And you didn't have a conversation

24   at that time with your wife, Victoria, about it;

25   you just contacted your lawyer, right?

56

1      A      We probably had a brief discussion about

2   it.

3      Q      Do you recall what you talked about?

4      A      No.

5      Q      I mean, were you outraged?

6      A      No.

7      Q      Now, do you know what -- at the

8   time -- withdraw that.

9             At the time you received and reviewed

10  Exhibit 3, did you know what a seasonal use

11  dwelling was at that time?

12                MR. SLATER:  Objection as to form.

13                THE WITNESS:  By the time I received

14            this letter, I knew what it was.

15  BY MRS. PARSONS:

16     Q      Okay.  How did you come to know what a

17  seasonal use dwelling was before the time you

18  received that letter marked as Exhibit 3?

19     A      After my discussion -- after my

20  application for a building and zoning permit with

21  Marilyn Ozols.

22     Q      Okay.  When did you make an application

23  for a building and zoning permit, first make an

24  application for building and zoning permit

25  concerning 11 Brookside Drive?

1      A      Either August or September of '97.

2      Q      Okay.  And what was the purpose of the

3   zoning application or permit?

4      A      To upgrade the existing residential home.

5      Q      In what manner did you want to upgrade the

6   existing home?

7      A      I wanted to add a deck, put new windows

8   in, new siding, new roof, new interior finishes.

9      Q      So you went sometime in August, did you

10  say, right?

11     A      August or September, I can't recall.

12     Q      So it's not very not very long after you

13  purchased the property in July, correct?

14     A      Correct.

15     Q      Okay.  So in connection with your

16  profession in contracting, I mean, you know about

17  building and zoning offices and zoning permits,

18  right?

19             MR. SLATER:  Objection as to form.

20             THE WITNESS:  Yes.

21  BY MR. RADSHAW:

22     Q      And you're familiar with municipal

23  requirements for zoning permits, correct?

24             MR. SLATER:  Objection as to form.

25             THE WITNESS:  Not zoning permits.

1    BY MR. RADSHAW:

2        Q    No?

3             You've never had to deal with zoning

4    issues in any of your construction?

5        A    I never did that phase of it.  I end up

6    doing the building and design phase.

7        Q    But you were involved --

8        A    Yes, I know about zoning.

9        Q    And you know about building permits and

10   inspections, that sort of thing?

11       A    Mm-hmm.

12       Q    And when you say "mm-hmm," you mean yes?

13       A    Yes.

14       Q    So you went down and you had this -- how

15   is it that you came to interact with Marilyn Ozols

16   in August or September of 1997 concerning a

17   planned upgrade to your property at 11 Brookside?

18       A    I applied for a building permit, and

19   they -- since I was adding a deck, they wanted to

20   make sure, so I had to go through zoning.

21            And then when I went to zoning, she gave

22   me the application to fill out for zoning, which I

23   did right there in front of her.

24       Q    Okay.  So you said it was just a -- it was

25   just the addition of a deck?

59

1    A    No.

2    Q    What other --

3    A    I didn't say that.

4    Q    What other improvements were going to be

5    made other than a deck?

6    A    New windows, siding, interior finishes.

7    Q    Okay.  And were --

8    A    Electrical.

9    Q    And were all of those improvements denied?

10   A    No.

11   Q    Okay.  Well, what improvements were

12   allowed and what improvements were denied?

13   A    I proposed a small upward addition onto

14   the house, and they denied that.

15   Q    Okay.

16   A    But I gave them two schemes; they approved

17   one, denied the other.

18   Q    And are you aware of what the minimum lot

19   size in that zone is where Brookside -- your

20   property on Brookside Drive is located?

21   A    Yes, I know what the minimum lot size is.

22   Q    And what is it?

23   A    10,000 square feet.

24   Q    And your lot is approximately how big?

25   A    85 to 88.  I can't remember.

60

1    Q    Okay.  So you make the application.

2         How is it that seasonal use restrictions

3    comes into the conversation or how do you learn of

4    that in the context of this initial application?

5    A    When I was filling out the form --

6    Q    Okay.

7    A    -- it asks for what type of use, I think,

8    on the form, or -- I don't remember the

9    exact -- there was a line for it.

10        And I said -- and I asked Marilyn, "What

11   do I put down here?"

12        And she says, "You have to put

13   'seasonal.'"

14   Q    Okay.  And what happened -- you know, how

15   did the conversation go after that?

16   A    What do you mean how did the conversation

17   go?

18   Q    What was the next part of the

19   conversation?

20   A    I finished the application, and then I

21   pulled the zoning regulations.

22   Q    And you read the zoning regulations,

23   right?

24   A    Right.

25   Q    And that's when you saw the seasonal use

1    restrictions, right?

2        A    Correct.

3        Q    Okay.  You also saw the merger provisions

4    of the regulations?

5                MR. SLATER:  Objection as to form.

6                Then you answer the question.

7                THE WITNESS:  I know.

8    BY MR. RADSHAW:

9        Q    Excuse me, let me ask a better question.

10                You saw the conversion section of the

11    zoning regulations at that time?

12        A    Correct.

13                MR. SLATER:  Objection as to form.

14                Please.

15                THE WITNESS:  Okay.

16    BY MR. RADSHAW:

17        Q    I was going to say, we're in no hurry.

18        A    Yeah, I know, I know.

19                THE WITNESS:  I thought he already

20                asked that question.

21                MR. SLATER:  Even if asks the same

22                question over --

23                THE WITNESS:  Oh, he can do it twice?

24                Okay.

25

62

1    BY MR. RADSHAW:

2        Q    All right.  So what happened after you got

3    the regulations and you read them?

4            I guess the application for -- the

5    application for the building permit was denied for

6    the second floor addition?

7        A    Correct.

8        Q    Okay.  Did you take an appeal?

9        A    No.

10       Q    But the application for the second option,

11   which was just a deck and the replacement of the

12   siding and, I guess, the roof and the interior

13   finishings, that was approved?

14       A    Correct.

15       Q    And since it was approved, you didn't need

16   to take any steps, right?

17       A    Correct.

18       Q    Okay.  All right.

19           So it sounds like when we were going

20   through this time line, that you received a letter

21   marked as Defendants' Exhibit 3 at some point

22   after the -- your application for the building

23   permits was made; is that fair to say?

24       A    I would assume so, yes.

25       Q    Does that comport with your recollection?

1          I don't want you to assume.

2      A    Between when I applied and when I received

3    the letters, I don't -- I mean, it all came

4    down -- I don't remember.  You have the documents

5    in front of you.

6      Q    Okay.  But it's fair to say that you made

7    the application for the building permit in '97

8    before you got the letter marked as Exhibit 3,

9    right?

10     A    Correct.

11     Q    Okay.  So you have the approval to do the

12   deck, the siding, and the windows, and you have

13   this letter marked as Exhibit 3.

14         After you got the letter, did you take any

15   steps to respond to the letter of September 23,

16   1997, other than talk to your lawyer?

17     A    (Indicating)

18     Q    Yeah, that one.

19     A    The 29th.  You said the 23d.

20     Q    Oh.  Okay.

21     A    Have you got a different one?

22     Q    Well, let's start -- yours says 29?

23     A    Absolutely.

24     Q    We'll go with that one.

25         Tell me, did you take any steps in

1    response to the letter dated the 29th marked as

2    Exhibit 3?

3       A    No.

4       Q    Okay.

5       A    Besides --

6       Q    Talk to your lawyer?

7       A    -- talk to my lawyer.

8       Q    Okay.  Now, you told me that you had

9    learned what the seasonal use regulations were

10   prior to receiving this letter in the context of

11   the permit, right?

12          Let me ask you a better question.

13          I asked you if you had saw the letter

14   marked as Exhibit 3, and you said yes, right?

15      A    Correct.

16      Q    Okay.  And when I asked you what

17   your -- whether you knew what a seasonal use

18   dwelling was, you told me that you had learned

19   what a seasonal use dwelling was prior to

20   receiving the letter marked as Exhibit 3, correct?

21      A    Correct.

22      Q    Okay.  So you get the letter.  It says

23   "We're going to designate your house as a seasonal

24   use dwelling.  We think it's been a seasonal use

25   dwelling all along."

1          What was your understanding at that moment

2    in time, when you got the letter marked as

3    Exhibit 3, of what a seasonal use dwelling was?

4        A    That I could not use the property between

5    November 30 and April 15, or whatever those dates

6    are.

7        Q    Okay.  Did you have any other

8    understanding of what a seasonal use dwelling

9    meant other than that you couldn't use the

10   property from November 30 until April 1, or

11   whatever it is?

12       A    Whatever it is, yeah.

13       Q    We'll say November to April.

14       A    There we go.

15       Q    Just so we're clear, you've had the

16   building permit experience, you've read the

17   regulations, you get this letter, you see

18   "seasonal use," and it's your understanding at the

19   moment you have that letter that the town wants to

20   take a step so that "I can't use my property from

21   November to April," correct?

22       A    Correct.

23       Q    Okay.  And you saw in the third paragraph

24   of the letter where ZEO Ozols says "We may put

25   something on the land records to that effect,"

66

1    correct?

2        A    Correct.

3        Q    In the last paragraph, the first sentence

4    of the last paragraph says "If you believe my

5    preliminary determination is in error, you should

6    contact me in person or in writing for the purpose

7    of providing me with such other information as you

8    think is appropriate."

9            Did you see that sentence when you read

10   the letter back in 1997?

11       A    Yes.

12       Q    Okay.  Did you believe that the -- at the

13   time you read the letter, that ZEO Ozols'

14   determination was in error, preliminary

15   determination was in error?  Or did you have not

16   enough information to know?

17       A    Not enough information.

18       Q    And you saw the next sentence where it

19   says "You should contact me no later than

20   November 22, 1997."

21           And it says "If I do not hear from you by

22   that date, I will proceed to take the necessary

23   steps to make the seasonal designation on the land

24   records in accordance with the zoning

25   regulations."

1          You saw that, right?

2     A    Yes.

3     Q    Now, you just told me that you didn't have

4  enough information to know whether or not ZEO

5  Ozols' preliminary determination was in error.

6          And ZEO Ozols invited, actually, your wife

7  to contact her.

8          Did you or your wife take any steps to

9  contact ZEO Ozols prior to November 22, 1997, if

10 you know?

11    A    No.

12    Q    Okay.  Did you take any steps to

13 investigate and get more information to determine

14 whether or not ZEO Ozols' preliminary

15 determination was correct or in error?

16    A    No.

17    Q    Okay.  Did you do anything --

18    A    No.

19    Q     -- whatsoever?

20    A    I did not.

21    Q    Okay.  You sent -- did you send a copy of

22 this letter, Exhibit 3, to your lawyer?

23    A    No.

24    Q    Do you still have a copy of the letter?

25    A    Probably not.  Maybe.

1    Q    Okay.

2    A    I don't know.

3    Q    All right.  Even though the exhibit

4    numbers are out of order, I'm going to show you a

5    document marked as Defendants' Exhibit 2, and it's

6    dated October 10, 1998.

7         The letter is one page long.  It's

8    addressed to Victoria Parsons at 1487 Stanley

9    Street.  It's on the letterhead of the Town of Old

10   Lyme, Zoning Commission, and it's signed by

11   Marilyn M. Ozols, zoning enforcement officer.

12        And there are two attachments: the first

13   attachment is a double-sided copy of the United

14   States Postal Service domestic return receipt

15   green card and a copy of the receipt for certified

16   mail with postage and canceled postmark attached,

17   also double-sided.

18        And I want you to look at those documents,

19   and the only pages I want you to pay attention to

20   are the first two pages.

21        And I want you to tell me first, have you

22   seen the letter that's the first page of Exhibit 2

23   before today?

24   A    Yes, I have.

25   Q    And that's a letter that you received?

72

1   didn't respond to that.

2           I mean, you didn't tell them, "No, this is

3   ridiculous.  I'm totally against this," when you

4   got the first letter, right?

5               MR. SLATER:  Objection as to form.

6               THE WITNESS:  No, I did not do that

7           at that time.

8               MR. RADSHAW:  Okay.

9   BY MR. RADSHAW:

10      Q    And when you got the second letter marked

11  as Exhibit 2 that said "This is a formal

12  decision," you didn't protest it at that time,

13  despite the last sentence that says "This appeal

14  must be taken within 30 days from the date of the

15  receipt of this letter," did you?

16      A    I didn't, yeah.

17      Q    No, you didn't do anything?

18      A    I didn't do anything.

19      Q    Okay.  After you received the second

20  letter --

21              MR. RADSHAW:  Actually, would you

22          mark this as Exhibit 4.

23                  (Defendants' Exhibit 4, marked for

24                   identification-described in index)

25

1    BY MR. RADSHAW:

2        Q    Mr. Parsons, I noticed that when you were

3    looking at the letter, you referenced -- you

4    pointed out on Exhibit 2 that Exhibit 2, which is

5    the one in your left hand at this point in time,

6    that it references a letter dated September 23,

7    right?

8            You saw that?

9        A    Correct.

10       Q    And you noticed that Exhibit --

11       A    3.

12       Q    -- 3 says September 29, 1997?

13       A    Correct.

14       Q    Okay.  I'm going to show you a document

15   that's been marked as Defendants' Exhibit 4.

16           Now, you'd agree with me that letter is

17   identical in all respects as Exhibit 3 with two

18   exceptions:  The first exception would be the date

19   of the letter, September 23 versus September 29;

20   and the address, the numerical address on Stanley

21   Street, instead of being 1487, which is your

22   correct address, the September 23 letter is listed

23   as 148 Stanley Street.

24           So sitting here today, you have no reason

25   to doubt that you received at least one of the

1    BY MR. RADSHAW:

2        Q    Mr. Parsons, I noticed that when you were

3    looking at the letter, you referenced -- you

4    pointed out on Exhibit 2 that Exhibit 2, which is

5    the one in your left hand at this point in time,

6    that it references a letter dated September 23,

7    right?

8             You saw that?

9        A    Correct.

10       Q    And you noticed that Exhibit --

11       A    3.

12       Q    -- 3 says September 29, 1997?

13       A    Correct.

14       Q    Okay.  I'm going to show you a document

15   that's been marked as Defendant's Exhibit 4.

16            Now, you'd agree with me that letter is

17   identical in all respects as Exhibit 3 with two

18   exceptions:  The first exception would be the date

19   of the letter, September 23 versus September 29;

20   and the address, the numerical address on Stanley

21   Street, instead of being 1487, which is your

22   correct address, the September 23 letter is listed

23   as 148 Stanley Street.

24            So sitting here today, you have no reason

25   to doubt that you received at least one of the

74

1       letters marked as Exhibit 3 or 4; is that right?

2       A    That's right.

3       Q    Okay.  You can put those down.

4            Now, we were talking about when you

5       received the September '97 letter, where were you

6       residing at the time you received that letter?

7       A    1487 Stanley.

8       Q    Back in New Britain?

9       A    Correct.

10      Q    Okay.  And when was the next time that you

11      regularly occupied Brookside Drive after receiving

12      the September 1997 letter from the town of Old

13      Lyme?

14      A    May of '98.

15      Q    Okay.  So you essentially --

16      A    May or June of '98.

17      Q    So you were in New Britain for the winter

18      and the early part of the spring and then went

19      back down to Brookside Drive for the next summer

20      season, right?

21      A    Construction was going on during that

22      time.

23      Q    Okay.  What kind of construction did you

24      do from -- during the winter and spring?

25      A    Replaced the windows, redid the siding,

75

1    redid all the interiors of the house, as described

2    in the application.

3         Q    Okay.  When you say replaced the interior,

4    what exactly did you do?

5         A    Replaced the whole interior.

6         Q    Okay.  I'm a lawyer, not a contractor.

7              When you say replaced the interior, that

8    can mean a lot of different things.

9              So describe that in a way that would have

10   meaning.  Like, for example, did you tear

11   everything out of the house down to the studs?

12        A    Correct.

13        Q    Okay.  So you tore all the wall boards

14   off, right?

15        A    Correct.

16        Q    Was it old plaster on lath?

17        A    No, it was all beadboard.

18        Q    So it was all beadboard.

19             So you tore everything out.

20             Did you upgrade the interior electrical at

21   that time?

22        A    Correct.

23        Q    So that's code-compliant sockets every

24   couple of feet, better wires, right?

25                   MR. SLATER:  Objection as to form.

114

1    Q    Okay.  And would it be fair to say that

2    you have a general idea or a general familiarity

3    with the buildings that are down there, the

4    layouts of the streets and that sort of thing?

5    A    I would say so.

6    Q    Okay.  Now, how many individual dwellings

7    are down on the beach community, say below 154?

8    A    I have no clue.  And it's 156.

9    Q    I'm sorry, 156.

10        Couldn't guess?

11   A    I couldn't guess.

12   Q    Okay.  If we just picked a number, say

13   2,000, for purposes of our discussion, you'd agree

14   with me that many of these -- withdraw that.

15        Do you have any evidence that all of the

16   dwellings located south of 156 comply with the

17   state building code?

18   A    No.

19   Q    Okay.  And what about the state public

20   health code, are you aware or do you have evidence

21   that all the dwellings south of 156 comply with

22   the state public health code?

23   A    I have no idea.

24   Q    You don't know.

25        And those -- those aren't things you've

115

1    studied?

2        A    No.

3        Q    You haven't gone out and made a

4    house-by-house determination.  Okay.

5        A    I'm not licensed to do that.

6        Q    But whether you are or not, you haven't

7    made -- you haven't studied it.

8        A    No.

9        Q    Okay.  And what about the town of Old Lyme

10   zoning regulations, you haven't -- you don't have

11   any evidence one way or another whether all of the

12   dwellings below 156 in Old Lyme comply with the

13   town zoning code?

14       A    I have no clue.

15       Q    Okay.  And there are various types of

16   residential dwellings down there, right?

17       A    Correct.

18       Q    I mean, some people have made

19   improvements, significant improvements, to the

20   dwellings, like you have, and other people

21   haven't.

22       A    I would -- yeah, correct.

23       Q    And, you know, some of the homes are

24   substantially larger than others, correct?

25       A    Correct.

116

1        Q    Okay.  And some of the homes have wells,

2    right?

3        A    Right.

4        Q    Many of the homes don't have wells?

5            MR. SLATER:  Objection as to form.

6            THE WITNESS:  I don't know what

7            their --

8    BY MR. RADSHAW:

9        Q    You don't know one way or another?

10       A    One way or another.

11       Q    But you would agree with me that the

12   houses below 156 are served -- some are served by

13   city water, some have only wells, some have other

14   forms, correct?

15           MR. SLATER:  Objection as to form.

16           THE WITNESS:  Correct.

17           MR. RADSHAW:  Okay.

18   BY MR. RADSHAW:

19       Q    And you'd also agree with me that the lot

20   sizes vary substantially in the communities in the

21   dwellings below 156, correct?

22       A    Correct.

23       Q    I mean, some of the lots are pretty small,

24   down to almost 3,000 square feet, and some are

25   closer to 10, and some are more than 10; is that

117

1  right?

2              MR. SLATER:  Objection as to form.

3              THE WITNESS:  Correct.

4              MR. RADSHAW:  Okay.

5  BY MR. RADSHAW:

6     Q    And you'd also agree with me that the

7  residential properties existing below 154 have

8  been held by their owners for all different

9  lengths of time?

10             MR. SLATER:  Objection as to form.

11  BY MR. RADSHAW:

12    Q    Is that correct?

13             MR. SLATER:  Objection as to form.

14             THE WITNESS:  I don't know what the

15             length of ownership was.

16  BY MR. RADSHAW:

17    Q    But based on your personal knowledge and

18  your experience, you know some of those

19  residential properties have been in some families

20  for generations.

21             MR. SLATER:  Objection as to form.

22  BY MR. RADSHAW:

23    Q    Isn't that right?

24             MR. SLATER:  Objection as to form.

25             THE WITNESS:  I know a couple.

118

1              MR. RADSHAW:  Right.

2    BY MR. RADSHAW:

3        Q    But I'm saying there's at least some that

4    you're aware of that have been in people's

5    families for a number of years.  Many years.

6              MR. SLATER:  Objection as to form.

7              THE WITNESS:  Right.

8    BY MR. RADSHAW:

9        Q    And there are some that you know, people

10   that are living down there, that purchased their

11   homes in the '80s, in the 1980s; is that right?

12       A    Correct.

13       Q    Okay.  And you'd agree with me that there

14   are some people that purchased their houses in the

15   late '90s, like you did; is that right?

16       A    Correct.

17       Q    And there are people who have purchased

18   their houses later, in the early 2000 year, like

19   your mom, right?

20       A    Correct.

21       Q    Okay.  And those variations in lot size

22   and structure and compliance with the state

23   building and public health code and the time and

24   length of ownership and the nature and value of

25   the improvements, all those variations, based on

119

1  your knowledge, would also extend to the members

2  of the association; isn't that right?

3             MR. SLATER:  Objection as to form.

4             THE WITNESS:  I would assume.

5             MR. RADSHAW:  Okay.

6  BY MR. RADSHAW:

7     Q    What is your understanding of the process

8  that the zoning enforcement officer for the town

9  of Old Lyme employed to make the preliminary

10  determination that was sent to you in September

11  1997?

12             MR. SLATER:  Objection as to form.

13             THE WITNESS:  What was their -- the

14             first part again?

15  BY MR. RADSHAW:

16     Q    I mean, I asked you about the --

17     A    All right.  I got it.

18             MR. SLATER:  Let him ask the

19             question.

20  BY MR. RADSHAW:

21     Q    Mr. Parsons, let me -- here is what -- I

22  want to briefly discuss a couple of things with

23  you.

24             Sometimes I will lay out some statements

25  to inform assumptions or observations I'll make to

122

1    department, and she said -- and you said she

2    forced you to write "seasonal" --

3         A    No, she didn't force me to write.  I asked

4    her, and she said, "That's what you need to write,

5    is 'seasonal.'"

6         Q    Okay.  And on what document did you write

7    "seasonal"?

8         A    Zoning permit application.

9         Q    Would that be the same thing as a town of

10   Old Lyme zoning compliance and health permit

11   application?

12        A    Probably.

13        Q    Okay.  On which -- okay.

14             Do you know if she did anything else?

15        A    Not that I'm aware of.

16        Q    Okay.  But after she did that, she invited

17   you to respond, right?

18        A    Correct.

19        Q    And you didn't, correct?

20        A    Correct.

21        Q    Okay.  And then after a period of time

22   went by, she said, "In the absence of new

23   information, I'm making this formal

24   determination."  That was the next letter you got,

25   correct?

1      A     Correct.

2      Q     And you didn't appeal.

3      A     Correct.

4      Q     Okay.   Have you ever taken a zoning appeal

5  before?

6      A     Yes.

7      Q     Okay.   So you understand that when a

8  zoning officer makes a decision, you have the

9  opportunity to take an appeal to the zoning board

10  of appeals, and that zoning board of appeals has

11  the power to reverse the decision of the officer,

12  right?

13      A     Correct.

14            MR. SLATER:   Objection as to form.

15  BY MR. RADSHAW:

16      Q     And you also understand, having done it,

17  that after you go to the zoning board of appeals

18  and if the zoning board of appeals agrees with the

19  zoning officer, you have the opportunity to

20  commence a lawsuit in state superior court to

21  challenge the decision of the zoning board of

22  appeals, right?

23            MR. SLATER:   Objection as to form.

24            THE WITNESS:   Correct.

25

124

1    BY MR. RADSHAW:

2        Q    Okay.  And when you go before the zoning

3    board of appeals, when you challenged the ZEO's

4    determination, I mean, you have the opportunity to

5    present evidence, right?

6        A    Correct.

7        Q    And, I mean, bring witnesses, make

8    arguments, present documents, right?

9                MR. SLATER:  Objection as to form.

10               THE WITNESS:  Correct.

11   BY MR. RADSHAW:

12       Q    Okay.  And -- okay.

13            But you didn't do that in this case.

14       A    Correct.

15       Q    Okay.  Now, what should the ZEO have done

16   to -- what records should the ZEO have looked at

17   instead of the assessor's cards and the health

18   card and the applications?

19               MR. SLATER:  Objection as to form.

20               THE WITNESS:  That's what this whole

21          lawsuit is about.

22               MR. RADSHAW:  I understand that.

23   BY MR. RADSHAW:

24       Q    I mean, the lawsuit claims --

25       A    You're asking me to give you an opinion.

125

1       Q    I want to know what you think.

2            I mean, you're saying that the ZEO in this

3    complaint -- as a plaintiff, you're saying that

4    "the ZEO didn't do the right thing, didn't give me

5    enough process, and looked at records that were

6    incomplete and inaccurate."

7                 MR. SLATER:  Objection as to form.

8    BY MR. RADSHAW:

9       Q    So what I want to know is what records,

10   what things should she have done to properly

11   evaluate whether or not your property was

12   seasonal?

13                MR. SLATER:  Objection as to form.

14                THE WITNESS:  She should have -- I

15           have a long opinion, but that's not for

16           here.

17                She should have reviewed the finished

18           product or the finished plans of what we

19           were doing to the process before she made

20           a determination.

21                MR. SLATER:  If you would allow a

22           brief voir dire, I think you might be able

23           to greatly shorten this line of

24           questioning.

25                And if not, I'd suggest we go off the

126

1          record and speak briefly.

2                    MR. RADSHAW:   Sure.   I'll talk to you

3          off the record, Ken.   Absolutely.   Let's

4          take a break.

5                    (Whereupon a conversation

6                     was held off the record.)

7                    MR. RADSHAW:   Back on the record.

8     BY MR. RADSHAW:

9          Q    Mr. Parsons, you've had an opportunity to

10    talk with your lawyer, and Attorney Slater and I

11    had a conversation off the record.   I'm going to

12    ask you some pretty direct and clear questions.

13                Mr. Parsons, do you claim that your

14    procedure to due process rights were violated in

15    any way as a result of the actions of the town of

16    Old Lyme, any of its boards or commissions or its

17    volunteers, officers, directors, or employees

18    based on the facts and circumstances alleged in

19    the plaintiffs' amended complaint, which has been

20    marked as Exhibit 5 in this deposition?

21         A    Yes.

22         Q    You claim your procedural due process

23    rights were violated?

24         A    Oh, my due process rights.

25         Q    Wait.   Hold on a second.   I just want to

1    questions.

2        MR. RADSHAW:  But he's a plaintiff in

3    this lawsuit --

4        MR. SLATER:  He is.

5        MR. RADSHAW:  -- and he verified the

6    original complaint.

7        MR. SLATER:  He is.  And as I

8    indicated, I'm willing to stipulate on the

9    record, and Mr. Parsons would be willing

10   to stipulate on the record, that he has

11   not been violated his procedural due

12   process rights because, under the

13   procedure that was employed by the town,

14   regardless of the procedure used, his

15   property has not been used on a year-round

16   basis prior to the adoption of the 1995

17   regulation.

18       MR. RADSHAW:  And Mr. Parsons would

19   absolutely concede that he has no evidence

20   whatsoever that it was used in any way

21   other than on a seasonal basis prior to

22   him purchasing it, right?

23       MR. SLATER:  Based on the definitions

24   in the Old Lyme zoning regulations.

25       MR. RADSHAW:  Okay.  That took care

138

1    enough -- so that the water is evenly distributed

2    to the soils.

3              And then after the water passes through a

4    certain distance of soils, it's appropriately

5    treated, right?

6        A     That's what I've been told.

7        Q     Okay.  So you have a pretty good

8    understanding of how septic systems work.  They

9    have been involved in your business, right?

10   Construction?

11                   MR. SLATER:  Objection as to form.

12                   THE WITNESS:  Right.

13   BY MR. RADSHAW:

14       Q     Now, I had asked you whether you thought

15   your system was operating appropriately, and the

16   information you gave me was it wasn't backing up,

17   "I could put everything down the pipes that I

18   wanted to and nothing was breaking out in the

19   backyard," right?

20       A     Correct.

21       Q     Okay.  My second component of properly is,

22   I want to say, maybe a more scientific definition,

23   and that is, is the septic system appropriately

24   treating the wastewater that returned to the

25   environment to get back into the water cycle?

1          Do you understand that proposition?

2     A     Mm-hmm.

3     Q     When you say "mm-hmm," you mean yes?

4     A     Yes, I understand.

5     Q     All right.  Sitting here today, do you

6 have any evidence that your system is not

7 operating properly, from a scientific basis, that

8 is, and returning appropriately treated wastewater

9 back to the environment?

10               MR. SLATER:  Objection as to form.

11               THE WITNESS:  No, I have no . . .

12 BY MR. RADSHAW:

13     Q     I mean, as far as you know, your system is

14 operating properly on both levels: one, "it works

15 because everything I flush goes down, nothing is

16 coming out in the backyard," and you have no

17 reason to believe that it's not properly treating

18 the effluent and returning appropriately treated

19 water back to the groundwater, right?

20     A     Correct.

21     Q     All right.  Now, when I had first started

22 asking you questions about the septic systems, you

23 said yours was definitely code compliant, right?

24     A     Correct.

25     Q     Okay.  Now, we talked already; you're

140

1   familiar with the neighborhood, the beach

2   communities below 156.

3          Do you believe that all the septic systems

4   that exist in the beach communities on individual

5   parcels of land are code-compliant septic systems?

6       A    No, I don't believe.

7       Q    Okay.  I mean, have you heard about

8   breakouts that have happened at people's

9   properties with their septic systems?

10      A    Yes.

11      Q    Okay.  But it would be fair to say, based

12  on your personal experience, that there are some

13  code-compliant systems and there are some that

14  aren't, correct?

15      A    Correct.

16      Q    Okay.  And sitting here today, you can't

17  say with any certainty how many there are of

18  either type, but you'd agree with me that both

19  those categories of systems, code compliant and

20  other on-site septic systems, exist in the beach

21  communities, right?

22      A    Correct.

23      Q    Okay.  And that would also hold true for

24  the 409 members of the association, right?

25      A    Yes.

141

1    Q    I mean, we'd hope that a lot of them or

2    all of them would be code compliant, but certainly

3    some of the on-site septic systems on the

4    properties owned by members of the association are

5    code compliant, right?

6    A    I would assume, yes.

7    Q    Right.  And it's possible that some of the

8    septic systems on the properties owned by the

9    members of the association are not code compliant,

10   right?

11   A    Right.

12   Q    Okay.  Has the property at 11 Brookside

13   Avenue ever been for sale after the time you

14   purchased it?

15   A    No.

16   Q    You've never marketed it for sale?

17   A    (No audible response)

18   Q    Although you testified that you

19   transferred it back and forth with your wife on a

20   couple of occasions, that was just for estate

21   planning purposes?

22   A    Correct.

23   Q    There wasn't a sale or anything like that.

24   Okay.

25        Do you have any plans to market it for

142

1    sale?

2        A    No.

3        Q    Okay.    Is it someplace you want to retire

4    to?

5        A    Yes.

6        Q    Okay.    Now, I want to ask you some

7    questions about the adoption of the zoning

8    regulations in question that are challenged by the

9    plaintiffs' complaint.

10            Do you have any personal knowledge what

11    the zoning commission and its members did, what

12    evidence they heard, what they determined, how

13    they came about to pass the seasonal use

14    restrictions in the Old Lyme zoning regulations?

15                MR. SLATER:    Objection as to form.

16                THE WITNESS:    No.

17    BY MR. RADSHAW:

18        Q    Okay.    I mean, you don't know what they

19    considered or didn't consider or what their

20    thought process was?

21        A    No.

22        Q    Okay.    Do you understand that your

23    complaint claims that you were denied the equal

24    protection of the laws?

25        A    Yes.

151

1   C E R T I F I C A T E   O F   D E P O N E N T

2

3       I, CHARLES PARSONS, have read the foregoing

4   transcript of the testimony given and it is true

5   and accurate to the best of my knowledge as

6   originally transcribed and/or noted on the

7   attached Errata Sheet.

8

9                        _____

10                            CHARLES PARSONS

11

12       Subscribed to and sworn to before me on

13   this ____ day of _____ , 2006.

14

15                        _____

16                            Notary Public

17   My Commission expires:

18   _____

19

20   300CV97 (EBB)

21   SOUTH LYME PROPERTY OWNERS ASSOCIATION, INC.

22   -vs-

23   TOWN OF OLD LYME

24   CHARLES PARSONS - JULY 26, 2006

25   WJL

152

```
 1   STATE OF CONNECTICUT
 2   COUNTY OF TOLLAND
 3        I, Wendy J. Leard, a Notary Public for the
 4   State of Connecticut, do hereby certify that
 5   the deposition of CHARLES PARSONS, a plaintiff,
 6   was  taken before me pursuant to the Federal Rules
 7   of Civil Procedure, at the law offices of
 8   HOWD & LUDORF, 65 Wethersfield Avenue, Hartford,
 9   Connecticut, commencing at 9:16 a.m., on
10   Wednesday, July 26, 2006.
11        I further certify that the deponent was first
12   sworn by me to tell the truth, the whole truth,
13   and nothing but the truth, and was examined by
14   counsel, and his testimony stenographically
15   reported by me and subsequently transcribed as
16   hereinbefore appears.
17        I further certify that I am not related to
18   the parties hereto or their counsel, and that I am
19   not in any way interested in the event of said
20   cause.
21        Dated at Somers, Connecticut, this 30th day
22   of July, 2006.
23                              Wendy J. Leard
24                              Notary Public
25   My Commission Expires May 31, 2007
```