COPY                                          1

1          UNITED STATES DISTRICT COURT
             DISTRICT OF CONNECTICUT
2
   SOUTH LYME PROPERTY OWNERS          CIVIL ACTION NO.
3    ASSOCIATION, INC.,                300CV97 (EBB)
     CHARLES AND VICTORIA PARSONS
4    AND JOAN BYER

5       VS.                            JULY 26, 2006

6  TOWN OF OLD LYME, TOWN OF OLD LYME
     ZONING COMMISSION, ERIC FRIES,
7    GEORGE JAMES, JANE MARSH, THOMAS RISOM,
     WALTER SEIFERT, SHARON COLVIN,
8    AND MARILYN OZOLS

9          DEPOSITION OF: VICTORIA PARSONS

10  APPEARANCES:

11  Attorneys for the Plaintiffs:

12     HALLORAN & SAGE
          One Goodwin Square
13        225 Asylum Street
          Hartford, Connecticut 06103
14        (860) 522-6103
       BY: KENNETH R. SLATER, JR., ESQUIRE
15
   Attorneys for Town of Old Lyme, Town of Old Lyme
16    Zoning Commission, Eric Fries, George James,
      Jane Marsh, Thomas Risom, Walter Seifert,
17    Sharon Colvin, and Marilyn Ozols:

18     HOWD & LUDORF
          65 Wethersfield Avenue
19        Hartford, Connecticut 06114-1190
          (860) 249-1361
20     BY:  JOHN J. RADSHAW, III, ESQUIRE
            MARK E. VILLENEUVE, ESQUIRE
21
   Also present:  Charles Parsons
22
                  Wendy J. Leard
23           Registered Merit Reporter
                  CSR # 00039
24     NIZIANKIEWICZ & MILLER REPORTING SERVICES
                 972 Tolland Street
25      East Hartford, Connecticut 06108-1533
                  (860) 291-9191

EXHIBIT D-2

1          . . . Deposition of VICTORIA PARSONS,

2     taken on behalf of the defendant in the

3     hereinbefore entitled action, pursuant to the

4     Federal Rules of Civil Procedure, before Wendy J.

5     Leard, RMR, duly qualified Notary Public in and

6     for the State of Connecticut, held at the law

7     offices of HOWD & LUDORF, 65 Wethersfield Avenue,

8     Hartford, Connecticut, commencing at 1:47 p.m., on

9     Wednesday, July 26, 2006.

10

11               S T I P U L A T I O N S

12

13        It is hereby stipulated and agreed by and

14    among counsel for the respective parties that all

15    formalities in connection with the taking of this

16    deposition, including time, place, sufficiency of

17    notice and the authority of the officer before

18    whom it is being taken may be and are hereby

19    waived.

20

21        It is further stipulated and agreed that

22    objections, other than as to form, are reserved to

23    the time of trial and that the reading and signing

24    of the deposition is not waived.

25

3

1          It is further stipulated and agreed

2      that the proof of the qualifications of the

3     notary public before whom the deposition is being

4     taken is hereby waived.

5

6          VICTORIA PARSONS, Deponent, having first

7     been duly sworn, deposes and states as follows:

8

9                    DIRECT EXAMINATION

10    BY MR. RADSHAW:

11        Q    Good afternoon, Mrs. Parsons.

12        A    Good afternoon.

13        Q    My name is John Radshaw.  I'm from Howd &

14    Ludorf, and I represent all the defendants.

15             Have you had your deposition taken before?

16        A    No.

17        Q    I just want to go over the ground rules.

18             And you acknowledge you were here during

19    the entire duration of your husband's deposition

20    earlier today?

21        A    Yes.

22        Q    You heard all of my questions already.

23        A    Yes.

24        Q    And you heard all of his answers, correct?

25        A    Yes.

1    A    No, it's just the basic, when we bought

2    the house and renovated the house.

3    Q    And you bought the house when?

4    A    In 1997.

5    Q    Okay.  And who was the purchaser at that

6    time?

7    A    Myself and my husband.

8    Q    So from 1997 to the present day, you heard

9    the questions I asked your husband, the two of you

10   owned it together; is that right?

11   A    Correct.

12   Q    Okay.  As of today, who owns the property

13   at 11 Brookside Drive?

14   A    I do.

15   Q    And how long has it been that way?

16   A    Since 2003.

17   Q    Since 2003.

18        And your husband -- you and your husband

19   owned the property together in 2003; is that

20   right?

21   A    I believe so.

22   Q    Okay.  And from when until 2003 did you

23   own the property together with your husband?

24   A    Up until 2005.

25   Q    Okay.  I just want to clear this up, and I

1    don't want to make it any more confusing than it
2    has to be.
3            You and your husband purchased it together
4    in 1997, correct?
5        A    Correct.
6        Q    And how long did you own it continuously
7    together?  Until what year did you first transfer
8    his interest back to you?
9        A    To be honest, I can't recall.  I don't
10   know.
11       Q    Okay.  You don't know one way or the
12   other?
13       A    No.
14       Q    But you'd agree with me that if we were to
15   do a title search of the property on 11 Brookside
16   Drive, that would be the definitive place for the
17   answer for that.
18           It would say, for example, that between
19   '97 and 2000, you owned it together; from 2000 to
20   2002, just you owned it; then you owned it
21   together, and then you owned it yourself, right?
22       A    Right.
23       Q    And that's the definitive place.
24       A    Yes.
25       Q    Okay.  You don't have copies of those

11

1   deeds or anything like that at home, do you?

2       A    No.

3       Q    Okay.  Now, since you're a plaintiff in

4   this action, too, we can -- you heard some of the

5   questions I asked your husband, Charles, who is

6   present here during this deposition.

7            You're not claiming that your procedural

8   due process rights were violated, are you?

9       A    Can you --

10      Q    Explain that to you?

11      A    Please.

12      Q    Well, let me ask you a different question.

13           Let me ask a couple different questions.

14           I mean, you understand that you're a

15  plaintiff in this case, right?

16      A    Yes.

17      Q    Okay.  And it's you, as plaintiff, that

18  are making certain allegations against the town of

19  Old Lyme, the Old Lyme zoning commission and its

20  members, right?

21      A    Yes.

22      Q    Do you know who Eric Fries is?

23      A    No.

24      Q    Did you ever meet him before?

25      A    No.

1    Q    Okay.  Now, I know we talked about the

2    letter that you got from Marilyn Ozols.  And I

3    think, because there might have been a problem

4    with the first address -- did you get the letter

5    marked as Defendants' Exhibit 3?

6    A    In all honesty, I can't remember this one.

7    Q    Okay.  How about the exhibit marked as

8    Defendants' Exhibit 2 dated August 10, 1998?

9    A    Yes.

10   Q    Okay.  And you read it when you got it?

11   A    Yes.

12   Q    I mean, that's your signature on the green

13   card?

14   A    Yes.

15   Q    And you read the whole thing, right?

16   A    Yes.

17   Q    And you specifically saw this section

18   where you were notified that this was an official

19   action of the zoning enforcement officer and that

20   you have 30 days to appeal, right?

21   A    Yes.

22   Q    And you didn't take an appeal?

23   A    No.

24   Q    Okay.  And then have you seen the document

25   marked as Defendants' Exhibit 6?

26

1          Do you recognize that document?

2     A    (Reviewing document)

3     Q    Now that you've had a few moments to look

4     at Defendants' Exhibit 6, do you -- have you seen

5     that document before?

6     A    Never.

7     Q    Okay.  Now, you told me a few minutes ago

8     that one of your claims is that the town took your

9     ability to live at your house in Old Lyme at

10    11 Brookside Drive year-round, took essentially

11    several months, correct?

12    A    Correct.

13    Q    Okay.  When was that ability taken from

14    you?

15    A    When I received the letter.

16    Q    Okay.  So that -- and which letter are you

17    referring to?

18    A    The one in 1998.  This one.

19    Q    Okay.  So it's your claim that when you

20    got this letter from ZEO Ozols, that was the

21    notification that you can't use your property for

22    that additional winter period of time, that

23    off-season period of time, correct?

24    A    Correct.

25    Q    Okay.  Now, sitting here today, you told

27

1    me you didn't remember receiving the first letter

2    back in 1997.

3        A    No.

4        Q    Okay.  And you don't remember having any

5    conversation with your husband about it?

6        A    No.

7        Q    Okay.  Do you remember talking to a lawyer

8    about that back in 1997?

9        A    No.

10       Q    Okay.  Did you know that there were

11   seasonal dwellings -- seasonal-only dwellings in

12   Old Lyme at the time you purchased this property?

13               MR. SLATER:  Objection as to form

14               THE WITNESS:  Yes.

15   BY MR. RADSHAW:

16       Q    You knew some of the houses were seasonal

17   only, right?

18               MR. SLATER:  Objection.

19               THE WITNESS:  Yes.

20               MR. SLATER:  Pause just for a moment,

21       please.

22   BY MR. RADSHAW:

23       Q    Did you know if the house you purchased at

24   11 Brookside was seasonal only or year-round?

25               MR. SLATER:  Objection as to form.

28

1            THE WITNESS:  I didn't know what it

2        was used for, whether it was year-round or

3        seasonal.

4    BY MR. RADSHAW:

5        Q    And knowing that some of the residences in

6    Old Lyme were seasonal only, did you undertake

7    and -- let me ask you a different question.

8            Withdraw that.

9            Did you know at the time or before you

10   purchased 11 Brookside that there were seasonal

11   use restrictions existing in Old Lyme?

12       A    No, I did not.

13       Q    And before you bought in Old Lyme, you

14   didn't go down and check the zoning regulations or

15   anything like that?

16       A    No, I didn't.

17       Q    And nobody -- your lawyer who represented

18   you in the transaction didn't tell you about that?

19       A    No, he did not.

20       Q    Okay.  And the estate of Hartung or their

21   representatives, they didn't say anything to you

22   about that either?

23       A    No, they didn't.

24       Q    Okay.  And you didn't have an appraisal

25   done on the property when you purchased it, right?

29

1    A    I don't think so.

2    Q    You don't think so.

3    A    No.

4    Q    And sitting here today, do you remember

5   ever having an appraisal done on the property

6   since the time you bought it until the present

7   day?

8    A    No.

9    Q    How much do you think your house is worth

10  on 11 Brookside?

11   A    A lot more than when we bought it.

12   Q    Okay.  How much is that?

13   A    What?

14   Q    Okay.  Let me ask you a better question.

15       Sitting here today, how much is your

16  property at 11 Brookside Drive worth, if you put

17  it on the market today?

18   A    I couldn't answer that.  I'm not an expert

19  in that field.

20   Q    You're not an expert, okay.

21       So you have no opinion on that value at

22  all?

23   A    No.

24   Q    Okay.  All right.

25       Now, ZEO Ozols went through a process in

1    which she made first a preliminary determination

2    that your property was seasonal, gave you an

3    opportunity to respond, and then made a final

4    determination in the absence of a response, which

5    is the second letter.

6         Now, do you have any claim that that

7    process was wrong or should have been done

8    differently?

9    A    Yes.

10   Q    Okay.  So you're claiming that ZEO Ozols

11   should have done something else?

12   A    Yes.

13   Q    Okay.  What should she have done?

14   A    When we first applied, she should have

15   explained to us and shown us this document.

16   Q    Which one?  This one right here?

17   A    Yes.

18   Q    All right.  This one, I think, was

19   recorded on the land records in October '98.

20        So if we go back to the first letter --

21   which I know you say you don't remember getting.

22   A    Huh-uh.

23   Q    Well, let's assume for a minute -- I mean,

24   it's addressed to you and your husband remembers

25   getting it.

31

1          I mean, you don't have any reason to doubt

2     that he got it, right?

3          A    Right.

4          Q    But let's assume that your husband got it.

5          A    Mm-hmm.

6          Q    And when you say "mm-hmm" --

7          A    Yes.

8          Q    You don't need to answer -- well, let's

9     assume for a moment that your husband got it, and

10    let's assume for a moment that he discussed with

11    you that ZEO Ozols said, "I'm going to make this

12    determination that it's seasonal use only."

13         And let's also assume that your husband

14    knew what the seasonal use determination was from

15    his experience with the zoning regulations.

16         And let's assume further that he told you

17    that a seasonal use determination means "we can't

18    use our property during these certain months."

19         And let's further assume you got the

20    letter and there was an invitation by ZEO Ozols to

21    say "if you have any questions or concerns and you

22    have any information that might show otherwise," I

23    mean, is that something you would have responded

24    to?

25         A    Probably not at that time.

32

1    Q    Okay.  Even though she said "please

2  respond to me no later than" -- it looks like a

3  little more than two months later.

4    A    Mmm.

5    Q    That's something you would not have

6  responded to?

7    A    Probably not at that time.

8    Q    Okay.  And when she sent you an official

9  letter in 1998 that's marked as Defendants'

10  Exhibit 2 that said "this is an official action

11  and your only recourse is an appeal to the zoning

12  board of appeals," I mean, is that something you

13  would have appealed?

14    A    Probably not at that time.

15    Q    So did you think maybe that the 30-day

16  time limit, you know, wasn't mandatory, it was

17  just, you know, advice?

18    A    Yes.

19    Q    Okay.  Do you understand what a statute of

20  limitations is?

21    A    Yes.

22    Q    Okay.  It's kind of like if you have an

23  injury, you can only bring a lawsuit until a

24  certain time in the future?

25    A    Mm-hmm.

33

1      Q      When you say "mm-hmm," you mean yes?

2      A      Yes.

3      Q      I mean, you understand that those kinds of

4      things are mandatory; that if you, say, you know,

5      got hurt on a certain date and you waited five or

6      ten years, unless you had a good explanation, the

7      court says "sorry, you can't bring a claim."

8              MR. SLATER:  Objection as to form.

9      BY MR. RADSHAW:

10     Q      I mean, you understand that concept,

11     generally?

12             MR. SLATER:  Objection as to form.

13             THE WITNESS:  Yes.

14     BY MR. RADSHAW:

15     Q      Okay.  But in this appeal limitations,

16     it's your opinion that it was just advisory, just

17     a suggestion, right?

18             MR. SLATER:  Objection as to form.

19             THE WITNESS:  Yes.

20     BY MR. RADSHAW:

21     Q      Okay.  And you never presented any

22     evidence to her or the ZBA on this issue?

23     A      No.

24     Q      All right.

25             MR. SLATER:  She's already testified

76

1   another second.

2          THE WITNESS:  Thank you.

3          MR. RADSHAW:  I have no further

4   questions.  Thank you very much.

5          MR. SLATER:  Nor do I.

6       (Whereupon the witness was dismissed and

7          the deposition concluded at 3:06 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

78

1    C E R T I F I C A T E   O F   D E P O N E N T

2

3        I, VICTORIA PARSONS, have read the foregoing

4    transcript of the testimony given and it is true

5    and accurate to the best of my knowledge as

6    originally transcribed and/or noted on the

7    attached Errata Sheet.

8

9                    _____

10                        VICTORIA PARSONS

11

12        Subscribed to and sworn to before me on

13    this ____ day of _____ , 2006.

14

15                    _____

16                        Notary Public

17   My Commission expires:

18   _____

19

20   300CV97 (EBB)

21   SOUTH LYME PROPERTY OWNERS ASSOCIATION, INC.

22   -vs-

23   TOWN OF OLD LYME

24   VICTORIA PARSONS -  JULY 26, 2006

25   WJL

79

1    STATE OF CONNECTICUT

2    COUNTY OF TOLLAND

3        I, Wendy J. Leard, a Notary Public for the

4    State of Connecticut, do hereby certify that

5    the deposition of VICTORIA PARSONS, a plaintiff,

6    was taken before me pursuant to the Federal Rules

7    of Civil Procedure, at the law offices of

8    HOWD & LUDORF, 65 Wethersfield Avenue, Hartford,

9    Connecticut, commencing at 1:47 p.m., on

10   Wednesday, July 26, 2006.

11       I further certify that the deponent was first

12   sworn by me to tell the truth, the whole truth,

13   and nothing but the truth, and was examined by

14   counsel, and her testimony stenographically

15   reported by me and subsequently transcribed as

16   hereinbefore appears.

17       I further certify that I am not related to

18   the parties hereto or their counsel, and that I am

19   not in any way interested in the event of said

20   cause.

21       Dated at Somers, Connecticut, this 30th day

22   of July, 2006.

23

24                               Wendy J. Leard
                                 Notary Public

25   My Commission Expires May 31, 2007