COPY                                    1

1        UNITED STATES DISTRICT COURT
           DISTRICT OF CONNECTICUT
2

3    SOUTH LYME PROPERTY OWNERS          CIVIL ACTION NO.
       ASSOCIATION, INC.,               300CV97 (EBB)
       CHARLES AND VICTORIA PARSONS
4    AND JOAN BYER

5        VS.
                                        JULY 27, 2006
6    TOWN OF OLD LYME, TOWN OF OLD LYME
       ZONING COMMISSION, ERIC FRIES,
7    GEORGE JAMES, JANE MARSH, THOMAS RISOM,
       WALTER SEIFERT, SHARON COLVIN,
8    AND MARILYN OZOLS

9            DEPOSITION OF: JOAN BYER

10   APPEARANCES:

11   Attorneys for the Plaintiffs:

12     HALLORAN & SAGE
         One Goodwin Square
13       225 Asylum Street
         Hartford, Connecticut 06103
14       (860) 522-6103
       BY: KENNETH R. SLATER, JR., ESQUIRE
15

     Attorneys for Town of Old Lyme, Town of Old Lyme
16     Zoning Commission, Eric Fries, George James,
       Jane Marsh, Thomas Risom, Walter Seifert,
17     Sharon Colvin, and Marilyn Ozols:

18     HOWD & LUDORF
         65 Wethersfield Avenue
19       Hartford, Connecticut 06114-1190
         (860) 249-1361
20     BY: JOHN J. RADSHAW, III, ESQUIRE
         MARK E. VILLENEUVE, ESQUIRE
21

22             Wendy J. Leard
           Registered Merit Reporter
23             CSR # 00039

24   NIZIANKIEWICZ & MILLER REPORTING SERVICES
               972 Tolland Street
25     East Hartford, Connecticut 06108-1533
               (860) 291-9191

EXHIBIT E

2

1          . . . Deposition of JOAN BYER, taken on

2     behalf of the defendant in the hereinbefore

3     entitled action, pursuant to the Federal Rules of

4     Civil Procedure, before Wendy J. Leard, RMR, duly

5     qualified Notary Public in and for the State of

6     Connecticut, held at the law offices of HOWD &

7     LUDORF, 65 Wethersfield Avenue, Hartford,

8     Connecticut, commencing at 10:22 a.m., on

9     Thursday, July 27, 2006.

10

11               S T I P U L A T I O N S

12

13          It is hereby stipulated and agreed by and

14     among counsel for the respective parties that all

15     formalities in connection with the taking of this

16     deposition, including time, place, sufficiency of

17     notice and the authority of the officer before

18     whom it is being taken may be and are hereby

19     waived.

20

21          It is further stipulated and agreed that

22     objections, other than as to form, are reserved to

23     the time of trial and that the reading and signing

24     of the deposition is not waived.

25

1     It is further stipulated and agreed
2   that the proof of the qualifications of the
3   notary public before whom the deposition is being
4   taken is hereby waived.
5
6     JOAN BYER, Deponent, having first been duly
7   sworn, deposes and states as follows:
8
9                DIRECT EXAMINATION
10  BY MR. RADSHAW:
11    Q    Ms. Byer, would you please state your full
12  name and residence address for the record, please?
13    A    Okay.  It's Joan K. Byer.  B-Y-E-R.
14         136 West Hartford Road in Newington,
15  06111.
16    Q    How long have you lived at 136 West
17  Hartford Road?
18    A    About 35 years.
19    Q    Okay.
20         MR. SLATER:  Can I interrupt one
21         second?
22         There's two things that I wanted to
23         mention.
24         Let's go off the record.
25

1            (Whereupon a conversation

2              was held off the record.)

3            MR. RADSHAW:  Let's go back on the

4        record.

5    BY MR. RADSHAW:

6        Q    Ms. Byer, my name is John Radshaw, and I

7    represent the defendants in this case.

8            You understand that you're a plaintiff in

9    a lawsuit against the town of Old Lyme, the Old

10   Lyme zoning commission, and a number of

11   individuals.

12           Do you know that?

13       A    Yes, I do.

14       Q    Okay.  Have you had your deposition taken

15   before ever?

16       A    Yes.  Actually, in this building.

17       Q    Okay.  When did you have your deposition

18   taken?

19       A    Oh, probably ten years, at least.

20       Q    And what was it in regards to?

21       A    It was a lawsuit of our beach association

22   by a young woman who was hurt on one of our

23   streets.

24       Q    Okay.  I just want to go over the ground

25   rules -- since it was about ten years ago, I want

34

1    BY MR. RADSHAW:

2        Q    Do you have an understanding why the

3    town --

4        A    Yes.

5        Q    Could you please describe for me --

6                MR. SLATER:   If I can interrupt.

7                Please wait until he finishes his

8            question and then make a pause, even

9            though I know that you're anticipating the

10           answer very quickly, just so I can object

11           and he can finish his question.

12   BY MR. RADSHAW:

13       Q    I will go slower.  And I don't want -- if

14   I put out my hand, it's not -- I don't want you to

15   take any offense at it, but it's probably because

16   I have a few more words that I need to get out in

17   my question.

18           So I'll just go a little slower and maybe

19   break my questions up into smaller pieces.

20           Let me get back.

21           My question is, Do you have an

22   understanding why -- withdraw that.

23           You just told me that the town considers

24   this to be one lot, correct?

25       A    Yes.

1    Q    Okay.  Do you have an understanding why it

2    is the town of Old Lyme considers your three

3    parcels as one lot?

4    A    Yes.

5    Q    Okay.  Could you please describe for me

6    your understanding of why the town thinks your

7    three parcels are actually now one lot?

8    A    I believe -- and I don't know, but I

9    believe it's to reduce the density in the beach

10   areas.

11   Q    Okay.  How would considering it one lot

12   reduce the density?

13   A    I would not be able to apply for a

14   building permit on the other two, if the zoning

15   regulations were changed again from the 10,000

16   square feet limit.  Or requirement, I should say.

17   Q    If I said that -- withdraw that.

18        Have you ever heard of something like

19   what's called the merger provision to the zoning

20   regulations?

21        Does that sound familiar to you?

22   A    No.

23   Q    Okay.  But you consider it three separate

24   lots.

25   A    I do.

1    Q    Okay.  Can you build on the other two

2    lots?

3              MR. SLATER:  Objection as to form.

4              THE WITNESS:  I've been told I cannot

5         build.  I have a business on those other

6         two.

7    BY MR. RADSHAW:

8    Q    Okay.  What business do you have on the

9    other two?

10   A    It's a legal parking lot, regulated by the

11   town of Old Lyme, on two of those parcels, and the

12   home is on one.

13   Q    Okay.  Now, are the parcels paved?

14   A    No.

15   Q    Okay.  It's just dirt?

16   A    Gravel.

17   Q    Gravel.  Okay.

18        How many cars can you park there?

19   A    Twenty-five.

20   Q    And that's 25 on each lot or 25 total?

21   A    Twenty-five total.

22   Q    Okay.  And when do you operate that

23   parking lot business?

24   A    From June through to September.

25   Q    Okay.  And do you have any employees?

37

1       A       No.

2       Q       So what do you do, collect parking fees

3    for people wanting to use the beach?

4       A       Primarily, it's used for people who don't

5    have enough parking and they rent a yearly space

6    so that they, in effect, have another parking

7    space.

8       Q       So you don't have to have someone there

9    sitting under an umbrella taking money?

10      A       No, but I do have to sit there --

11      Q       Okay.

12      A       -- to make sure that they're available for

13   the people who bought them.

14      Q       I understand.

15              What do you charge for a season pass there

16   for a space?

17      A       $150.

18      Q       And that's for the whole season?

19      A       Yes.

20      Q       Now, your dwelling on 61 Breen Avenue, it

21   says here on the response to interrogatory 2C, on

22   page 2, that it's 954 square feet; is that

23   correct?

24      A       Yes.

25      Q       All right.  Well, let me back up and go to

38

1   2A.

2           2A says you purchased 61 Breen Avenue in

3   1970.

4           Do you recall our conversation earlier

5   today, we were talking about when you might have

6   purchased it?

7           Do you think that at the time you signed

8   this document, that was the most -- that was the

9   most accurate information back at the time you

10  signed this?

11          MR. SLATER:   Objection as to form.

12          THE WITNESS:   I'm not sure.

13          MR. RADSHAW:   Okay.

14  BY MR. RADSHAW:

15      Q   Do you know the square footage of the

16  living space in your property at 61 Breen Avenue?

17      A   I think it's close to that 954 square

18  feet, because that's livable and they don't count

19  porches.  So I think that's without the porches.

20      Q   Okay.  If the tax assessor's card said

21  that there were 1,116 square feet of living area

22  on the first floor and 936 square feet on the

23  second floor, for a total living area space of

24  2,052 feet, that would be incorrect?

25      A   I think that is incorrect.

39

1    Q    Okay.  Even if it also considered there's

2   288 square feet on a screen porch and 132 square

3   feet on a wood deck for a total living area of

4   3,488 square feet, that's too much?

5                MR. SLATER:  Objection as to form.

6                THE WITNESS:  That is too much.

7                MR. RADSHAW:  Okay.

8   BY MR. RADSHAW:

9    Q    How many bedrooms do you have there?

10   A    Seven, and then there are six on the third

11  floor that are not used.

12   Q    So that would be a total of 13 bedrooms?

13   A    Yes.

14   Q    Okay.

15   A    There were 14, and I consolidated two.

16   Q    Okay.

17                MR. SLATER:  Can we take a quick

18           break?

19                MR. RADSHAW:  Sure.

20                (Whereupon a recess was

21                 held off the record.)

22  BY MR. RADSHAW:

23   Q    Ms. Byer, now that you had a short break

24  to consult with your attorney, is there anything

25  that you want to tell me?

1      A     No.

2      Q     So sitting here today, you think the most

3   accurate depiction of the square footage of your

4   property on 61 Breen is what's written here in

5   your interrogatory response as 954 square feet?

6      A     Yes.

7      Q     Okay.  And so if the tax assessor has

8   about 2,000 square feet of living space, that's

9   inaccurate?

10     A     I don't know.

11     Q     Okay.  The number of toilets at 61 Breen,

12  there's three?

13     A     Yes.

14     Q     And there was three in 2000 and there are

15  still three here today?

16     A     Yes.

17     Q     Okay.  And today you have a -- excuse me.

18  Withdraw that.

19            In 2000, when you signed this, you had a

20  septic tank and a leaching field at 61 Breen,

21  correct?

22     A     Yes.

23     Q     And you still have that today?

24     A     Yes.

25     Q     Do you know when that septic system was

41

1   put in?

2       A    I do not.

3       Q    Okay.  Have you ever had any problems with

4   it?

5       A    No.

6       Q    So I guess when you flush the toilets, put

7   stuff down the drain, run the washer and dryer and

8   the dishwasher -- you have those appliances?

9       A    No.

10      Q    What kind of appliances do you have there?

11      A    None other than a stove and refrigerator.

12      Q    You have a kitchen, right?

13      A    Yes.

14      Q    Do you have more than one kitchen?

15      A    There's a side kitchen, yes.

16      Q    Okay.  Is that adjacent to the primary

17  kitchen?

18      A    Yes.

19      Q    Okay.  There isn't a kitchen on another

20  floor, is there?

21      A    No.

22      Q    Okay.  But when you use the sink, you

23  don't have any problems with the water or whatever

24  you put down the sink --

25      A    No.

1          When we'd get, you know, enough

2          renovated that we felt we could rent it,

3          we did, and we rented it for July or

4          August to various people.

5    BY MR. RADSHAW:

6    Q    Now, did you have your -- have you rented

7    the property to anybody in the 2000s?

8    A    No.

9    Q    Okay.  What about the 1990s, did you rent

10   the property at any time during the 1990s?

11   A    Yes.

12   Q    Of that -- we'll just take that decade.

13        Of that decade, how much of that decade

14   did you rent it for, in any capacity?

15   A    Probably -- probably continuously.

16   Q    And I want to describe for you

17   three -- well, let me withdraw that.

18        You've been down to the beach communities

19   in Old Lyme for at least 30 years.

20   A    Yes.

21   Q    You're familiar with that area.

22   A    Yes.

23   Q    You have friends down there; you've driven

24   through the streets, right?

25   A    Yes.

46

1      Q     And you served as a member of one of the

2   beach associations.

3      A     Yes.

4      Q     And you know that there are properties

5   that people use only on a seasonal basis, right?

6              MR. SLATER:  Objection as to form.

7              THE WITNESS:  Yes.

8   BY MR. RADSHAW:

9      Q     And you know there are other people who

10  live in their homes year-round, right?

11             MR. AOFPLT:  Objection as to form.

12             THE WITNESS:  Yes, I do.

13  BY MR. RADSHAW:

14     Q     And you also know in the South Lyme Beach

15  Association, there are people who rent their

16  properties, right?

17             MR. SLATER:  Objection as to form.

18             THE WITNESS:  You mean just rent them

19         and not use them?

20             MR. RADSHAW:  That's right.

21             THE WITNESS:  Very few.

22  BY MR. RADSHAW:

23     Q     But there are some?

24     A     Yes.

25     Q     And there are some people that rent them

1    for the summer months, all or some part?

2            MR. SLATER:   Objection as to form.

3            THE WITNESS:   Yes.

4    BY MR. RADSHAW:

5       Q    Okay.   And are you aware if anyone down in

6    the beach communities rents the apartments for the

7    entire year?

8            Withdraw that.   I misspoke.

9            Are you aware of any homeowner down there

10   at the Old Lyme beach communities who rents all or

11   part of their property on a year-round basis?

12      A    I don't know.

13      Q    Okay.   What about on, like, I'll say an

14   off-season use, for that part of the year other

15   than the summer, are you aware of anyone who rents

16   it?

17      A    I don't know.

18           MR. SLATER:   Objection as to form.

19           MR. RADSHAW:   Okay.

20           MR. SLATER:   Please pause just a

21       moment.

22   BY MR. RADSHAW:

23      Q    Now, of all the renting you did, the only

24   time you rented some portion of your property at

25   61 Breen, it was just for the summer season,

48

1    correct?

2        A    Yes.

3        Q    Okay.  Now, I want to focus on the area

4    you were telling me about, the renting that you

5    did in the 1990s, and you said you basically had

6    summer -- withdraw that.

7            I want to talk about the 1990s, and you

8    testified that you rented some portion of your

9    property at 61 Breen for essentially all of the

10   1990s, for all those summer seasons, right?

11       A    Yes.

12       Q    All right.  Now, during the 1990s, did

13   your property at 61 Breen have the same number of

14   bedrooms as it does today?

15       A    Yes.

16       Q    Okay.  Let's start with 1990.

17           Did you rent your property in 1990?

18       A    Yes.

19       Q    Okay.  To how many people did you rent

20   your property?

21       A    Well, one tenant in July and one in

22   August.

23       Q    Okay.  Now, let's talk about the first

24   tenant in July.

25           Did you rent it to just one person?

49

1    A    No.

2    Q    Okay.

3    A    A family.

4    Q    Okay.  How many people were in that family

5    in 1991?

6    A    Maybe five.

7    Q    Okay.  How many rooms did they occupy?

8    A    All of them, really.  Except the third

9    floor, all of them.

10    Q    Where did you live during July of that

11    year?

12    A    Home.

13    Q    Okay.  So for all the summers that you

14    rented the property at 61 Breen during the 1990s,

15    assuming it was rented, you rented the entire

16    house to them, correct?

17    A    Yes.

18              MR. SLATER:  Objection.

19    BY MR. RADSHAW:

20    Q    So you didn't -- if you had rented -- I'm

21    just going to pick, you know, July of 1995.

22              You rented that to some person or, excuse

23    me, some tenant, and you didn't stay down at

24    61 Breen.

25    A    Not usually, but if it was a family

55

1    A    Outside.

2    Q    -- when did you make that improvement to

3 61 Breen with the walls?

4    A    It was ongoing.  It was --

5    Q    Do a room at a time?

6    A    The whole -- I think from probably 1975 on

7 until maybe '95.

8    Q    Okay.  You did a room at a time?

9    A    Yes.

10   Q    As funds became available?

11   A    Exactly.

12   Q    Did you and your husband do this, I would

13 say, sweat equity, yourself?

14   A    Yes.

15   Q    So as it went.

16   A    Mm-hmm.

17   Q    Did you apply for any permits or anything

18 like that to conduct those interior renovations

19 concerning the insulation and interior wall

20 coverings at 61 Breen?

21   A    No.

22   Q    What other improvements did you make to

23 61 Breen other than the interior walls that you

24 described?

25   A    A roof and vinyl siding.

56

1    Q    And when did you put on a new roof?

2    A    I really have no idea.

3    Q    Well --

4    A    It was part of that process.

5    Q    Somewhere in the '70s or '80s?

6    A    No, I think, actually, the beginning of

7    the '90s.

8    Q    Okay.  Did you apply for a permit to put

9    on the roof?

10    A    No.

11    Q    Did you receive any feedback from the town

12    for putting on a new roof without a permit?

13    A    No.  They reassessed the house, so they

14    were aware of it.

15    Q    And what about the vinyl siding, about

16    when did you put the vinyl siding up?

17    A    Actually, before the roof.  Probably '92,

18    '93.

19    Q    Okay.  Did you apply for a permit to put

20    on the vinyl siding?

21    A    No.

22    Q    Have you ever put on any additions or

23    anything like that to the structure at 61 Breen?

24    A    Put on, yes.

25    Q    Okay.  Can you tell me about the additions

57

1    that you've caused to be put on 61 Breen?

2        A    The back kitchen is an L shape.  It sticks

3    out from the main house.

4        Q    Okay.

5        A    There was a fire escape and a deck, and we

6    had taken the fire escape down.  We filled in and

7    made a room to close off that L for my elderly

8    mother.

9        Q    Okay.  And is that structure there today?

10       A    No.

11       Q    Okay.  What happened?

12       A    The town required I take it down.

13       Q    Okay.  Why is that?

14       A    Because I didn't get a permit, and it

15   was -- it needed a variance.

16       Q    But you had -- now, did you do that work

17   yourself or your former husband?

18       A    I had --

19       Q    A contractor?

20       A    -- a contractor.

21       Q    Okay.  And did he apply for a permit, if

22   you know?

23       A    No.

24       Q    And you didn't apply for a permit.

25       A    No.

1    going to be my next question.

2            So I'm going to ask you a series of

3    questions, and I know Attorney Slater would like

4    you to answer this way.

5            If I ask you a question, answer that

6    question, and then I'll ask you the very next one,

7    which may be self-evident to you at that moment.

8            Do you understand what I'm getting at?

9    A       (No audible response)

10   Q       When you nod your head up and down, you

11   mean yes?

12   A       Yes.

13   Q       So you found out that you needed to apply

14   for a variance for this enclosure of this section,

15   and that was after the ZEO denied your permit; is

16   that right?

17   A       I'm sorry.  I don't understand your

18   question.

19   Q       Okay.  I'll withdraw it.

20           You told me you applied for a variance,

21   right?

22   A       Yes.

23   Q       And then who denied that variance?

24   A       The board of zoning appeals.

25   Q       Okay.  And did you take an appeal from the

1    decision of the board of zoning appeals?

2        A    No, I didn't know you could.

3        Q    Okay.  You didn't know that you could

4    appeal the decision of the board of zoning appeals

5    in the superior court?

6        A    No.

7        Q    Other than that particular permit and

8    variance issue that you described for me, have you

9    made any other alterations or modifications to the

10   structure at 61 Breen?

11       A    No.

12       Q    Now, we were talking earlier in the

13   deposition about renting at 61 Breen, and you told

14   me you had rented it, you know, during the summer

15   seasons for at least the '90s and you said you had

16   been doing it quite a bit.

17           Was that also true in the '80s?

18       A    No.

19       Q    Okay.  Did you stay down there in the

20   '80s?

21       A    Yes.

22       Q    And what about in the '70s, did you rent

23   it then?

24       A    No.

25       Q    Would it be fair to say that you only

1    rented it after you made a number of the interior

2    improvements?

3        A    Yes.

4        Q    Okay.  Now, did you ever live down at

5    61 Breen as your primary residence?

6        A    No.

7        Q    Okay.  Your primary residence was in

8    Newington, and you commuted to work during the

9    off-season, September through May or June months,

10    when you worked as a teacher, right?

11                MR. SLATER:  Objection as to form.

12                THE WITNESS:  Right.

13                MR. RADSHAW:  Okay.

14    BY MR. RADSHAW:

15        Q    And when you worked all those years for

16    CIGNA, what location did you work at for CIGNA?

17        A    In Bloomfield.

18        Q    Okay.  How long does it take to get from

19    Bloomfield to Old Lyme?

20        A    About one hour.

21        Q    Okay.  Was that a commute that you drove

22    at any time on a regular basis when you worked at

23    CIGNA?

24        A    Not more than once a week.

25        Q    Okay.  And the rest of that time, on those

62

1    weeks that you mentioned, you lived in Newington.

2        A    Right.

3        Q    Okay.  And was 20 Purthill Road, was that

4    ever your primary residence?

5        A    No.

6        Q    But you told me a number of summers you

7    stayed there on and off when you had the other

8    half of Purthill Road rented and when you had

9    61 Breen rented.

10       A    Yes.

11       Q    Okay.  Have you rented any part of

12   61 Breen since the year 2000?

13       A    No.

14       Q    Okay.  Have you lived there during the

15   summer months from 2000 to the present day?

16       A    Yes.

17       Q    Okay.  Were you still renting Purthill

18   Road up to the time you sold it in 2002 or 3?

19       A    Yes.

20       Q    How much did you rent -- withdraw that.

21            What was the rental fee on either a

22   monthly or weekly basis when you rented Purthill

23   Road in the 2000s?

24       A    It ranged from 1,500, or maybe even 1,200,

25   to 2,000, was the last year that I owned it.

1    Q    Was that on a weekly basis?

2    A    No, no, no.  That was a month.

3    Q    On a monthly basis.  Okay.

4         And during the 1990s when you rented

5    61 Breen, what was the rent on a monthly basis?

6         I mean, if you can give me a range, just

7    an idea.

8    A    I really don't know.  I mean, there were

9    times when I rented it to family members for next

10   to nothing to cover the utilities.

11   Q    Right.

12   A    And then -- I really don't know.  I don't

13   remember.

14   Q    During those years, was it, you know, ever

15   any more than a thousand a month?

16   A    It might have been up to 1,500.

17   Q    Okay.  But you testified earlier that you

18   really didn't know of anyone who rented those

19   properties from September to May, right?

20   A    Right.

21   Q    Okay.  So as far as you know, there really

22   isn't a market for people to live there from

23   September until May?

24              MR. SLATER:  Objection as to form.

25              THE WITNESS:  I don't know that.

1              MR. RADSHAW:   Okay.

2    BY MR. RADSHAW:

3        Q    You don't know one way or the other?

4        A    No.

5        Q    I mean, it's not something you've

6    investigated?

7        A    No, I didn't choose to do that.

8        Q    Right.

9             Did you ever think about doing that?

10       A    No.

11       Q    Okay.  And you also -- when I asked you

12   about other people on the beach, based on your

13   familiarity and your personal knowledge, whether

14   there were people down there that rented their

15   homes in the beach communities on a year-round

16   basis, you said there might have been a few.

17       A    A few, but I don't really know.

18       Q    Okay.  And you didn't investigate, you

19   know, what that market was, how much people could

20   get to rent their properties on a monthly basis

21   for the entire year?

22       A    No, I don't.

23       Q    Okay.  Now, do you have any documentary

24   evidence that could support a claim that your

25   property at 61 Breen was used on a year-round

1    basis, you know, somebody's primary residence,

2    prior to January 1, 1992?

3        A    No.

4        Q    There's no documents out there that can

5    support that?

6        A    No.

7        Q    Okay.  And you don't have any evidence,

8    you know, in the form of witnesses or anything

9    else that will say "at some point in time, this

10   was my primary residence, and I lived here

11   continuously on a year-round basis," right?

12       A    No.

13       Q    And what about from January 1, 1992, until

14   I think it's January 1, 1995, you don't have any

15   evidence, documentary, testimonial, or otherwise,

16   that could support a claim that someone lived at

17   61 Breen on a year-round basis, do you?

18       A    No.

19       Q    Okay.  Now, what about 20 Purthill Avenue,

20   do you have any evidence, we'll start with

21   documentary evidence, that could support a claim

22   that someone lived on that property on a

23   year-round basis prior to January 1, 1999?

24       A    No.

25       Q    Okay.  What about between January 1,

1      1992 -- I'll withdraw that question because I want

2      to ask you a different question.

3              It's going to sound like the same

4      question, but it's not.

5              Do you have any evidence, documentary or

6      otherwise, testimonial, witnesses, that can

7      support a claim that anyone lived on a year-round

8      basis at 20 Purthill Road prior to January 1,

9      1992?

10     A      No.

11     Q      Okay.  What about from January 1, 1992, to

12     January 1, 1995, do you have any evidence,

13     documentary, testimonial or otherwise, that could

14     support a claim that someone lived there

15     year-round prior to that date?

16     A      No.

17     Q      Okay.  And sitting here today, you have no

18     evidence as to either property from January 1,

19     1995, until the present day, no one has lived at

20     either one of those properties continuously on a

21     year-round basis?

22     A      No.

23     Q      And you've never made an application to

24     convert either of those dwellings, 61 Breen or

25     Purthill Road, to year-round use as provided for

67

1    in the regulations of the town of Old Lyme.

2        A    No.

3        Q    Okay.  Now, have you ever -- did you ever

4    receive a preliminary determination concerning

5    seasonal use as to 61 Breen Avenue?

6        A    What do you mean by that?

7        Q    Okay.

8            (Defendants' Exhibits 2 - 7, marked

9            for identification-described in index)

10   BY MR. RADSHAW:

11       Q    Ms. Byer, I'm going to show you a document

12   that's been marked as Defendants' Exhibit 2.  I'd

13   like you to take a look at this document and tell

14   me if it's something you've seen before.

15       A    (Reviewing document)

16            Yes, I have seen this.

17       Q    Okay.  That document is on the letterhead

18   of the Town of Old Lyme.  It's dated April 15,

19   1999.  It's directed to you at your address in

20   Newington, and it's signed by Marilyn Ozols; is

21   that correct?

22       A    Yes.

23       Q    Now.  I started asking you some questions

24   about what a preliminary determination concerning

25   seasonal use was, and it sounded like you didn't

68

1    understand my question.

2         So I'm going to tell you that for the

3    purposes of my next couple of questions, this

4    letter would constitute a preliminary

5    determination.

6         Do you understand?

7    A    Yes.

8    Q    Okay.  Now, this letter that's been marked

9    as Defendants' Exhibit 2, you did, in fact,

10   receive that letter at your Newington residence?

11   A    I did.

12   Q    Okay.  And when you got it, got that

13   letter, Exhibit 2, you read it?

14   A    Yes.

15   Q    Okay.  And at the time you read it, you

16   saw that, towards the end of the letter, it said

17   "We've made this preliminary determination, and if

18   you disagree, we invite you to contact us and

19   provide documentation"; is that right?

20   A    Yes.

21   Q    And you read that at the time you got the

22   letter?

23   A    Yes.

24   Q    Okay.  What did you do after you got this

25   letter?

69

1      A    I believe I made application for either a

2   variance or whatever you had to do.

3          As she said here, "If I don't hear from

4   you by that date, it will be final," and so I did

5   protest.

6      Q    Okay.  But sitting here today, you

7   remember you did some protest, right?

8      A    Yes.

9      Q    Okay.  I'm going to show you a document

10  that's been marked as Defendants' Exhibit 3.  It's

11  dated June 1, 1999, and the author's address block

12  says 136 West Hartford Road.

13         It appears to be a letter to Marilyn Ozols

14  from Joan K. Byer, and it's copied to Timothy

15  Griswold and Dennis Melluzzo.  And it appears to

16  reference the April 15 letter marked as Exhibit 2,

17  and it's stamped "Received June 21, 1999."

18         Why don't you take a minute to look at

19  that and tell me if that's a letter you recognize.

20     A    (Reviewing document)

21     Q    Is that a letter you recognize?

22     A    I wrote it.

23     Q    Okay.  That's a letter that you wrote to

24  Marilyn Ozols back on June 1, signed by you, and

25  it references the April 15 letter, right?

70

1    A    Yes.

2    Q    Okay.  When you sent this letter, did you

3    send anything, any documents with it, or was it

4    just this one page?

5    A    I assume it was this one page.  I don't

6    know.

7    Q    Okay.  Because if you had put enclosures

8    in the same way you put cc for carbon copy, you

9    would have put "enclosures" or some abbreviation

10   for that, right?

11   A    Yes.

12   Q    Okay.  So after you sent the June 1

13   letter, did you do anything else?

14              MR. SLATER:  Objection as to form.

15              THE WITNESS:  I don't remember.

16              MR. RADSHAW:  Okay.

17   BY MR. RADSHAW:

18   Q    I'm going to show you a letter marked as

19   Defendants' Exhibit 4.  It's on the letterhead of

20   the Town of Old Lyme; it's from Marilyn Ozols to

21   Joan K. Byer at your West Hartford Road address in

22   Newington.

23        I want you to take a look at this letter

24   and tell me if that's something you recognize.

25   A    (Reviewing document)

71

1          I believe I saw this.

2      Q    Okay.  Now, I'm going to ask you a couple

3   of questions about it, because -- and I don't want

4   you to make any assumptions.

5          I want you to tell me whether you know or

6   you don't know.  I'm trying to figure this out.

7          And I don't want to confuse the issue by

8   the series of the next couple questions I'm going

9   to ask you.

10         The first letter to you marked as

11  Defendants' Exhibit 2 is dated April 15, and in

12  that letter, Marilyn Ozols asked you to contact

13  her no later than June 16, 1999.

14         Do you see that in Exhibit 2?

15     A    Yes.

16     Q    It's the second-to-last paragraph in bold.

17     A    Yes.

18     Q    Okay.  Now, the next point is your letter,

19  which is Exhibit 3, dated June 1, but it is date

20  stamped received as June 21.

21         Now, is it possible that you wrote that

22  letter on June 16, or something along those lines?

23         Why it would take, you know, 20 days to

24  get from Newington to Old Lyme?

25     A    No.

72

1    Q    You think you wrote that letter on June 1?

2    A    Yes, I do.

3    Q    Can you give any idea why it might have

4  taken 20 days to get to Old Lyme?

5    A    I might not have had stamps.

6    Q    Okay.

7    A    It was during final exams.  Lots of

8  reasons.

9    Q    I understand.

10        Now, looking at the July 2 letter, which

11  is marked as Exhibit 4, you see where ZEO Ozols

12  references your June 16 letter?  Do you see that?

13    A    Yes.

14    Q    Sitting here today, do you have a present

15  memory of writing a letter dated June 16?

16    A    I do not.

17    Q    Okay.  So we're not missing a letter.

18    A    No.

19    Q    In fact, probably the most likely

20  explanation here is that ZEO Ozols took the

21  June 16 deadline out of her letter that's marked

22  as Defendants' 2, seeing that the letter that you

23  sent her back in reply came in after that

24  deadline, and just misread your letter and might

25  have put June 16 instead of June 1.

73

1              MR. SLATER:  Objection as to form.

2              THE WITNESS:  I have no idea.

3              MR. SLATER:  Just pause just another

4          second.

5  BY MR. RADSHAW:

6      Q    But you'd agree with me that's possibly

7  just a scrivener's error?

8          I mean, she made an error in date.

9          There isn't some other letter out there,

10 is there?

11             MR. SLATER:  Objection as to form.

12             THE WITNESS:  No, there's no other

13         letter.

14             MR. RADSHAW:  Okay.

15 BY MR. RADSHAW:

16     Q    Okay.  Now, the July 2 letter that's

17 marked as Defendants' Exhibit 4, you received that

18 letter?

19     A    Yes.

20     Q    You read it when you received it, right?

21     A    Yes.

22     Q    Okay.  And at the time you read that

23 letter, you understood that letter to invite you,

24 as it says in there, to contact her or provide any

25 documentation that would substantiate anything

74

1    other than a seasonal use of that property at

2    61 Breen, correct?

3        A    Yes.

4        Q    Okay.  Did you take any steps to contact

5    her?

6        A    I do believe I made application to the

7    zoning board of appeals following this letter.

8        Q    Okay.  At some point?

9        A    Yes.

10       Q    But I want to focus your -- this next

11    couple of questions and the time period especially

12    to the month of July of 1999.

13           Do you believe that you sent any documents

14    to her or anything like that?

15       A    No, I do not.

16       Q    Okay.  Do you remember if you called her?

17       A    No, I did not.

18       Q    Okay.  I'm going to show you another

19    document that's been marked as Defendants'

20    Exhibit 5.

21           This particular document is three pages in

22    length.  The first page is a letter dated July 22,

23    1999, on the letterhead of the Town of Old Lyme;

24    it's to Joan K. Byer at 136 West Hartford Road in

25    Newington; it's signed by Marilyn Ozols.

1          The second page of this document is a

2     two-sided photocopy of what's customarily called

3     the domestic return receipt green card, and the

4     third page is a double-sided photocopy of the

5     receipt for certified mail stamped by the post

6     office canceling the cost paid for that receipt.

7          And what I want to draw your attention to

8     is the reverse side of the second page of the

9     green card where that lists Joan K. Byer as the

10    addressee and there is a signature block

11    concerning receipt.

12         Do you see that?

13    A    Yes, I do.

14    Q    Is that your signature?

15    A    It's questionable, because I don't make

16    some of my letters that way.

17    Q    Okay.  Sitting here today, do you have a

18    present memory of signing the green card?

19    A    I do not.

20    Q    Okay.  Do you have -- okay.

21         Did you -- let's turn back to the first

22    page.

23         Did you get that letter dated July 22?

24    A    (Reviewing document)

25         I believe I did.

76

1    Q    Do you have any idea approximately when

2    you got that letter?

3    A    I do not.  One of the problems is not

4    living at home when that letter was sent to my

5    primary residence.

6    Q    Okay.

7    A    And sometimes I don't pick up my mail for

8    two weeks.

9    Q    Okay.  And that would be during the summer

10   months, right?

11   A    Yes.

12   Q    But your Old Lyme property tax bill,

13   where's that sent?

14   A    To Newington.

15   Q    Okay.  And you have personal bank

16   accounts?

17   A    Yes.

18   Q    What bank do you bank with?

19   A    Bank of America, which was Fleet, and

20   Webster.

21   Q    Okay.  And how long have you banked

22   with -- I guess Bank of America bought Fleet,

23   right?

24   A    Yes.

25   Q    And did you bank with the predecessor of

1   exhibit numbers, and I'm going to show you a

2   document marked as Defendants' Exhibit 8.

3         This is a letter and it appears to be

4   signed by you directed to June Speirs listed as

5   chairperson in the zoning board of appeals.  It's

6   dated August 22, 1999, and the author's address

7   block says 61 Breen Avenue.

8         Do you recognize that document?

9   A    Yes.

10  Q    Okay.  This is a letter that you authored?

11  A    Yes.

12  Q    Okay.  And this is a letter that you,

13  sitting here today, remember sending on or about

14  August 22, 1999?

15  A    Yes.

16  Q    Okay.  So it would be fair to say that

17  although you testified earlier that you don't have

18  a memory of the exact date of when you received

19  the document marked as Defendants' Exhibit 5, the

20  July 22, 1999, letter, even though the card is

21  stamped August 7, it's possible that you received

22  it on that day but you definitely received it

23  sometime before the day you wrote this letter?

24  A    Yes.

25  Q    So you definitely got Defendants'

83

1    Exhibit 5 sometime in the middle August 1999,

2    right?

3        A    Yes.

4        Q    Okay.   Now, did you consider this document

5    to be an appeal of the zoning enforcement

6    officer's decision?

7        A    I think I did at that time, yes.

8        Q    Okay.   But that's --

9                MR. RADSHAW:   Would you mark that as

10              Exhibit 9.

11                  (Defendants' Exhibit 9, marked for

12                   identification-described in index)

13   BY MR. RADSHAW:

14       Q    I'm going to show you a document marked as

15   Defendants' Exhibit 9.   It's on the letter of

16   Dzialo, Pickett & Allen, signed by David M.

17   Royston.   It's dated September 2, 1999, and it's

18   addressed to you, Ms. Byer.

19            Have you seen that document before?

20       A    I can't be certain.

21       Q    Okay.

22       A    I assume I did because I know I made

23   application after that time.

24       Q    Okay.   That was the next document I'm

25   going to show you, even though it's marked as

84

1    Defendants' Exhibit 6.

2         It's date-stamped received with what looks

3    like October 5, 1999, and it appears to be signed

4    by you on September 18, 1999.

5         So I want you to take a look at that

6    package of documents which appears to be an appeal

7    and tell me if that's something that you

8    recognize.

9    A    (Reviewing document)

10        Yes.

11   Q    And the first couple of pages there, it

12   says "Appeal from the ruling of the zoning

13   enforcement official," at least the first four

14   pages are completed in your handwriting, correct?

15   A    Yes.

16   Q    And there's a copy of your deed taking

17   possession of the property, and then there's your

18   check to cover the statutory appeal fee, right?

19   A    Yes.

20   Q    Okay.  Now, in this appeal, your claim is

21   that you're taking an appeal from the ruling of

22   the zoning enforcement official denying you

23   permission to your home from November to April,

24   correct?

25   A    Yes.

1      Q    And it's your opinion that that decision

2   should have been reversed because it's

3   unconstitutional to tell a property owner when

4   they can live in their home, right?

5      A    Yes.

6      Q    And -- okay.

7           Now, was that appeal later the subject of

8   a hearing before the zoning board of appeals?

9      A    Yes.

10     Q    I'm going to show you a document marked as

11  Defendants' Exhibit 7.  It's on the letterhead of

12  the Town of Old Lyme, Zoning Board of, Appeals.

13          It's addressed to you at your West

14  Hartford Road address in Newington, and it's

15  signed by June B. Speirs, chairman.

16          And tell me if you've seen that document

17  before.

18     A    (Reviewing document)

19          Yes, I have.

20     Q    And that document reflects Chairwoman

21  Speirs advising you of the decision of the Old

22  Lyme zoning board of appeals, correct?

23     A    It does.

24     Q    And it reflects there was a meeting held

25  on, I believe, November 18; is that correct?

86

1    A    Yes.

2    Q    And were you present at that meeting?

3    A    I was.

4    Q    Okay.  Were you represented by counsel?

5    A    No.

6    Q    Okay.  Did you have an opportunity to

7    address the zoning board of appeals?

8    A    Yes, I did.

9    Q    Did you have an opportunity to call

10   witnesses?

11   A    I don't know.

12   Q    I mean, did you bring any witnesses?

13   A    No.

14   Q    Did you bring any documents to show --

15   A    No.

16   Q    -- or submit to the zoning board of

17   appeals?

18   A    No.

19   Q    It says here in the second-to-last

20   sentence there is a 15-day appeal.

21        Do you see that?

22   A    To the court, right.

23   Q    Right.  Did you take that appeal?

24   A    No, I did not.

25   Q    I mean, you didn't commence an action in

1      A     I'm just naming some of my neighbors on

2   Breen Avenue.

3      Q     Okay.  You said the Avoleses, what number

4   is that, 67 Breen?

5      A     Yes.

6      Q     Okay.  And that's Lisa?

7      A     Right.

8      Q     Okay.  Now, I want to ask you a couple

9   questions about the association and its members.

10          You know that some of the members received

11  preliminary determination letters --

12     A     Yes.

13     Q     -- and final determinations in the same

14  manner that you did; is that correct?

15     A     Yes.

16     Q     Okay.  But others didn't; is that correct?

17     A     Right.

18     Q     So if we had all -- and this is a document

19  I'm looking at marked as Defendants' Exhibit 8

20  from the deposition of Larry Lapila on July 24,

21  2006.

22          All 408 members of the South Lyme Property

23  Owners Association, you'd agree with me that if we

24  got all 408 people and lined them up outside my

25  office and I deposed every one of them, you'd

1    agree with me that some of them got preliminary

2    determinations and final determinations that they

3    were seasonal use and others did not get any of

4    those determinations; is that correct?

5        A    Yes.

6        Q    Okay.  And you'd also agree with me, of

7    those who got final determinations that their

8    house was a seasonal use, that some of them made

9    appeals to the ZBA; is that right?

10        A    Yes.

11        Q    And others, even though they got final

12    determinations, did not appeal to the ZBA.

13        A    I assume so.

14        Q    I mean, you'd also agree with me -- you're

15    familiar with the beach communities; you've been

16    going there since the '50s.

17            You're familiar with the houses, the

18    street layouts.  You know a lot of the people not

19    just as friends but acquaintances; there's a lot

20    of families.  There's a lot of tradition down in

21    the beach communities, right?

22                MR. SLATER:  Objection as to form.

23                THE WITNESS:  Yes.

24                MR. RADSHAW:  All right.

25

124

1    BY MR. RADSHAW:

2        Q    And you've been going down there.  You

3    know that a lot of the houses vary; some are

4    small, some are big, right?

5        A    Yes.

6        Q    I mean, some have just a few bedrooms;

7    others, like yours, one of the bigger places in

8    the beach communities, have 12, 13, or more

9    bedrooms.

10       A    Yes.

11       Q    And you'd also agree with me that the lot

12   sizes vary considerably.  Your lot is

13   considerable.

14                   MR. SLATER:  Objection as to form.

15                   THE WITNESS:  No.  Most of the lots

16           were 50-foot lots.

17                   MR. RADSHAW:  Okay.

18   BY MR. RADSHAW:

19       Q    But if we applied the merger provisions in

20   the town zoning regulations and looked at your

21   lot, seeing that you're the common owner of all

22   three and they're contiguous, that lot might be

23   12,000 square feet or so, right?

24                   MR. SLATER:  Objection as to form.

25                   THE WITNESS:  Yes.

125

1    BY MR. RADSHAW:

2        Q    Okay.  I mean, you do have a business on

3    the other two lots, but taken together, it might

4    be 12,000 or a little bit more than that, right?

5        A    Yes.

6        Q    Okay.  Now, have you -- you said that most

7    of the lots are 50 by 80; is that right?

8        A    50 by 83, 85.

9        Q    Okay.  Now, that's just your impression of

10   the size of the lots.

11       A    Yes.

12       Q    Okay.  Have you undertaken a study to

13   determine exactly how many lots are, say, below

14   156 in Old Lyme and exactly what the square

15   footage of all of them are?

16       A    No.

17       Q    Now, you also would agree with me that of

18   the members of the South Lyme Property Owners

19   Association, of which you're a member, there are

20   members who held their properties as long as you

21   have or longer since the '60s --

22       A    Some.

23       Q    -- to the present day, correct?

24       A    Some.

25       Q    And you'd also agree with me there are

1    some members there that bought in the '80s and

2    held their property to the present day, right?

3        A    Yes.

4        Q    And you'd also agree with me there are

5    some members that are more recent people who have

6    moved to town who purchased their properties

7    after, say, 1992, correct?

8        A    Yes.

9        Q    And there's even people who purchased them

10   even later, in the late '90s and into the 2000s,

11   correct?

12       A    Yes.

13       Q    Okay.  Now, do all the members of the

14   South Lyme Property Owners Association own

15   property in the beach communities of Old Lyme?

16               MR. SLATER:   Objection as to form.

17               THE WITNESS:   I have no idea.   I

18          assume.

19   BY MR. RADSHAW:

20       Q    You don't know one way or the other?

21       A    No.

22       Q    Are there any membership requirements --

23   seeing that you're one of the founding members of

24   the South Lyme Property Owners Association, are

25   there any membership requirements for membership

127

1    in the association?

2        A    No.

3        Q    Aside from the fact that I'm a lawyer

4    representing the defendants in this case and I

5    don't own any property in Old Lyme, can I be a

6    member of the South Lyme Property Owners

7    Association?

8        A    You'd have no vested interest.  What would

9    be your interest?

10       Q    Okay.  Let me ask you that question a

11   little differently.

12            Are there any rules or regulations of the

13   South Lyme Property Owners Association that would

14   prevent me from joining the association and making

15   a financial contribution?  Yes or no.

16       A    No.

17       Q    Okay.  So to the best of your knowledge,

18   there's nothing in the organizing documents that

19   say membership in the South Lyme Property Owners

20   Association is limited to people who have an

21   ownership interest in real property in the town of

22   Old Lyme; is that correct?

23       A    No.  But the initial letters went out via

24   the tax records, so they would have owned

25   property . . .

128

1    Q    I understand that.

2         But if I heard about -- if somebody else,

3    you know, from Waterford heard about this case or

4    from somewhere else heard about this case and

5    wanted to make a financial contribution, are there

6    any rules or regulations or qualifications or

7    requirements of the association that would prevent

8    that person from joining and enjoying all the

9    rights and privileges as member of the South Lyme

10   Property Owners Association?

11   A    No, but in going back, I think we wanted

12   them to be owners of real property.

13   Q    Okay.  So everybody who's a member -- if

14   this list is accurate, everybody who's a member is

15   a property owner in Old Lyme; is that correct?

16   A    At one time.

17   Q    Okay.  So are there members of the South

18   Lyme Property Owners Association who no longer own

19   property in Old Lyme?

20   A    Might be.  They might have sold their

21   interest.

22   Q    Okay.  You don't know one way or another?

23   A    I don't.

24   Q    Okay.  Other than the letters we discussed

25   earlier today authored by the South Lyme Property

129

1    Owners Association, do you have any documents at

2    home concerning the organization or the

3    proceedings of the association?

4        A    Other than letters requesting our presence

5    at meetings, I don't think so.

6        Q    Okay.  I mean, you understand what I mean

7    by documents regarding the proceedings?

8        A    No.

9        Q    Okay.  Let me ask you some questions.

10           You were an officer of the Old Colony

11   Beach Association, right?

12       A    I am.  Was.

13       Q    There was a clerk there, right?

14       A    Yes.

15       Q    The clerk took the minutes of the meeting?

16       A    Yes.

17       Q    Okay.  And then at the next meeting -- and

18   there were agendas drawn up?

19       A    Yes.

20       Q    And at some point the presiding officer of

21   the board said, "We need to approve last month's

22   minutes.  Any questions?"

23       A    Yes.

24       Q    And there was a discussion whether or not

25   to approve or edit, correct?

1     A    Yes.

2     Q    And those documents, the meeting minutes,

3  when you had -- and the agendas, I'd like you to

4  consider them what would be the proceedings of an

5  organization, might also include the roll call and

6  that sort of thing, other documents that might

7  have been discussed on the agenda, you know, "This

8  is the proposed contract for our security services

9  at the beach," you know, "these are our three

10  bids."

11     Do you have now, based on what I've told

12  you, an understanding of what I mean by the

13  proceedings of the organization?

14     A    Yes.

15     Q    Do you have any documents that might

16  reflect the proceedings of the South Lyme Property

17  Owners Association?

18     A    No.

19     Q    And you never got any minutes of meetings

20  or agendas or anything like that?

21     A    Not that I can recall.

22     Q    Okay.  I know you told me that you

23  participated in the editing of a number of the

24  letters but not all of them.

25     Did you contribute in any other way to the

1    organization, management, or operation of the

2    South Lyme Property Owners Association?

3        A    No, except to verbally ask my neighbors to

4    join.

5        Q    Okay.  Did you contribute any money?

6        A    Yes.

7        Q    How much money did you contribute?

8        A    $1,500.

9        Q    Okay.  And when did you contribute that

10   money?

11       A    In three increments: once when we got

12   started, 500, and then 500 again, and then 500

13   last year.

14       Q    Is that a requirement, to contribute

15   $1,500 to be a member?

16       A    No.

17       Q    Okay.  Is it just a suggestion?

18       A    It is a suggestion.

19       Q    Okay.  Is it your understanding that that

20   contribution was tax deductible in any way?

21       A    No.

22       Q    Okay.  I'm going to show you a document

23   that's been marked as Defendants' Exhibit 10, and

24   tell me if you've ever seen that document before.

25       A    Yes, I've seen it.

1    Q    How is it that that document came to your

2    attention?

3    A    I can't be certain.

4    Q    The document that's marked as Defendants'

5    Exhibit 10 is a copy of a document that's recorded

6    at book 261, page 185 of the Old Lyme land

7    records, and it's a designation the property of

8    Joan K. Byer at 61 Breen Avenue.  And it's dated

9    Old Lyme this 30th day of December 1999.

10         Do you -- withdraw that.

11         So you know you've seen it but you

12   haven't -- you can't recall exactly when.

13   A    Right.

14   Q    Okay.  Do you believe it might have been

15   transmitted in the mail to you?

16   A    It might have been.

17   Q    Okay.  But sitting here today, you're not

18   sure what year or when?

19   A    I have no idea.

20   Q    Okay.

21              MR. RADSHAW:  I'd like to take a

22              short break.

23              (Whereupon a recess was

24              held off the record.)

25

1    BY MR. RADSHAW:

2        Q    Ms. Byer, I appreciate your patience;

3    we're coming very close to the end.

4        A    Okay.  I'm a high school teacher; you

5    don't have to worry about patience.

6        Q    Okay.  You told me earlier today that you

7    thought that the majority of the on-site septic

8    systems in the communities in Old Lyme were not

9    properly working; is that correct?

10       A    Yes.

11       Q    And you told me that sewers -- withdraw

12   that question.

13           When you say sewers are necessary, is it

14   your understanding, when you say "sewers," of

15   pipes in the ground that transport the household

16   waste away from the property, maybe far away from

17   the property to a wastewater treatment facility, a

18   big structure, kind of a large building some

19   distance away and there might be some pumping

20   stations to get the waste there; is that correct?

21                   MR. SLATER:  Objection as to form.

22                   THE WITNESS:  Yes.

23   BY MR. RADSHAW:

24       Q    Okay.  And I had asked you about how

25   sewers work -- excuse me, septic systems work, and

1    you gave me your layperson's understanding.

2          And in your mind, is it fair to say there

3    are really two options for the treatment of

4    household waste: on-site septic systems and

5    sewers?

6                MR. SLATER:   Objection as to form.

7                THE WITNESS:   I have no idea.

8    BY MR. RADSHAW:

9       Q    Okay.  Are you aware of any other option

10   other than an on-site septic system or what we've

11   understood to be a sewer system with an off-site

12   treatment familiarity?

13      A    No.

14      Q    But in your opinion, the answer to

15   whatever pollution problem exists is the

16   installation of sewers, right?

17      A    Yes.

18      Q    Okay.  Who should pay for the installation

19   of sewers in the town of Old Lyme?

20      A    I believe, like any other piece of

21   property, that the taxpayer pays based on a

22   low-cost loan with contributions from the federal

23   and state government, because it's in their

24   interest to have clean water.

25      Q    Okay.  Assuming that such contributions

135

1    from the state and federal government are

2    available, right?

3        A    Yes.

4        Q    They might not be in the budget.

5        A    Right.

6        Q    Okay.  But I mean, it's your opinion that

7    all the property owners in Old Lyme should pay for

8    a sewer system; is that right?

9                MR. SLATER:  Objection as to form.

10               THE WITNESS:  No.

11   BY MR. RADSHAW:

12       Q    Okay.  Which property owners should pay?

13       A    The people who are serviced by that area.

14   If it applies to the whole town, then the whole

15   town pays.

16       Q    Okay.  Does the whole town of Old Lyme

17   need sewers, in your opinion?

18       A    Yes.

19       Q    All of it, everything?

20       A    I do.

21       Q    Even the farthest point north farthest

22   from the beach?

23       A    Yes.  Economies of scale.

24       Q    Now, you would agree with me that in order

25   to put sewers in -- and I'm just going to put

136

1    aside for a minute the construction of a

2    wastewater treatment facility, put that aside.

3         Isn't it true that you pretty much have to

4    run a pipe from all of the homes and buildings and

5    structures that create household or commercial

6    waste and then pipe all of that to the facility?

7         A    Yes.

8              MR. SLATER:    Objection as to form.

9    BY MR. RADSHAW:

10        Q    And you would agree with me that in order

11   to do that, you pretty much have to dig up quite a

12   few of the roads, if not all of them, in the town

13   of Old Lyme?

14             MR. SLATER:    Objection as to form.

15             THE WITNESS:    Yes.

16   BY MR. RADSHAW:

17        Q    I mean, you and I can agree there's a lot

18   of roads; it may not have to be all of them, but

19   you'd have to dig up many of them?

20        A    Yes.

21        Q    Okay.  And do you have any evidence that

22   any of the on-site septic systems outside the

23   beach communities of the town of Old Lyme, do you

24   have any evidence whether they are not operating

25   appropriately and properly?

149

1   C E R T I F I C A T E   O F   D E P O N E N T

2

3       I, JOAN BYER, have read the foregoing

4   transcript of the testimony given and it is true

5   and accurate to the best of my knowledge as

6   originally transcribed and/or noted on the

7   attached Errata Sheet.

8

9                   _____

10                          JOAN BYER

11

12          Subscribed to and sworn to before me on

13   this ____ day of _____ , 2006.

14

15                   _____

16                          Notary Public

17   My Commission expires:

18   _____

19   300CV97 (EBB)

20

21   SOUTH LYME PROPERTY OWNERS ASSOCIATION, INC.

22   -vs-

23   TOWN OF OLD LYME

24   JOAN BYER -  JULY 27, 2006

25   WJL

150

STATE OF CONNECTICUT

COUNTY OF TOLLAND

I, Wendy J. Leard, a Notary Public for the

State of Connecticut, do hereby certify that

the deposition of JOAN BYER, a plaintiff, was

taken before me pursuant to the Federal Rules

of Civil Procedure, at the law offices of

HOWD & LUDORF, 65 Wethersfield Avenue, Hartford,

Connecticut, commencing at 10:22 a.m., on

Wednesday, July 27, 2006.

I further certify that the deponent was first

sworn by me to tell the truth, the whole truth,

and nothing but the truth, and was examined by

counsel, and her testimony stenographically

reported by me and subsequently transcribed as

hereinbefore appears.

I further certify that I am not related to

the parties hereto or their counsel, and that I am

not in any way interested in the event of said

cause.

Dated at Somers, Connecticut, this 30th day

of July, 2006.

_____

Wendy J. Leard

Notary Public

My Commission Expires May 31, 2007