Exhibit
A
(pages 11-20)

--- F.Supp.2d ----                                                                                                    Page 11
--- F.Supp.2d ----, 2007 WL 805779 (E.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

104 Counties
    104VII Torts
        104k141 k. Nature and Grounds of Liability. Most Cited Cases
New York county health care corporation, as public benefit corporation, was immune from punitive damages, as were its individual employees in their official capacities.

[45] Civil Rights 78 ☞1465(1)

78 Civil Rights
    78III Federal Remedies in General
        78k1458 Monetary Relief in General
            78k1465 Exemplary or Punitive Damages
                78k1465(1) k. In General. Most Cited Cases
In § 1983 action against individual defendants, punitive damages may be awarded when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others. 42 U.S.C.A. § 1983.

Law Offices of Frederick K. Brewington by Gregory Calliste, Jr., Esq., Hempstead, NY, for Plaintiff.
Clifton Budd & Demaria, LLP by George P. Brenlla, Esq., New York, NY, for Defendants.

### MEMORANDUM AND ORDER

HURLEY, Senior District Judge.

*1 Plaintiff Clifford Johnson ("Plaintiff") filed the present action against defendants County of Nassau,[FN1] Nassau County Health Care Corporation ("NCHCC"), Nassau University Medical Center ("NUMC"), Sharon Popper ("Popper"), Richard Turan ("Turan"), Michael H. Mostow ("Mostow"), and Karle Kampe ("Kampe") (collectively, "Defendants") claiming that he was discriminated against based on his race and in retaliation for his complaints of race discrimination. Defendants have moved for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56. For the reasons stated below, the motion is granted in part and denied in part.

### BACKGROUND

The material facts, drawn from the Complaint and the parties' Local 56.1 Statements, are undisputed unless otherwise noted.

NCHCC is a Public Benefit Corporation created by the New York State Legislature. In or about September 1999, the legislature authorized NCHCC's acquisition of certain assets and operations of Nassau County relating to the provisions of healthcare services, including NUMC. Pursuant to the New York law, County employees performing functions associated with NUMC become NCHCC employees.

#### I. *Plaintiff's Employment*

Plaintiff is an African-American male who was hired by Nassau County in 1983 as a hospital aid. In 1997, he was promoted to "Lead Painter" and also held an "informal" position leading the Office of Diversity (the "Office of Diversity" or the "Office"). When NCHCC was formed, Plaintiff became an employee of NCHCC.

According to Plaintiff, the Office of Diversity was officially opened in July 1999 and became a recognized department within the hospital. At that time, Plaintiff was promoted to Chairman and Director of the Office of Diversity. Thereafter, in June 2001, Plaintiff was also named as a Community Service Representative. In Plaintiff's role in the Office of Diversity and as a Community Service Representative, Plaintiff acted as a liaison between the employees and NCHCC upper management regarding employee complaints of discrimination. Plaintiff and his staff, inter alia, interviewed employee complainants, conducted fact-finding inquiries, and prepared reports pertaining to matters investigated for upper management. It is undisputed that in these roles, Plaintiff brought hundreds of instances of alleged discriminatory treatment to NCHCC's attention. Plaintiff also performed community outreach activities.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                                                                      Page 12

--- F.Supp.2d ----, 2007 WL 805779 (E.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

## II. *Plaintiff's Claims of Discrimination/Retaliation*

Plaintiff claims that despite the fact that Defendants had created the Office of Diversity, Plaintiff and his staff were discouraged from raising issues concerning discrimination in the workplace. In this regard, Plaintiff claims that Defendants only created the Office of Diversity because they were receiving funds and grant monies from the State that were intended for fostering diversity programs at NUMC; however, Defendants never intended to permit the Office of Diversity to fulfill its purpose and did everything in their power to ensure that the Office could not function properly. For example, Plaintiff alleges that he was consistently berated and his employment threatened for reporting discriminatory complaints. Plaintiff also claims that Defendants intentionally ignored numerous valid cases of employee discrimination that he brought to their attention. Plaintiff also contends that he was retaliated against for raising claims of discrimination directed at himself and his staff personally, as well as against other employees.

*2 On November 18, 2002, Plaintiff attended a NCHCC Board meeting wherein he raised concerns regarding discrimination against other employees at NCHCC which had not been rectified and noted that "racial discrimination was rampant." (Turan Dep. at 40.) Plaintiff alleges that as a direct result of his public address to the Board, Defendants began retaliating against him by repeatedly transferring his office and, on one occasion, displacing his staff.

### A. *Plaintiff's Transfer to Human Resources*

For example, it is undisputed that in or around January 2003, Defendants hired Vance Shaw, who is African-American, to work in the Office of Diversity. Around the same time, the Office of Diversity was transferred to the Human Resources Department and Plaintiff was directed to report to Shaw, who in turn reported to Kampe, the Vice President for Human Resources. Plaintiff claims that this transfer was tantamount to a demotion because once he began reporting to Shaw, who allegedly took over many of Plaintiff's duties, Plaintiff was no longer recognized as the Director of the Office of Diversity. (*See* Pl.'s Decl. ¶ 11; Decl. of Doreen Whethers ("Whethers"),[FN2] dated June 15, 2006 ("Whethers Decl."), ¶ 11.) Plaintiff further alleges that Defendants hired Shaw for the sole purpose of having him take over Plaintiff's responsibilities and to "subdue" the Office. (*See* Pl.'s Decl. ¶ 17; Whethers Decl. ¶ 17.) According to Plaintiff, however, Shaw defied Defendants' intentions by defending the Office's actions and assisting it in investigating complaints; Shaw was thereafter terminated. (*See* Pl.'s Decl. ¶ 17; Whethers Decl. ¶ 17.)

In January 2003, Plaintiff wrote a letter to the New York State Division of Human Rights (the "NYSDHR"), alleging that he had been retaliated against immediately following his address at the Board meeting. (*See* Pl.'s Ex. V.) In his letter, Plaintiff asserted that after his statements to the Board, he was informed that the Office of Diversity, which he oversaw, would be taken over and "run by someone with more expertise, and that [he] would no longer be in charge." *(Id.)* He further stated that this "new person" would now decide all staff requests. *(Id.)* Nine days later, he was told that Kampe would take over the Office. *(Id.)*

### B. *Plaintiff's Other Transfers*

It is undisputed that in March or April of 2003, the Office of Diversity was transferred to the Office of the General Counsel. Plaintiff continued to report to Shaw who now reported to Popper, Vice President of Legal Affairs and General Counsel. It is further undisputed that in October 2003, the Office of Diversity was transferred yet again to the Academic Affairs Department, which was located next to the General Counsel's Office. Plaintiff now reported to Mostow, the Dean of Academic Affairs; Shaw was no longer employed by NCHCC. With regard to this latter move, Mostow directed Plaintiff to physically move his office, which was in a different building, to an office closer to Mostow. Plaintiff's staff was moved elsewhere, to a location outside the grounds of NUMC. Plaintiff claims this his new office was the size of a closet and filled with garbage, which took Defendants weeks to remove. He also claims that due to the size of his office and the inadequate

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----  
--- F.Supp.2d ----, 2007 WL 805779 (E.D.N.Y.)  
(Cite as: --- F.Supp.2d ----)

Page 13

space given to his staff, the Diversity staff was not afforded an appropriate work area to address employees' complaints and had to meet with employees in the back of NUMC's cafeteria to address their concerns. He further alleges that he and his staff were given clerical tasks not related to the Office of Diversity. (See Pl.'s Decl. ¶ 11; Whethers Decl. ¶ 12.)

*3 Plaintiff claims that these transfers were effectuated to deter employees from complaining of discrimination because Defendants knew that employees would not go to Human Resources or Legal Affairs to address discriminatory complaints. Thus, Plaintiff argues, Defendants intentionally situated the Diversity Office in "hostile areas" because they were aware that this would intimidate employees and prevent them from lodging complaints. Alternatively, Defendants could keep an eye on employees that did show up to file a complaint. Plaintiff claims that as a result of these transfers, the Office became "inoperable and unworthy of respect." (Pl.'s Decl. ¶ 13.)

Finally, Plaintiff claims that he was required to submit daily reports to Mostow every morning concerning his activities the day before. (Pl.'s Counter-Statement Pursuant to Local Rule 56.1 ¶ 30.) Plaintiff alleges that no other employees, similarly situated to him, were required to do so. (Id.)

Defendants counter that they had legitimate nondiscriminatory reasons for all of Plaintiff's transfers. For example, they assert that in April 2003, since issues being investigated in the Office of Diversity had legal ramifications, some of which were already in litigation, NCHCC made the decision to transfer the Office of Diversity to the Office of the General Counsel. Thereafter, in October 2003, because the Office of Diversity was going to be conducting more educational training, Defendants transferred it to the Dean of Academic Affairs.

### III. Defendants' Alleged Plot to Terminate Plaintiff

On April 14, 2004, Plaintiff hand delivered a letter to Turan, Mostow, and Michael DeLuca ("DeLuca") asserting that he "was given an ultimatum that if [he] did not retire [he] would be fired today." (Pl.'s Ex. G.) Turan, NCHCC's President and Chief Executive Officer, directed Popper, NCHCC's General Counsel, to conduct an investigation into Plaintiff's allegations. After being questioned by Popper, Plaintiff identified the persons who allegedly made the ultimatum as DeLuca, Mostow, and Turan; however, Plaintiff refused to identify the person who allegedly told him about the ultimatum. Popper also interviewed DeLuca, Mostow, and Turan, all of whom denied making any kind of ultimatum.

According to Plaintiff, he found out about the ultimatum from Nick Delasanta ("Delasanta"), Vice President of Labor Relations at the time, who was present at a meeting between Turan, Mostow, and DeLuca where they allegedly reached an agreement that Plaintiff would be fired if he did not retire early. (Pl.'s Dep. at 117-18.) Plaintiff did not disclose Delasanta's name during the course of Plaintiff's employment for fear that Delasanta would be retaliated against. FN3

Plaintiff advised Popper that he would meet with her to discuss the ultimatum and the name of the person who told him about same if she agreed to allow his attorney to be present during the meeting. On April 25, 2004, Popper sent Plaintiff a memorandum denying Plaintiff's request, noting that "[n]either you nor any other employee has the right to refuse to talk to management about hospital business, with or without an attorney." (Pl.'s Ex. H.)

*4 According to Defendants, because Plaintiff would not provide Popper with the name of his source, and because Plaintiff was set to retire effective May 31, 2004, NCHCC required that Plaintiff take a one month paid leave of absence until his retirement. (See Popper Dep. at 82 ("[T]here was a concern about the need for some type of disciplinary action as a consequence of [Plaintiff] having circulated a letter containing allegations that [Plaintiff] subsequently confirmed ... were not true.").) According to Defendants, Ann Johnson, who is African-American, assumed the diversity duties

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                                                          Page 14
--- F.Supp.2d ----, 2007 WL 805779 (E.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

previously performed by Plaintiff.

According to Plaintiff, Popper told him that he should use his sick/vacation time until it was time for him to retire or he would "find things to be difficult, as far as [his] retirement was concerned-[his] benefits." (Pl.'s Dep. at 120.) As a result of Popper's "threat," Plaintiff was forced to use his sick time and retire early. In addition, Plaintiff argues that the only reason he was "set to retire" on May 31, 2004, was because he felt forced out as a result of Defendants' actions. In support of this argument, he proffers his March 24, 2004 letter to Mostow which states, in pertinent part, as follows:
My staff and I were placed under your direction approximately six months ago. Since that time, the office functions were changed by you without any input from my staff or I and these changes served to alter the Office of Diversity Affairs mission, intent, and purpose.
...
Let it be known, as a Department Head, I wasn't given an opportunity to express my opinion in these changes, or was I consulted of the intent prior to changes being made.
It is clear that I have been isolated and ostracized with the apparent intent to demoralize, humiliate, embarrass, and degrade me and my staff in every way possible.
Therefore under these conditions, that have had a severe adverse impact on me, I am now faced with retirement before my desired time.

(*See* Pl.'s Ex. R.)

### IV. *Plaintif's EEOC Charge*

Plaintiff filed a complaint with the NYSDHR against NUMC on March 4, 2003, alleging race discrimination and unlawful retaliation. That complaint was "cross-filed" with the Equal Employment Opportunity Commission ("EEOC") that same day. After reviewing all of the evidence, on February 11, 2004, the NYSDHR issued a Determination and Order After Investigation dismissing the Complaint, finding "no probable cause." This finding was subsequently adopted by the EEOC without independent review and the EEOC issued Plaintiff a right to sue letter on April 12, 2004.

### V. *the Instant Action*

Plaintiff commenced this action on July 9, 2004. The Complaint asserted six causes of action: (1) unlawful race discrimination and retaliation under Title VII; (2) unlawful race discrimination and retaliation under Title VI; (3) violations of 42 U.S.C. § 1983 ("Section 1983"); (4) unlawful discrimination in violation of 42 U.S.C. § 1981 ("Section 1981"); (5) violations of the First and Fourteenth Amendments in violation of Section 1983; and (6) unlawful race discrimination and retaliation in violation of the New York Executive Law. By Memorandum and Order dated January 23, 2006, the Court dismissed: (1) the Title VII claims against all individual defendants; (2) the Title VI claim in its entirety; (3) the Section 1983 and Section 1981 claims against NUMC; and (4) the sixth cause of action under the New York Executive Law. Defendants now move for summary judgment dismissing all remaining claims. For the reasons indicated below, the motion is granted in part and denied in part.

### DISCUSSION

### I. *Applicable Law and Legal Standards*

*A. Summary Judgment*

*5 Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir.1994). The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ---- Page 15

--- F.Supp.2d ----, 2007 WL 805779 (E.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen. 'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir.1996) (citing Fed.R.Civ.P. 56(c)).

[1][2] To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir.1996). The non-movant must present more than a "scintilla of evidence," *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir.1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts, " *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir.1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir.1996) (internal citations omitted).

[3][4][5] The district court considering a summary judgment motion must also be "mindful of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir.1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions. *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir .1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim. *Id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not 'implausible.' " *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587).

*6 [6] Summary judgment is generally inappropriate where questions of the defendant's state of mind are at issue, *Gelb v. Board of Elections of the City of New York*, 224 F.3d 149, 157 (2d. Cir.2000), and should thus be granted with caution in employment discrimination cases. *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir.1994); *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir.2000). Nonetheless, "summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." *Chambers v. TRM Copy Ctrs. Corp*, 43 F.3d 29, 40 (2d Cir.1994).

### B. The McDonnell-Douglas Burden-Shifting Methodology

In *McDonnell-Douglas Corporation v. Green*, 411 U.S. 792, 802-804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court first enunciated the now-familiar "burden-shifting" formula used in analyzing Title VII employment discrimination claims based on indirect or circumstantial evidence. This standard was further refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252-253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) and *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

[7][8] Under *McDonnell-Douglas* and its innumerable progeny, (1) a plaintiff must first establish a prima facie case of discrimination; (2) the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions; if the employer does so, the *McDonnell-Douglas* framework and its presumptions and burdens disappears, leaving the sole remaining issue of " discrimination vel non," and thus (3) the burden shifts back to the plaintiff to prove that the employer's stated reason is merely pretextual and that discrimination was an actual reason for the adverse employment action. *See Reeves v.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----    Page 16

--- F.Supp.2d ----, 2007 WL 805779 (E.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

*Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Although intermediate evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.*

[9] The burden of establishing a prima facie case of employment discrimination has been described as " modest," *Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir.1994), or even "minimal." *Roge v NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir.2001). It is a burden of production, not persuasion, and involves no credibility assessments. *Reeves*, 530 U.S. at 143.

[10][11] Likewise, the employer's burden of showing a legitimate non-discriminatory reason for its actions is not a particularly steep hurdle. It is not a court's role to second-guess an employer's personnel decisions, even if foolish, so long as they are non-discriminatory. *See Seils v. Rochester City Sch. Dist.*, 192 F.Supp.2d 100, 111 (W.D.N.Y.2002) (citing, inter alia, *Meiri*, 759 F.2d at 995 (2d Cir.1985)), *aff'd*, 99 Fed. Appx. 350 (2d Cir.2004). Federal courts do not have a "roving commission to review business judgments," *Mont v. First Fed. Sav. & Loan Ass'n of Rochester*, 869 F.2d 100, 106 (2d Cir.1989) (quoting *Graefenhain v. Pabst Brewing Co.*, 827 F.2d 13, 21 n. 8 (7th Cir.1987)), and may not "sit as super personnel departments, assessing the merits-or even the rationality-of employers' non-discriminatory business decisions." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 825 (1st Cir.1991). Thus, "[e]vidence that an employer made a poor business judgment generally is insufficient to establish a question of fact as to the credibility of the employer's reasons." *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1116 (2d Cir.1988).

*7 [12][13] In order to demonstrate that the employer's stated non-discriminatory reasons for the allegedly discriminatory action are pretextual, "[a] plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir.1995). A discrimination claimant may show pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Bombero v. Warner-Lambert Co.*, 142 F.Supp.2d 196, 203 n. 7 (D.Conn.2000) (quoting *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir.1999), and citing *Olson v. Gen Elec. Astrospace*, 101 F.3d 947, 951-52 (3d Cir.1996)), *aff'd*, 9 Fed. Appx. 38 (2d Cir.2001).

[14] However, to rebut an employer's proffered non-discriminatory rationale for its actions and withstand summary judgment, a plaintiff must present more than allegations that are "conclusory and unsupported by evidence of any weight." *Smith v. Am. Exp. Co.*, 853 F.2d 151, 154-55 (2d Cir.1988). "To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases." *Meiri*, 759 F.2d at 998.

### II. Plaintiff Fails to Raise a Genuine Issue of Material Fact as to his Discrimination Claims

[15] To establish a prima facie case of discrimination under Title VII, a plaintiff must show that: (1) he belonged to a protected class, (2) was qualified for the position he held or sought, and (3) suffered an adverse employment action (4) under circumstances giving rise to an inference of discriminatory intent. *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir.2003). Defendants concede that Plaintiff has established the first two elements of his prima facie case, viz. that he was a member of a protected class and that he was qualified. Defendants contend, however, that Plaintiff cannot prove that he suffered an adverse employment action under circumstances giving rise to discrimination. Because the Court finds that Plaintiff has established the third element of his

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                                                              Page 17
--- F.Supp.2d ----, 2007 WL 805779 (E.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

prima facie case, i.e., that he suffered an adverse employment action, but has failed to establish the final element, i.e., under circumstances giving rise to an inference of discriminatory intent, Plaintiff's Title VII discrimination claims are dismissed.

### A. *Adverse Employment Actions*

[16] The Supreme Court has stated that in order to be actionable under federal discrimination laws, an adverse employment action must be "tangible" or "material." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *see also Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir.2006) ("A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment.") (citation and internal quotation marks omitted). A "tangible employment action" connotes a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* "Materially adverse" employment actions can also include "a demotion evidenced by a decrease in wage or salary, a less distinguished title, ... or other indices ... unique to a particular situation." *Feingold v. N.Y.*, 366 F.3d 138, 152 (2d Cir.2004) (citations and internal quotations omitted). However, a "bruised ego," a "demotion without change in pay, benefits, duties, or prestige," or "reassignment to [a] more inconvenient job" are all insufficient to constitute a tangible or material adverse employment action. *Burlington Indus., Inc.*, 524 U.S. at 761 (internal quotations and citations omitted).

*8 Defendants argue that their conduct and actions against Plaintiff do not rise to the level of adverse employment actions as that term has been defined by the case law. In support of this contention, they emphasize that throughout his entire employment, Plaintiff never received any decrease in wages or benefits. They further contend that Plaintiff was merely transferred to different supervisors, his office location physically moved once, and that none of these transfers amounted to a demotion. In that regard, they argue that Plaintiff's claims "are simply a series of ordinary workplace occurrences and inconveniences" and, thus, are not actionable. (Defs.' Mem. at 10.)

[17][18] The Second Circuit has stated that "'a transfer is an adverse employment action if it results in a change in responsibilities so significant as to constitute a setback to the plaintiff's career.'" *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir.2006) (quoting *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 641 (2d Cir.2000)). An adverse employment action may also be found where "the plaintiff was transferred from an elite unit to one that was less prestigious or where the transfer effected a radical change in [the] nature of the plaintiff's work." *Id.* (citations and internal quotation marks omitted). To be materially adverse, however, "a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* at 207 (citations and internal quotation marks omitted). Thus, "[i]f a transfer is truly lateral and involves no significant changes in an employee's conditions of employment, the fact that the employee views the transfer either positively or negatively does not of itself render the denial or receipt of the transfer [an] adverse employment action." *Id.* (citations and internal quotation marks omitted). "Because there are no bright-line rules, courts must pore over each case to determine whether the challenged employment action reaches the level of 'adverse.'" *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir.1997).

[19] The Court finds that Plaintiff has presented evidence sufficient to create a genuine triable issue as to whether the transfers he was subjected to materially altered the terms and conditions of his employment in a negative way. Plaintiff has proffered his own declaration, as well as the declaration of Whethers, a NUMC employee who worked under Plaintiff at the Office of Diversity, which support Plaintiff's claims that as a result of the transfers, he was subjected to "a loss of status, a clouding of job responsibilities, and a diminution in authority." *Id.* at 466 (discussing *Collins v. State of Ill.*, 830 F.2d 692, 704 (7th Cir.1987)). According to both Plaintiff and Whethers, once Plaintiff began reporting to Shaw, he was no longer recognized as

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----  
--- F.Supp.2d ----, 2007 WL 805779 (E.D.N.Y.)  
(Cite as: --- F.Supp.2d ----)

Page 18

the Director of the Office of Diversity and his duties and responsibilities lessened. In addition, the net result of all of the transfers and the accompanying adverse consequences-for example, the location of his new office, being separated from his staff, having his complaints intentionally ignored by upper management, and having to meet clients in the cafeteria-was that Plaintiff was hindered from performing his job properly. A reasonable juror could certainly infer from such evidence that the transfers resulted in a functional dismantling of Plaintiff's department, a resultant loss of prestige to Plaintiff, and/or a "setback to [his] career," *Kessler*, 461 F.3d at 206, culminating in Plaintiff being forced to retire early and use up his sick/vacation time.

*9 In their Reply papers, Defendants argue that Plaintiff may not rely on his declaration and the declaration of Whethers to defeat summary judgment because they contradict Plaintiff's prior deposition testimony in that Plaintiff testified that: (1) for the short period of time during which he was supervised by Kampe, viz. approximately two months, his duties were the same as they had always been; (2) when he reported to Mostow, he continued to perform all of his duties as Community Service Representative as he had in the past; and (3) the Office of Diversity was never "shut down." *(See* Defs.' Reply at 3-4.)

In the Court's view, considering the record in toto, Plaintiff's testimony that he continued to perform all of his duties while reporting to Kampe and Mostow does not entirely contradict his later statements that his duties were diminished. Plaintiff also testified at his deposition that "work was being taken from [him] and given to ... Mostow." (Pl.'s Dep. at 48.) This testimony is somewhat consistent with Plaintiff's present claim that his duties were diminished and taken over by other supervisors. Moreover, a plausible reading of Plaintiff's deposition testimony is that his job duties remained the same but he was hindered from actually performing them due to Defendant's actions. *Cf. Langman Fabrics, a div. of Blocks Fashion Fabrics, Inc. v. Graff Californiawear, Inc.*, 160 F.3d 106, 112 (2d Cir.1998) ("If there is a plausible explanation for discrepancies in a party's testimony, the court considering a summary judgment motion should not disregard the later testimony because of an earlier account that was ambiguous, confusing, or simply incomplete."), *amended on other grounds by*, 169 F.3d 782 (2d Cir.1998). Most importantly, however, the Court's finding that Defendants' actions may have risen to the level of an adverse employment action does not rely solely on Plaintiff's claims that his duties were diminished. As outlined above, there were other actions taken by Defendants which, taken together, could be viewed by a rational fact-finder as negatively impacting the terms and conditions of his employment.

Finally, Plaintiff's testimony that the Office of Diversity was never "shut down" does not contradict Plaintiff's present claims that Defendants' actions made it very difficult for him to carry out his duties.

In sum, the Court finds that the transfers arguably altered the terms and conditions of Plaintiff's employment in a negative way sufficient to constitute an adverse action for purposes of his discrimination claims.

### B. *Inference of Discrimination*

[20] A Title VII plaintiff may establish the last element of the prima facie case in a number of different ways depending on the specific facts of the case. *See Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir.2001). Here, Plaintiff argues that a juror could infer that Defendants acted with a discriminatory motive because: (1) he was treated differently than similarly situated white employees; (2) Defendants engaged in a pattern of discriminatory treatment of African-American employees; and (3) Mostow made a racist comment. The Court will address Plaintiff's allegations in turn.

### 1. *Similarly Situated Employees*

*10 Plaintiff alleges that he was treated in a disparate manner in that: (1) he was subjected to excess scrutiny "compared to Caucasian employees who were similarly situated under the defendants

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                                             Page 19
--- F.Supp.2d ----, 2007 WL 805779 (E.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

TURAN, POPPER, MOSTOW, and who worked for NCHCC and or NUMC" (Pl.'s Mem. at 11); and (2) he and other African-American employees did not receive salary increases at the same rate as Caucasian employees.

[21] Under Second Circuit law, where a plaintiff seeks to make out a case of discrimination "by pointing to the disparate treatment of a purportedly similarly situated employee, the plaintiff must show that [ ]he shared sufficient employment characteristics with that comparator so that they could be considered similarly situated." *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir.1997). Furthermore, "such an employee must be similarly situated in all *material* respects-not in all respects." *McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir.2001) (emphasis in original). In order for employees to be similarly situated in all material respects, "a plaintiff must show that h[is] co-employees were subject to the same performance evaluation and discipline standards." *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir.2000) (citing *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 96 (2d Cir.1999)). In addition, Plaintiff must demonstrate that the similarly situated employees engaged in comparable conduct. *Id.*

[22] In order to make out a prima facie case of unequal pay for equal work under Title VII, Plaintiff must show that "[ ]he was paid less than non-members of h[is] class for work requiring substantially the same responsibility" and he must in addition produce evidence of "discriminatory animus." *Belfi v. Prendergast*, 191 F.3d 129, 139 (2d Cir.1999).

[23] With respect to Plaintiff's claims of excess scrutiny, Plaintiff has failed to identify any Caucasian employee who was similarly situated to him, let alone demonstrate how they were similarly situated. Instead, Plaintiff generally contends that " Caucasian subordinates" were not subject to scrutiny. Such conclusory assertions, wholly unsupported by the record, are insufficient to create an inference of discrimination.

[24] As to Plaintiff's claims of disparate pay, Plaintiff identifies three allegedly similarly situated employees, to wit, DeLuca, Gary Bie ("Bie") and Mostow, who he claims were given higher pay raises than he was. DeLuca was NCHCC's Chief Operating Officer, Bie was NCHCC's Chief Financial Officer, and Mostow was the Dean of Academic Affairs. Plaintiff has failed to offer competent evidence from which any reasonable trier of fact could infer that any of the three individuals to which he compares himself, all high level NCHCC corporate officers, had substantially similar job responsibilities. In addition, Plaintiff has not produced any evidence such as payroll records, to substantiate his claim that he received lower pay raises. Accordingly, the Court finds that Plaintiff's bald assertions of disparate impact are insufficient to establish a prima facie case of discrimination.

### 2. *Pattern of Discriminatory Treatment of African-American Employees*

*11 [25] Plaintiff alleges that Defendants engaged in a pattern of discriminatory treatment of African-American employees by ignoring and condoning complaints of racial discrimination, discouraging Plaintiff and the Office of Diversity staff from actively investigating claims of racial discrimination, and chastising Plaintiff for looking into such claims. To support these allegations, Plaintiff relies primarily on his deposition testimony, his declaration, and Whether's declaration. Plaintiff argues that a reasonable juror could infer, based upon Defendants' alleged " pattern of systemic racial discrimination" (Pl.'s Mem. at 11), that the adverse actions taken against Plaintiff arose under circumstances giving rise to an inference of discriminatory intent. Defendants do not address this allegation by Plaintiff in the context of his attempts to establish a prima facie case of discrimination.[FN4]

Essentially, Plaintiff argues that it may be inferred that because Defendants quashed his efforts to raise claims of workplace discrimination in general, Defendants acted adversely against Plaintiff personally because he is African-American. The flaw in this logic, however, is that even if a juror could believe that Defendants intentionally sabotaged Plaintiff's efforts to resolve issues of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

Page 20

--- F.Supp.2d ----, 2007 WL 805779 (E.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

employee discrimination, there is nothing in the record to indicate how many of these employee claims involved discrimination against African-Americans. For example, if Plaintiff could show that Defendants ignored a disproportionately significant number of complaints pertaining to discrimination against African-Americans, a juror could arguably infer that there was a pattern of discrimination against African-Americans. The record here, however, does not bear that out. In fact, Plaintiff's own declaration, as well as that of Whethers, assert that "[t]he function of the [Office of Diversity] was to address alleged workplace discrimination and to safeguard employees from *any form* of discrimination." (Pl.'s Decl. ¶ 5 (emphasis added); *see also* Whethers Decl. ¶ 5.) In addition, Plaintiff's January 2003 letter to the NYSDHR notes that from July 1999 to the date of the letter, the Office of Diversity had received approximately "220 claims of discrimination *of some form.*" (Pl.'s Ex. V (emphasis added).) Thus, the fact that Defendants may have ignored complaints relating to any form of discrimination, whether based upon gender, religion, ethnicity, disability, etc., without more, is insufficient to give logical support to an inference that Defendants harbored animus towards African-Americans in particular and therefore discriminated against Plaintiff because of his race.

Further, to the extent Plaintiff attempts to establish that Defendants engaged in a "pattern of systemic racial discrimination" based upon employee complaints of discriminatory treatment (Pl.'s Mem. at 11), his claim must fail. The only evidence in the record is that employees complained to Plaintiff about unspecified forms of discrimination in the workplace. The record is devoid, however, of any evidence that such discriminatory acts actually occurred, much less that they were directed against African-Americans. Plaintiff could have submitted affidavits or deposition testimony from African-American employees who were allegedly discriminated against, but he has failed to do so. Absent such evidence, no inference may be drawn that Defendants engaged in a pattern of discrimination based on race.

*12 In sum, the Court finds that Plaintiff's allegations regarding a general pattern of discrimination by Defendants is insufficient to raise an inference of discrimination against Plaintiff because he is African-American.

### 3. *Turan's Alleged Racist Comment*

The only remaining evidence Plaintiff proffers in support of his claim that he suffered adverse employment actions under circumstances giving rise to an inference of discriminatory intent is his claim that Turan, NCHCC's President and Chief Executive Officer, made a racist comment to him. In support of this allegation, Plaintiff relies on the following excerpt from his deposition testimony:
Q. What derogatory remarks did you hear Mr. Turan make?
A. I once came to him with a proposal about dealing with the black community and his response was "I don't want this to become a black hospital."
Q. And when did you bring that proposal to him?
A. [I]t might have been 2002.
Q. Any other comments?
A. No, not that I can recall.

(Pl.'s Dep. at 17-18.) Defendants do not address Turan's alleged comment.

[26] The Second Circuit has repeatedly held that " stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination. " *Abdu-Brisson,* 239 F.3d at 468. "If it were otherwise, disparaged workers who had the 'fortuity ' of being in the class encompassed by the stray remark would have an instantaneous jury case on discrimination, regardless of the ground for their dismissal.' " *Danzer v. Norden Sys., Inc.,* 151 F.3d 50, 56 (2d Cir.1998). The remarks, however, will no longer be deemed stray "when other indicia of discrimination are properly presented [so that] the jury has a right to conclude that they bear a more ominous significance." *Id.* In order for the remarks to be deemed significant, the plaintiff must show their nexus to the adverse employment decision. *Cf. id.; see also Revere v. Bloomingdale's Inc,* No. 03 CV 5043, 2006 WL 3314633, at *7. (E.D.N.Y. Nov.14, 2006).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.