G

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------X
SOUTH LYME PROPERTY OWNERS :
ASSOCIATION, INC., CHARLES AND :
VICTORIA PARSONS AND JOAN BYER, :
    Plaintiffs :
                      :
VS                  : 3:00CV97(EBB)
                     :
TOWN OF OLD LYME, TOWN OF OLD :
LYME ZONING COMMISSION, :
ERIC FRIES, GEORGE JAMES, :
JANE MARSH, THOMAS RISOM, :
WALTER SEIFERT, SHARON COLVIN AND :
MARILYN OZOLS, :
    Defendants :
------------------X

VOLUME II

    Deposition of GEORGE JAMES taken at the
offices of Halloran & Sage, 225 Asylum
Street, Hartford, Connecticut, before
Audra Quinn, RPR, Licensed Shorthand Reporter
#106, and Notary Public, in and for the State
of Connecticut on August 15, 2003, at
1:16 p.m.

DEL VECCHIO REPORTING SERVICES, LLC
PROFESSIONAL SHORTHAND REPORTERS
117 RANDI DRIVE        100 PEARL ST., 14th FL.
MADISON, CT 06443     HARTFORD, CT 06103-4506 5/03

Page 1

30

1  amendments, the zoning regulations imposed literally no

2  restriction on the duration of a use of a residential

3  home in the town of Old Lyme?

4     A   I can't do that. As I say, the issue that

5  was -- the legal issue that was brought up was the

6  definition of "use" and that seasonal use needed to be

7  defined and, therefore, there was an active part of our

8  legal adviser to help us make that clear.

9     Q   Were the 1995 amendments adopted for the

10  purpose of environmental protection?

11     A   I would say in an ancillary role, yes.

12     Q   And what existing environmental problem

13  pertained to the use of residential properties in the

14  months of November, December, January and February?

15     A   You had heat. You had the question of

16  electrical, sound electrical wiring. You had the

17  question of other building code requirements. You had

18  to have a foundation. You had to have a septic system

19  that was working, and you had to have potable water.

20  And if you met those requirements, you were in

21  business.

22     Q   How did any of those issues relate to

23  environmental protection?

24     A   Water, you had to have water, potable water.

31

1  functioning. They had to work. Those were the two

2  things that were uppermost in the minds of our

3  sanitarian and health officer, Frank Kneen.

4     Q  Turning back to the uses allowed -- I'll show

5  you a document that's been labeled TR-36 which are

6  excerpts of the zoning regulations, and just by way of

7  background, this document was created by the attorneys

8  for both sides in this case at part of the preliminary

9  injunction hearing and the attachment Tab A refers to

10 the regulations that were in effect prior to January 1,

11 1992. Attachment B is those regulations that were

12 effective on January 1, 1992, and then Attachment C

13 would be regulations in effect on September 15, 1997,

14 i.e. after the adoption of the 1995 amendments.

15     Are you familiar with the fact that the

16 zoning regulations established a table of uses that are

17 allowed in the various zones in the town?

18    A  Various uses in different parts of town, is

19 that what you're saying?

20    Q  Yes. In other words, in every zone, the

21 zoning regulations will establish the uses that are

22 authorized in that particular zone?

23    A  I think that's correct.

24    Q  And turning to Tab B which are the

54

1  and that the -- we are encouraged to continue that

2  system. And we, by the very people we are responsible

3  to, and we have in court cases at the Supreme Court

4  level of the State of Connecticut, supported the town's

5  restriction of these -- their right to restrict the use

6  of the property as long as there is some use of the

7  property.

8     So I go to -- I mean, I'm not a legal expert

9  in this matter. We repeatedly, when we get into these

10 conflicts, go to the attorneys and legal counsel to

11 support our position. And I don't know how high, much

12 higher you would go than the Supreme Court of the State

13 of Connecticut for support for this.

14    Q  We'll leave what those cases say and don't

15 say to the cases.

16       My question to you is, can you articulate any

17 benefit to public health and safety served by

18 prohibiting a property owner who is under the

19 circumstances I've just outlined from using his

20 property during off-season months?

21    A  I believe I have just --

22    Q  So whatever those benefits are, it's the ones

23 that you've already outlined?

24    A  I believe so. And then there may be others

1  communities. We can't walk on them. We are not

2  allowed in there, to park in there at all. And, as you

3  know, they may have a fire, and if you had a large

4  number of these people living there, the opportunity to

5  get in and service those during a fire in the winter,

6  particularly, when the snow is on the ground is a real

7  concern.

8      We go to public health and safety. It's not

9  an arbitrary, one-sided view of the situation. And

10 when you're supported time and again by the people who

11 are giving you orders from the state level, it seems to

12 me that it's not our business to question those

13 people.

14  Q  Other than the letter that you referenced

15 that came out of the meeting with the Water Pollution

16 Control Authority was so dead set against Point of

17 Woods going forward with a structural solution, what

18 other evidence do you have that the Department of

19 Environmental Protection or any other state authority

20 is supportive of a restriction against private property

21 rights of usage of property during the off-season

22 months in Old Lyme?

23      MR. RADSHAW: Object to the form of the

24      question.

68

1  air in this subject area.

2       When you have a group of more than a thousand

3  dwellings, granted they were purchased as seasonal use

4  and they still are seasonal use, when it works and

5  prevents pollution, then there is some justification

6  for continuing that and that's what we hear from the

7  state, the DEP, the top officials. Jane Stahl is

8  certainly number two up there at the headquarters.

9   Q   Why do you suggest these properties were

10  purchased 30 years ago as seasonal dwellings?

11   A   Why? I haven't got a clue. I wouldn't know

12  why they were purchased.

13   Q   Isn't it true that the zoning regulations

14  which is the basis in which a property owner would

15  understand what use his property is allowed, if

16  adopting the seasonal limitation first occurred in

17  1995, what is the basis for your suggestion that 30

18  years ago property owners understood that they were

19  buying, quote/unquote, seasonal properties?

20       MR. RADSHAW: Object to the form of the

21       question.

22       You can answer, Mr. James.

23   A   I have repeatedly said that the system seems

24  to work, that the people who came to our town, and I

69

1  and 1970, you had 30 units were purchased and built as

2  summer cottages. And that represented more than

3  half -- almost half of all the dwellings that were

4  built in the town, and the number of these houses that

5  have -- cottages that have come to us through the

6  years, certainly the people when they bought them were

7  well aware that that's what they were for, summer use

8  only.

9  Q  How would they be well aware of that when the

10  zoning regulations never said that until 1995?

11       MR. RADSHAW: Object to the form of the

12    question.

13       You can answer, Mr. James.

14  A  1966, the Old Lyme building ordinance

15  specifically talked about seasonal use and the specific

16  requirements for conversion to year-round use. Now,

17  that's 1966. So I don't know where you're getting your

18  1995 date.

19  BY MR. SLATER:

20  Q  So your whole premise on this policy of the

21  Zoning Commission relates back to the housing ordinance

22  that was adopted in 1966?

23  A  No. What I'm saying is that the people who

24  ran the town of Old Lyme from 1966 until the zoning

70

1  confronted with. We didn't sell those people lots,

2  houses, cottages on lots that are 50 by 20 or 40 or

3  whatever they are. So you're forced to obey two

4  masters. One is the Public Health Code and the other

5  is the DEP supposedly supporting our environment.

6  You're required to serve both those masters. Not maybe

7  successfully in the sense that every person who lives

8  in the town is going to be happy with the regulations,

9  but that it has worked.

10    Q    Anything in the '66 housing code prohibit a

11  property owner from using their property in December if

12  they have a code-complying septic system?

13         MR. RADSHAW: Object to the form of the

14      question.

15         You can answer, Mr. James.

16    A    There's plenty in there. It's not the only

17  requirement. Certainly they list, as I think we

18  mentioned before, you had a foundation, you had

19  adequate heat and you had to have electrical inspection

20  and that the building was sound. I think you had to

21  have all those things.

22  BY MR. SLATER:

23    Q    You have all of those things. Anything in

24  the housing ordinance of 1966 prohibit you from using

71

1     MR. RADSHAW: Object to the form of the
2        question.
3        You can answer, Mr. James.
4  A  That became an issue, I think, in the court.
5  That was the issue in the court. So the answer is I
6  don't know what those Superior Court decisions were in
7  each case, but I know that was an issue. That was the
8  issue, and if it's the issue, in other words, the use,
9  then I think it was the intent and hope that the
10 regulations could assist those who wanted to make
11 year-round houses that qualified, and for those who did
12 not qualify, again, using our battery of requirements
13 and regulations and recommendations from the state,
14 tried to be fair and still make the system work.
15 BY MR. SLATER:
16 Q  What was the basis for establishing a policy
17 in 1966 against converting seasonal cottages to year
18 round?
19    MR. RADSHAW: Object to the form of the
20       question.
21 A  Again, what it says is this ordinance was
22 established to specify how you become a year-round user
23 of a seasonal dwelling that normally would have been a
24 summer cottage. It tells you how to do it.

George James testimony - 08/15/03          Page 71

72

1  limitations --

2  A   This is -- I'm sorry, are you asking another
3  question?

4  Q   Yes, I am. Prior to the adoption of the 1966
5  ordinance, there was nothing in the town of Old Lyme's
6  regulations that would prevent a property owner who has
7  a residential home from using their property at any
8  time of the year. Isn't that correct?

9        MR. RADSHAW: Object to the form of the
10       question.

11       You can answer, Mr. James.

12  A   In 1960, there were 1,728 summer cottages
13  designated summer use only.

14  BY MR. SLATER:

15  Q   By whom?

16  A   I don't know, but they were on the cards.

17  Q   Do you know what --

18  A   I haven't got a clue. I wasn't in town at
19  that time.

20  Q   Have you ever seen any evidence that there
21  was -- any evidence of what the basis for the
22  designations made in 1960 were?

23  A   I have no idea, no. And this date is out of,
24  I believe out of the 1960 Plan of Development, the

George James testimony - 08/15/03                Page 72

73

1  fact came from.

2  Q  And you keep talking about the program that
3  works. Is the commencement of this program that has
4  worked that 1960 designation of seasonal properties?

5  A  I don't know. I wasn't here.

6  Q  Well, what do you mean when you're referring
7  to the program has worked. What program?

8      MR. RADSHAW: Object to the form of the
9    question.

10     You can answer, Mr. James.

11  A  Well, the seasonal use dwelling designation
12  based on septic system and those items enumerated in
13  1966 housing ordinance -- I'm sorry, could you read the
14  question again. I'm getting a little groggy.

15  BY MR. SLATER:

16  Q  I can ask the question again.

17     In answering a number of questions you
18  suggested that the program regarding limitations
19  towards seasonal use has worked for 30 years, I believe
20  you said, and I just want to make sure I understand
21  which program you're talking about.

22  A  The word is not program. That's a poor
23  choice of word. The existing designation of seasonal
24  use only is a system that has been in place for about

1  far as our records can show that is present today.

2  Q   And going back that 35 years, does it go back

3  to the designations you're aware of all the way to

4  1960?

5  A   No.

6  Q   Or 1966?

7  A   I'm just saying that those in 1960, 1,728

8  summer cottages, you wanted to know numbers before.

9  That's a fairly accurate number, I guess, that were

10 designated summer use only.

11 Q   But you have no idea how or why they were

12 designated that way?

13 A   I have no idea, but that's what we were

14 given. You say it's our fault for doing regulations

15 that you dislike or think are incorrect, but you're

16 given -- you inherit a situation and it's not just some

17 arbitrary designation, but it's the fact that you have

18 a lake that was divided up into summer cottages where

19 they were practically next door to each other. They're

20 small lots.

21     And the same was true at the beach. And

22 we're having to live with that situation. Our purpose

23 time and time again is public health and safety, and

24 some property rights obviously have suffered as a