L

PART TWO

1           MR. RADSHAW:  If you understand it, you
2      can answer.
3      A    I'd like a clarification, please.
4  BY MR. SLATER:
5      Q    Would you agree that these properties can all
6  be used at a hundred percent occupation between April
7  and November?  The septic systems and wells serve those
8  properties during that majority period of the year.
9  Correct?
10     A    Yes.  Or they have a public water supply.
11 It's not all wells.  In fact, I have no idea, maybe you
12 do, of what percentage of wells versus public water
13 supply.  I don't have that at my fingertips.
14     Q    What public health, safety or other issue
15 that was a legitimate concern for planning and
16 zoning -- Zoning Commission is served by telling those
17 persons who could use their property at full capacity
18 for that majority portion of the year stopping and
19 halting the use of the property for those few winter
20 months of the year?
21     A    Well, I think one of the things I've already
22 addressed is a character issue.  Now, let me clarify
23 that.  There, I think, is a distinct difference and I
24 feel that way in Old Lyme and I also feel that way on
25 other places I go and spend my summer holiday of what

```
 1  constitutes a summer use or a seasonal use of a piece
 2  of property is not necessarily what's appropriate for a
 3  year-round use. There's a lot of things, and seasonal
 4  use is fine and beach use is fine, but I think there's
 5  a lot of character issues that we have considered
 6  relative to what's acceptable for a cottage versus
 7  what's acceptable for a year-round residence.
 8          Now, hopefully, I'm not being prejudicial
 9  when I say that, but there is a character issue on that
10  with regard to character of how people live. I think
11  there are issues that are different between something
12  you use on a seasonal basis and what you use as a
13  year-round residence. I think that's also reflected in
14  some of the different areas of the shore community and
15  we try to take that into consideration. Those were
16  considerations from the commission standpoint when we
17  did that.
18          You also have issues of use in the winter
19  months, entails more heating systems, potential for
20  having different systems in a building being used
21  during the winter months. That's one of the reasons
22  why we certainly wanted to have a bona fide heating and
23  other mechanical systems being up to snuff.
24          But even within that context there's still an
25  aspect of certain amount of lot size to prevent spread
```

```
 1   of fire, access to facilities and things of that
 2   nature, and when we consider that, we thought 10,000
 3   square feet was the right amount.
 4       Q   Is there a public health and safety problem
 5   with respect to fire aspect regarding the use of these
 6   properties at very high capacity during the summer
 7   months?
 8       A   I'm sure there probably is, but one of the
 9   things that's not in play necessarily is the heating
10   system.  And that was just one of the considerations we
11   had.
12           Now, do I think all of our considerations
13   were perfect and could be absolutely done on an
14   analytical basis?
15           No.  But we were very mindful of what we
16   thought the character of a year-round development would
17   be and the conclusion we came back with was we think
18   houses on 10,000 square feet was appropriate and that's
19   what we base it on.
20       Q   Can you elaborate a little bit more on what
21   you mean by character?
22       A   Yes, I can elaborate on the issue of
23   character.  You know, how close do you want year-round
24   residences.  That's one of the main things zoning asked
25   from a standpoint that's applied elsewhere in town.  In
```

```
 1   the non-R10 zone we have certain provisions on what we
 2   want properties to be there, too.  In certain areas we
 3   have a minimum, basically.  For broad ranging basis we
 4   basically have 40 and 80,000 square feet in the rest of
 5   the town.  That's what I mean by character, what we
 6   would like the town to look like.  And that is one of
 7   the provisos of zoning, one of the things we oversee.
 8   And in this particular case, we said we're going to
 9   revert back to the end of the line zone.  We never
10   heard any objections or no one had ever come forward --
11   we did hear okays to that.  Of course we never heard
12   anyone come forward and say let's change it to R5,
13   let's change it to R3.  So we stuck to the underlying
14   zone.
15       Q    And referring to what the community would
16   look like, I understand that the commission adopts
17   zoning regulations that establishes the standards in
18   which a new development would occur, but the R10 zone
19   was largely developed at the time this policy was
20   adopted in 1995, wasn't it?
21       A    Yes.
22       Q    So the character wouldn't be in the character
23   of the way these buildings were going to look and the
24   roads would look, but the character simply comes down
25   to whether or not these properties were going to have
```

```
 1   people in them during certain months of the year.
 2   Isn't that true?
 3        A    I don't think that really came into being.
 4   The issue, once again, was, I'll repeat, we came to the
 5   conclusion that we would like to have year-round
 6   single-family houses on 10,000 square feet of property
 7   and that we weren't going to interfere with the aspects
 8   of seasonal property, but for a year-round basis, we
 9   came and thought about it and we looked at what a
10   sister town had done, we followed their process, not
11   blindly, and we came up saying we wanted 10,000 square
12   feet.
13        Q    Were these regulations adopted in 1995 for
14   the purpose of environmental protection?
15        A    We did discuss those matters.  I don't know
16   if that was a driving overcompelling factor, but there
17   were considerations with regard to exactly how dense we
18   wanted year-round residences to be relative to allowing
19   those discharges to the environment on a very tight
20   basis to see if they would -- I think the term that I
21   had heard used was, you know, winter recovery period.
22   So there was an aspect of that, yes.
23        Q    Who did you hear the term winter recovery
24   from?
25        A    I don't recall right now.
```

1    Q    Do you recall whether the Zoning Commission
2    received any environmental studies or any environmental
3    reports as to whether or not the restriction against
4    off-season use would serve the environment?
5    A    I know we discussed the matter. I don't
6    believe we committed any studies to take place. I
7    don't recall seeing other studies. It doesn't mean
8    that we didn't receive them.
9    Q    Would your minutes of a public hearing
10    ordinarily reflect the documents that were submitted
11    to the commission during the course of the public
12    hearing?
13    A    Oh, yes, they would. They would all be
14    exhibits.
15    Q    Referring to the minutes of the 1995 public
16    hearing, there is a reference to some exhibits. Is
17    that correct?
18    A    Okay. I see a reference to a number of
19    exhibits, yes.
20    Q    Would you expect that those would be the only
21    exhibits that were submitted during that course of the
22    public hearing? In other words, that the exhibits that
23    were submitted during that public hearing were
24    identified as exhibits in the minutes?
25    A    These were actually submitted, it looks like

```
 1   most of these were submitted in advance of our public
 2   hearing because it looks like the character of these
 3   exhibits dealt with the submittals we make prior to
 4   public hearing as required by, I believe, state
 5   statutes.  And they were like to the Old Lyme Planning
 6   Commission, the CRERPA, Southeastern Connecticut
 7   Council of Governments, River Gateway Commission, DEP,
 8   Lyme and Old Lyme as abutting towns.  So it looks like
 9   that's what these were in this particular case.  I
10   don't see a submittal of any technical papers that
11   might be similar to what you asked the question about.
12        Q    I'll just very quickly show you some
13   documents and see if you recall having ever received
14   them as a member of the Zoning Commission of the town
15   of Old Lyme.
16             That's a Dames & Moore report listed as TR-4.
17             MR. RADSHAW:  TR-3.
18   BY MR. SLATER:
19        Q    TR-4.  I have TR-3 in my hand which is also a
20   Dames & Moore report.
21        A    I may have seen them.  I don't recall that
22   right now.  I certainly recall hearing people talk
23   about these, and of course, they look like -- let me
24   see -- they look like they were provided to the WPCA.
25   Our minutes would certainly indicate whether we
```

1  discussed these at our meetings. I do recall hearing
2  about Dames & Moore. I don't recall exactly what we
3  did with regard to them.
4  Q  As you sit here today, are you certain that
5  you heard about the Dames & Moore report in your
6  capacity as a member of the Zoning Commission as
7  opposed to simply being a citizen in the town?
8  A  I think more as a member of the Zoning
9  Commission.
10       Is there some difference between these?
11       MR. RADSHAW: Don't worry. You don't
12       get to ask any questions.
13 BY MR. SLATER:
14  Q  I'll ask you the same question with respect
15 to whether you received and reviewed a report by
16 Malcolm Pirnie?
17  A  I've certainly heard his name.
18       MR. RADSHAW: Just so the record is
19       clear, that document is TR-6.
20  A  I don't recall reviewing this report. I know
21 I've heard the name Malcolm Pirnie. Yes, I do recall
22 hearing that name. I would have to refer back to the
23 minutes to determine if we ever discussed these in a
24 substantive technical manner at our meetings.
25  Q  If these reports were reviewed and relied on