H

March 25, 2004

Report for the South Lyme Property
Owners Association, Inc.

Civil Action No. 3:00CV97 (EBB)

SEI # 03-1420-W

_Mary K. Clark_ _March 25, 2004_
Mary K. Clark                                    Date
Project Scientist, Stone Environmental, Inc.

Dr. Mark Gross, P.E.                             Date
Rural Engineering Services, Inc.

| Prepared For: | Prepared By: | with |
|---|---|---|
| South Lyme Property Owners Association<br>c/o Halloran & Sage LLP, Attorneys at Law<br>One Goodwin Square, 225 Asylum Street<br>Hartford, Connecticut 06103<br>Phone / 860.522.6103<br>Fax / 860.548.0006<br>E-Mail / Slater@halloran-sage.com | Mary K. Clark<br>Stone Environmental, Inc.<br>535 Stone Cutters Way<br>Montpelier, Vermont 05602<br>Phone / 802.229.4541<br>Fax / 802.229.5417<br>E-Mail / sei@stone-env.com | Dr. Mark Gross, P.E.<br>Rural Engineering Services, Inc.<br>PO Box 3189<br>Fayetteville, Arkansas 72702<br>Phone / 573.578.1661 |

## 4. QUESTION 4 - DO THE STUDIES, DATA AND REPORTS RELIED UPON BY THE COMMISSION IN ADOPTING THE 1995 ZONING AMENDMENTS PROVIDE AN ADEQUATE SCIENTIFIC BASIS TO SUPPORT A POLICY AGAINST OFF-SEASON USE OF RESIDENTIAL PROPERTIES FOR THE PURPOSE OF ENVIRONMENTAL PROTECTION?

The short answer to this question is that no, the literature does not provide an adequate scientific basis to support a policy of seasonal use of residential properties for the purpose of environmental protection.

In responding to this question, we reviewed the pre-1995 literature on the design and performance of septic systems when allowed to rest for an extended period of time (the current seasonal restrictions require a minimum of 3.5 months rest from November 15th through April 1st). We also looked for evidence in local reports, studies and data on impacts on groundwater, surface freshwater, or coastal waters that showed signs of improved water quality conditions during or following the rest period.

Following is a summary of our review of general engineering design considerations and the potential impacts of seasonal use of septic systems; of local reports and documents, and water quality information prior to 1995.

### 4.1. Design Considerations

We reviewed general engineering references prior to 1995 and the Connecticut Public Health Code (PHC) technical standards. There are no differences in seasonal versus year round use when evaluating minimum soils and site requirements, wastewater strength or design flows, system sizing (based on flows and percolation rates), or system components and layout. All systems are sized on the number of bedrooms and soil and site conditions. Section 19-13-B103b(d) states that a "Residential building means any house, apartment, trailer or mobile home, or other structure *occupied by individuals permanently or temporarily* (added italics) as a dwelling place but not including residential institutions." In other words, a year-round residence may be occupied continuously or not, but the design standards do not change. Section 19-13-B103d(e)2 of the PHC describes "Areas of Special Concern" which include soil types containing "severe" soil limitations for onsite sewage disposal.

The 1980 EPA design manual, Laak, and Metcalf & Eddy general references do not specify any differences in design or soils and siting standards for seasonal vs. year round use.

#### 4.1.1. EPA 1980 Design Manual

The EPA 1980 design manual states "alternative systems where one field is allowed to rest over extended periods of time can extend the life of an absorption system due to biodegradation of the clogging mat. In sandy soils with a shallow water table, the use of alternating beds may increase the chance of ground water contamination

because of the loss of treatment efficiency when the clogging mat is decomposed after resting (p. 217)."

### 4.1.2.  Metcalf & Eddy Inc.

In the Metcalf and Eddy Inc. 3rd edition text, conventional systems provide adequate treatment, although "nitrates and phosphorus are exceptions". Metcalf & Eddy does not mention long term resting impacts, but it does indicate that biomat formation occurs "over a long period of time (p. 1032)".

### 4.1.3.  Rein Laak Reference

General engineering references prior to 1995 include information on the importance of developing and maintaining a mature biomat for wastewater treatment. Laak indicates that a clogging layer is continually changing and develops at a rate dependent upon the load. This layer reaches a state of relative equilibrium, in regard to the average infiltration rate or long-term acceptance rate, in a period of one to six months depending on the wastewater load. However, "the clogging layer shrinks by drying and oxidation of anaerobic components (p. 93), and "significant thinning of the clogging layer reduces its valuable treatment capacity (p. 95)". "Maintaining a mature clogging layer assures improved treatment (p. 132). A nitrogen reduction of approximately 30% is achieved through treatment in the septic tanks, and "the clogging layer removes approximately 20% of the nitrogen from the septic tank effluent (p. 100)". Nitrogen can be further reduced by the use of composting toilets for the household blackwater, and through the use of alternative or pre-treatment systems such as intermittent and recirculating sand filters.

The actual soil types and permeabilities do not appear to have an impact on the development of a clogging mat. Laak also discusses long term resting and loading and its impact on the clogging layer and long term acceptance rate (LTAR). Figure 5-19 shows that after a 6-month rest, the LTAR results in 80% recovery of the original infiltration surface, and indicates approximately 3-4 months of use before the LTAR is again achieved. In the context of Old Lyme seasonal restrictions, this means that the clogging layer may disappear in the winter rest, and may take most or all of the summer season to re-form to maturity.

### 4.2.    Impacts of Seasonal Use

Seasonal use creates some significant impacts on the performance of septic systems.

1.  Biomats are allowed to rest for a period of the year (3 months minimum) – however, biomats can take a period of time to mature, and to break down.

Resting onsite wastewater treatment soil absorption systems has been shown to allow the soil absorption system to recover its hydraulic conductivity. Although the hydraulic conductivity of the system is restored, the movement of the wastewater into the soil is more rapid, and this does not necessarily indicate better treatment in terms of removing pathogens or transforming deleterious compounds to innocuous compounds such as carbon dioxide, water and elemental nitrogen. In fact, higher hydraulic conductivity provides a shorter hydraulic retention time for biochemical reactions to occur. Resting has been used primarily as a technique to manage the hydraulic conductivity of soil absorption systems, not as a treatment technique in sensitive receiving environments.

2. Soil considerations. High seasonal groundwater tables (shwt) typically occur in the spring and fall, so occupancy is allowed during the seasonal high groundwater periods of the year. Some areas of seasonal residences do have soils with shwt, as do other areas of town where year round residences are located.

High seasonal groundwater tables (shwt) typically occur in the spring and fall, and are measured by the PHC usually from February 1 through May 31", which overlaps with the seasonal use period by two months, so occupancy is allowed during the seasonal high groundwater periods of the year. Some areas of seasonal residences do contain soils with shwt, as do other areas of town where year round residences are located.

When septic tank effluent is introduced into a saturated soil condition, the oxygen uptake rate for the microbiological activity is faster than the oxygen diffusion rate into the soil absorption system, and the soil absorption trenches develop anaerobic conditions. Anaerobic biochemical degradation of wastewater produces incomplete treatment, with treatment products including organic acids and noxious gases such as methane and hydrogen sulfide. Also, anaerobic bacterial slimes tend to be thicker and less permeable.

The result is that the wastewater is incompletely treated and returns to the receiving environment containing contaminants. In addition, pathogen transport in saturated conditions is much faster than in unsaturated conditions. Faster transport means that there is less time (hydraulic retention time) for pathogen die-off in the treatment system before the water is returned to the receiving environment.

### 4.3.    Local Studies, Soils and Water Quality Information

Malcolm-Pirnie, Inc., prepared an engineering report and supplemental study for the Town of Old Lyme, and Dames & Moore prepared a Sewer Avoidance Plan for the town prior to 1995. Additionally, a review of the local soils and soils ratings for onsite septic systems was conducted. None of these references indicate that restricting use of seasonal properties will improve water quality conditions in Old Lyme. Following is a discussion of these reports and data.

### 4.3.1.  Malcolm Pirnie, Inc. Reports

Malcolm-Pirnie Inc. prepared an engineering report entitled, "Wastewater Facilities Plan For A Sewer Avoidance Program" dated September 1979, and revised March 1980. The report mentions a previous regional study that proposed a municipal wastewater treatment plant approach in 1975. This was apparently opposed by town residents and dropped by local officials. The report focused on four areas of town while 92% of the town was not evaluated. This report includes a statement that "seasonal properties will not be dealt with in the same manner as year round dwellings", but it does not specify how they were dealt with differently.

There is a reference in Section 5.1.08C, which mentions, "that hydraulic capacities may be exceeded when a system sized for short-term use (such as a summer cottage) is used on a year-round basis." However, PHC design flows are based on a peak daily flow, not a short-term, long-term basis.

The report developed designations for different areas of town. Area I designation would indicate a severe disposal problem requiring an immediate structural solution. There were no areas of town ranked with this designation.

An Area II designation indicates some problems, but not enough to warrant a structural solution. The Point of Woods area was included in this designation. The study recommended additional water quality monitoring and annual sanitary surveys (a walk-through inspections looking for obvious signs of septic system failures). If problems are identified, the recommended solution was to construct a community collection and disposal system, not to limit the properties to seasonal uses. The study states, "The major problem associated with malfunctioning septic systems in this area is there impact on adjacent wetlands and the Sound." The study also adds regarding the water quality monitoring, that "Any problems of wells by these contaminants would be a valid reason for the immediate implementation of a structural sewage disposal program in the area."

The remainder of the town was designated Area III, with no irreparable problems with onsite wastewater treatment and disposal. It is interesting to note that commercial areas or other areas of town where there exists year round residences on severe soil conditions. Also, we question why Point of Woods was designated an Area II, and not White Sands. Table 3-1 of the report appears to indicate that the White Sands area contained more severe soil conditions (60 % of the area in White Sands contained suitable soils, 65% were suitable in Point of Woods.) White Sands also contained a larger percentage of "Data Points" (some type of failure condition) with 4.7% to Point of Woods' 3.3%. If Point of Woods is described as having a "moderate" failure rate, White Sands should be worse.

The other important point regarding this report is that the final conclusions are primarily based on the failure rates, and not enough attention is given to the existing soil and site conditions requiring significant variances. Due to the predominantly sandy soils and the biomat breaking down over the winter months, the systems are not as prone to a surface failure. However, that does not mean that the system is functioning adequately. For instance, in the Sound View area, where 35% of the soils contain a high seasonal groundwater table, 35% or 325 properties could be improperly treating the wastewater due to a lack of adequate vertical separation between the bottom of the system and the shwt, but never have a surfacing problem.

### 4.3.2. Dames & Moore Sewer Avoidance Plan

This plan does not reference any environmental or other information indicating that restricting seasonal use of systems would benefit environmental quality. The plan calls for improvements in design, construction, and repair of systems, but does not recommend seasonal restrictions nor indicate different design or treatment standards in areas of seasonal use properties.

On page 24 of the Dames and Moore "Sewer Avoidance Plan Town of Old Lyme, Connecticut" March 31, 1994, a reference is made to limiting the use of property. The report states "The Director of Health may choose to grant a limited permit which has a restriction attached to prevent the system from being overloaded. The permit may specify limitations such as seasonal use only, or use by present number of occupants only." This statement in the Dames and Moore report did not imply that the seasonal use would necessarily ameliorate water quality in Old Lyme or Long Island Sound. It merely indicated that the seasonal use could be implemented as one (but not the only) option to prevent overloading of an individual system.

### 4.3.3. Other Information

Although limiting the usage of homes—restricting the occupation and use of property—would seem by intuition to be a solution to elevated contaminant concentration, there is a scientific basis to conclude that seasonal use of the onsite wastewater system would in fact cause the system to operate less efficiently, and to produce higher concentrations of the undesirable products of incompletely-treated wastewater. Mr. Jacobson, one of the Town of Old Lyme's environmental consultants, in his report *The Effect of Vertical Separating Distance on the Fate of Pathogens in the Subsurface,* discusses at length the concept and significance of the clogging mat in wastewater treatment in soil absorption systems. He cites a 1992 journal article by Postma, Gold, and Loomis that concludes that incomplete

treatment occurred because a clogging mat did not form in a soil absorption system during seasonal use. Since microbial activity and the filtration afforded by the biomat is crucial to effective wastewater treatment in the soil absorption system following a septic tank, the clogging mat should be healthy and mature to effectively renovate the septic tank effluent. In cold climates, the clogging mat is expected to take more time to mature than in warm climates, and the microbial activity is expected to be slower in colder temperatures. If seasonal use is limited, it is conceivable that the clogging mat never matures during the use of the system, and therefore, seasonal use of the onsite wastewater system may actually cause the system to perform less effectively than if the system were used year round.

Connecticut DEP letter Dennis Greci to Mr. George James 9/26/90
Mr. Greci's letter is clear that from his perspective, there are some areas where the existing properties are so densely populated; there are no appropriate onsite solutions. He also references a closing of public water supply wells in Sound View due to failing septic systems. Mr. Greci encourages the town to pursue a structural solution, and conduct a detailed evaluation of the problem areas.

We have also reviewed two groundwater study reports prepared by Frank Kneen for the town. One report dated 12/1/81 of the Point of Woods area, included sampling 20 well water samples. Only one well contained coliform, which was attributed to an improper well seal, no detergents were detected. The nitrate nitrogen results were relatively low, none exceeding the 10 mg/L limit, although some nitrites were detected, not above 10 mg/L, but one 9.4, and others in the 4-5 mg/L range. The second report by Mr. Kneen dated 12/22/81 included 16 samples in the Point of Woods area. One well exceeded the coliform limit; none exceeded the nitrogen limit, and 69% having concentrations of 3.0 mg/L or less. Samples were taken once a year in December, so there is no way to determine whether there are seasonal fluctuations.

## 5.  QUESTION 5 - DID THE COMMISSION HAVE AN ADEQUATE BASIS TO CONCLUDE WHETHER A PROHIBITION AGAINST OFF-SEASON USE OF RESIDENTIAL PROPERTIES WOULD EXACERBATE OR AMELIORATE WATER QUALITY IN OLD LYME AND IN LONG ISLAND SOUND?

Even the updated 2002 EPA design manual, which includes references to the latest design concepts and research studies, contains no evidence that maintaining seasonal restrictions on systems provides an environmental benefit. The preponderance of the local documents indicate that the major facet of the sewer avoidance plan is to monitor the groundwater in and around the Old Lyme area and to be prepared to implement a structural solution if indications of contamination by wastewater systems are observed.

There is very little indication in the consultants' reports that implementing the Sewer Avoidance Plan or the solution for elevated contaminant levels in monitoring wells or drinking water wells would include restricting the occupation of homes to seasonal use. Among the many recommendations by Malcolm Pirnie and Dames and Moore, only one citation was found where seasonal occupancy is recommended as a mechanism for avoiding sewers. On page 24 of the Dames and Moore "Sewer Avoidance Plan Town of Old Lyme, Connecticut" March 31, 1994, a reference is made to limiting the use of property. The report states "The Director of Health may choose to grant a limited permit which has a restriction attached to prevent the system from being overloaded. The permit may specify limitations such as seasonal use only, or use by present number of occupants only." This statement in the Dames and Moore report did not imply that the seasonal use would necessarily ameliorate water quality in Old Lyme or Long Island Sound. It merely indicated that the seasonal use could be implemented as one (but not the only) option to prevent overloading of an individual system. Along with this statement, there is no development of a scientific or engineering basis for supporting this as a means of preventing environmental deterioration, or of protecting public health.

As previously discussed, biomat formation occurs over time, depending on the wastewater load, soil temperature, and soil type. Under controlled conditions, biomat formation can take approximately 21 days for nitrifier development and nitrification at 25 degrees C (room temperature). Jacobson notes that the average groundwater temperature in New England is 10 degrees C. Given these temperature conditions, biomat formation may take roughly 2.4 months to occur. Jacobson cites several pre-1995 publications showing that biomat formation is important for treatment – and is particularly important for pathogen removal.

Gross further notes that most virus removal under laboratory conditions occurs in the top few centimeters of sand columns. The virus removal data was correlated with volatile suspended solids concentrations in the same zone of sand and showed a correlation between the biomat and the virus removal zone. Considering these scientifically based observations and measurements, the projection above can be made showing that it may take approximately two and a half months for formation of the biomat to begin and therefore for effective treatment to occur in the onsite systems. Considering

STONE ENVIRONMENTAL, INC. • March 25, 2004

this evidence, the biomat may never fully mature during the period of use, and therefore restricting the wastewater system to seasonal use may have the effect of causing more damage to the environment than year-round use of the system.

The scientific basis for this projection is the Arrhenius equation stating that the rate of biochemical activity (the biochemical kinetic coefficients) are related to the temperature as follows:

$$k_t = k_{20} \, (\theta)^{t-20}$$

Where

$k_t$ is the rate coefficient at some temperature (t); units are per time

t is the temperature at which the process occurs units are degrees C

$k_{20}$ is the rate coefficient at $20^0$ C; units are per time

$\theta$ is a coefficient, typically taken as 1.086; no units

so using this equation, and projecting the rate for the soil temperature cited by Jacobson as 10 degrees C, then the difference in the rate coefficient can be calculated as follows:

$$k_{10} = k_{20} \, (1.086)^{10-20} = 0.43 \, k_{20}$$

Also, performing the same calculation for the rate coefficient at $25^0$ C yields

$$k_{25} = (1.086)^{25-20} = 1.5 \, k_{20}$$

Using these relationships, it is shown that the 25-degree C rate is 3.5 times faster than the 10-degree C rate. This means that the biochemical processes occur 3.5 times slower in the $10^0$ C New England soils than they would in a heated $25^0$ C laboratory where they take approximately 21 days.

At this rate, it would take 73 days or approximately 2.4 months for the biomat to begin to develop.