PART ONE

```
                UNITED STATES DISTRICT COURT
                   DISTRICT OF CONNECTICUT


- - - - - - - - - - - - - - - - - - -X
SOUTH LYME PROPERTY OWNERS           :
ASSOCIATION, INC., CHARLES AND       :
VICTORIA PARSONS AND JOAN BYER,      :
              Plaintiffs             :
                                     :
VS                                   :  3:00CV97(EBB)
                                     :
TOWN OF OLD LYME, TOWN OF OLD        :
LYME ZONING COMMISSION,              :
ERIC FRIES, GEORGE JAMES,            :
JANE MARSH, THOMAS RISOM,            :
WALTER SEIFERT, SHARON COLVIN AND    :
MARILYN OZOLS,                       :
              Defendants             :
- - - - - - - - - - - - - - - - - - -X
```

Deposition of ERIC FRIES taken at the offices of Halloran & Sage, 300 Plaza Middlesex, Middletown, Connecticut, before Audra Quinn, RPR, Licensed Shorthand Reporter #106, and Notary Public, in and for the State of Connecticut on August 25, 2003, at 9:13 a.m.



DEL VECCHIO REPORTING SERVICES, LLC
PROFESSIONAL SHORTHAND REPORTERS
117 RANDI DRIVE                 100 PEARL ST., 14th FL.
MADISON, CT 06443               HARTFORD, CT 06103-4506
   203 245-9583                     800 839-6867

1    A    Could you clarify what you mean by limit?

2    Q    Prohibit.

3    A    So if you -- would you rephrase this question using prohibit instead of limit, then?

5    Q    Certainly. During your entire tenure on this Zoning Commission there were efforts by the town of Old Lyme to prohibit conversion of properties the Zoning Commission believed were seasonal to conversion as year-round use?

10   A    I don't recall any effort to prohibit it.

11   Q    What were the efforts regarding seasonal properties?

13   A    I would prefer to say that they were to establish the controls to allow that conversion to take place. I don't ever remember any -- and this is based on my recollection at this point in time, I don't ever remember any situation that I participated in where my opinion was that we were out to prohibit the conversion. Now, I could be wrong on that, but the aspect is that we wanted to, certainly with the regulations circa 1994, 1995, provide a process for that to take place.

23   Q    Do you recall having received and reviewed this document prepared during 1991 regarding -- titled, "Enforcement of Seasonal Use Limitation for

```
 1   Nonconforming Dwellings"?
 2           And, for the record, that has been marked
 3   previously as SC-3.
 4      A    (Witness reviewed.)
 5           Okay.  I'm going to take time to read this.
 6           (Witness reviewed.)
 7              MR. RADSHAW:  Mr. Fries, I think you
 8           should answer Attorney Slater's question that
 9           do you remember seeing this document.
10      A    At the surface, I don't, but I do remember
11   some of the topics that were discussed, and I do
12   recognize Kaye Patch's initials, and I do know that she
13   was involved in this process.  And I do know sometime
14   during this time frame we were looking at getting, but
15   I can't remember the exact time of doing some of these
16   items.  I do remember that and I do also recall that
17   Kaye Patch was the member of the zoning enforcement
18   part that was involved in seasonal use.
19   BY MR. SLATER:
20      Q    Do you know when the window of time either
21   specifically or approximately when Kaye Patch served on
22   the Zoning Commission?
23      A    Well, she was there when I got there, I
24   believe, and I can't recall when she left.  I'm going
25   to say she left probably in the late 1990s, and she was
```

1  an alternate on our commission subsequent to that time.
2  But I don't recall the window specifically.
3     Q    The document indicates that she was
4  undertaking an effort at enforcing seasonal limitations
5  in the town of Old Lyme as of November of 1991.
6     A    That appears to be what the document says.
7  Since I haven't read it, I can't say it for sure, but
8  that is what it appears to be.
9     Q    What specific efforts do you remember that
10 Kaye Patch was undertaking with respect to seasonal
11 properties on or before November of 1991?
12    A    I don't recall specifically that time frame.
13 I do know that some of the things that she and I had
14 talked about was the aspect of, you know, preparing a
15 data base to move to a more streamlined data base of
16 properties and the determinations, the work that she
17 had done in that regard, because I believe that she had
18 at times undertaken to work with property owners to
19 make a determination of whether their property
20 specifically was year round or seasonal based on
21 grandfathering.  Now, that's my recollection.
22    Q    Grandfathering suggests that a zoning
23 regulation that was in place that would prohibit the
24 year-round use of these properties.  Do you know what
25 regulation Ms. Patch was relying on to suggest that

1  that were in before the public hearing in August of
2  '94?
3      A   You know, I don't know basically why they
4  were. When I drafted the regulations to start with, I
5  believe I had 10,000 square feet in there, and I'm
6  not -- I know that there was obviously some discussion
7  that went through on that. I don't know the basis for
8  it, but I do know that I believe that the regulation I
9  initially drafted was 10,000 square feet and we
10 subsequently went to public hearing with 20,000 square
11 feet.
12     Q   My question, though, is why did you establish
13 that policy of prohibiting conversion of existing homes
14 simply because they were located on lots of less than
15 10,000 square feet?
16     A   Well, I don't want to bring motherhood into
17 it or anything like that, but there was an issue, I
18 believe, we discussed on character issues and just
19 exactly health and safety, you know, how many
20 residences, how close together did we want them, things
21 of that nature. I believe those issues came into the
22 discussion on why we would do 10,000 square feet. We
23 were also guided by Old Saybrook's regulation on the
24 same thing which required a minimum of 12,500 square
25 feet for year-round conversions. In fact, that was the

```
 1   basis for the regulation that I drafted was the exact
 2   same regulation that Old Saybrook uses to convert
 3   seasonal cottages to year round and it dealt with the
 4   property has to meet the underlying zone which is
 5   12,500 square feet, and the other mechanical aspects
 6   that we listed in ours were basically lift-offs from
 7   Old Saybrook.
 8          And when we had thought about how can we
 9   establish a process that allows conversion to take
10   place, I was directed that way, I can't remember if it
11   was CRERPA that directed me that way or someone did,
12   someone said why don't you look at what Old Saybrook
13   does because they have a process that seems to work.
14   That's what we did.
15       Q    You're still testifying that you were trying
16   to establish a policy that would enable conversion as
17   opposed to limit or prohibit conversion of these
18   properties?
19       A    Yes.
20       Q    Do you think the majority of these properties
21   in these communities were on lots greater than 10,000
22   square feet?
23       A    You said the word majority.  I don't know.
24       Q    You have driven through the beach communities
25   of the R10 zone?
```

1    A    Right.

2    Q    Would you expect that the majority of the
3 properties of existing dwellings are located on lots
4 greater than 10,000 square feet?

5    A    I really can't render a decision on that.

6    Q    Did your Zoning Commission study that
7 question to determine whether or not your policy was,
8 in fact, going to have the effect of essentially
9 prohibiting most property owners affected in that zone
10 from converting versus, as you suggest, enabling
11 conversions subject to certain standards?

12    A    I don't recall that we discussed that.  We
13 may have discussed that.  I'd have to look at minutes
14 of past meetings to determine that.

15    Q    Do you recall ever asking any staff member to
16 evaluate how many properties in the R10 zone were --
17 actually contained dwellings on lots of less than
18 10,000 square feet?

19    A    I'm not saying I didn't, but I don't recall
20 that now.

21    Q    And other than, again, pointing to the fact
22 that that's the underlying zone, what issues of
23 character, as you stated, or other public health and
24 safety issues would be served by prohibiting a person
25 who owns an existing property and existing dwelling

```
 1  from occupying that property in the month of December,
 2  for example?
 3       A    Well, I think really the aspect of character
 4  was a major discussion during that time frame from the
 5  standpoint of -- and we never looked at it from a
 6  focused standpoint of saying let's see what's wrong
 7  with letting someone be there during Thanksgiving or
 8  something along those lines.  We never really looked at
 9  that.
10            The issue was character and how close we want
11  year-round residents together in the town of Old Lyme.
12  You know, how much lot area do we want associated with
13  a year-round residence that has been either built from
14  scratch that way or converted that way, and we referred
15  back to the underlying zone as being that which we
16  thought was appropriate.
17       Q    But your underlying zone would affect any new
18  development.  You didn't need a new standard having to
19  do with constructing a new home, did you?
20       A    The underlying zone would do that.  The --
21  I'm trying to remember just exactly the basis we were
22  looking for on that.  I don't recall the exact
23  discussion of how this particular regulation was
24  established, but you're right.  Basically it would
25  allow for that.  I mean, it would stand for that, and I
```

1  don't remember the exact discussion that we had when we
2  started working on that particular piece of the
3  regulation.
4      Q    Well, this regulation is really not targeted
5  to try to determine the density of new development.  I
6  mean, that is established by your existing zoning
7  standards.  Correct?
8      A    Yes.  Our R10 is the underlying zone.
9      Q    So the standards would not have the 10,000
10 square foot imposition of these regulations is not
11 something that would prevent new properties from being
12 built too close together, but, in fact, had to do with
13 whether or not existing properties that were already
14 there, whether they would be used during winter months.
15 Isn't that true?
16          MR. RADSHAW:  Object to the form of the
17      question.
18          You can answer.
19     A    We established 10,000 square feet as the
20 minimum lot size that a seasonal residence could be
21 converted to year-round, unless it could be shown as
22 being a pre-existing nonconforming use.
23 BY MR. SLATER:
24     Q    Understood.  And I'm trying to get to what
25 public purposes or character issues, et cetera, would

72

be served by that policy. And I think one you suggested that it may have to do with how close properties would be constructed next to one another. And I'm trying to point out that this wouldn't affect new construction. It has to do with existing structure that's already there.

Can you think of any other reasons, public health, safety or character of the community, whatever the reasons that you'd suggest you and members of the Zoning Commission based the adoption of this policy that would prohibit existing property owners on existing lots from using the properties during winter months?

MR. RADSHAW: Object to the form of the question.

You can answer.

A   The aspects that we covered that we thought of was, number one, an aspect of what we felt was the minimum size of the lot for a good year-round house. That figure came back to us as being the underlying zone of 10,000 square feet. That, of course, without getting into all the great preamble in our regulations, dealt with how close do we want people living next to each other on a year-round basis, number one.

Number two, there's aspects of how close do


1  we want to have septic systems and wells necessarily
2  close together. The aspects of what is the character
3  that we're looking for. Are we looking for something
4  that reflects different areas of Old Lyme or different
5  areas even along the shore communities, and those are
6  typically the areas that we sought after just like we
7  considered those same factors throughout the entire
8  town was they all came back in saying we'd like to stay
9  with the underlying zone with regard to allowance for
10 conversions to year-round.
11     Q    I understand the town of Old Lyme would like
12 to see that, but these properties can be fully occupied
13 from April to November. Correct?
14     A    Uh-huh.
15     Q    Other than what you've said, is there any
16 other public health and safety concern or issue that
17 would be served by telling those persons who could use
18 those properties at a hundred percent capacity during
19 those months from stopping in the months between April
20 and November?
21          MR. RADSHAW: Object to the form of the
22     question. Which question would you like him
23     to answer?
24          MR. SLATER: If he understands the
25     question.