PART TWO

74

```
 1              MR. RADSHAW:  If you understand it, you

 2        can answer.

 3        A    I'd like a clarification, please.

 4   BY MR. SLATER:

 5        Q    Would you agree that these properties can all

 6   be used at a hundred percent occupation between April

 7   and November?  The septic systems and wells serve those

 8   properties during that majority period of the year.

 9   Correct?

10        A    Yes.  Or they have a public water supply.

11   It's not all wells.  In fact, I have no idea, maybe you

12   do, of what percentage of wells versus public water

13   supply.  I don't have that at my fingertips.

14        Q    What public health, safety or other issue

15   that was a legitimate concern for planning and

16   zoning -- Zoning Commission is served by telling those

17   persons who could use their property at full capacity

18   for that majority portion of the year stopping and

19   halting the use of the property for those few winter

20   months of the year?

21        A    Well, I think one of the things I've already

22   addressed is a character issue.  Now, let me clarify

23   that.  There, I think, is a distinct difference and I

24   feel that way in Old Lyme and I also feel that way on

25   other places I go and spend my summer holiday of what
```

1   constitutes a summer use or a seasonal use of a piece

2   of property is not necessarily what's appropriate for a

3   year-round use.  There's a lot of things, and seasonal

4   use is fine and beach use is fine, but I think there's

5   a lot of character issues that we have considered

6   relative to what's acceptable for a cottage versus

7   what's acceptable for a year-round residence.

8          Now, hopefully, I'm not being prejudicial

9   when I say that, but there is a character issue on that

10  with regard to character of how people live.  I think

11  there are issues that are different between something

12  you use on a seasonal basis and what you use as a

13  year-round residence.  I think that's also reflected in

14  some of the different areas of the shore community and

15  we try to take that into consideration.  Those were

16  considerations from the commission standpoint when we

17  did that.

18         You also have issues of use in the winter

19  months, entails more heating systems, potential for

20  having different systems in a building being used

21  during the winter months.  That's one of the reasons

22  why we certainly wanted to have a bona fide heating and

23  other mechanical systems being up to snuff.

24         But even within that context there's still an

25  aspect of certain amount of lot size to prevent spread

1   of fire, access to facilities and things of that

2   nature, and when we consider that, we thought 10,000

3   square feet was the right amount.

4        Q    Is there a public health and safety problem

5   with respect to fire aspect regarding the use of these

6   properties at very high capacity during the summer

7   months?

8        A    I'm sure there probably is, but one of the

9   things that's not in play necessarily is the heating

10  system.  And that was just one of the considerations we

11  had.

12            Now, do I think all of our considerations

13  were perfect and could be absolutely done on an

14  analytical basis?

15            No.  But we were very mindful of what we

16  thought the character of a year-round development would

17  be and the conclusion we came back with was we think

18  houses on 10,000 square feet was appropriate and that's

19  what we base it on.

20       Q    Can you elaborate a little bit more on what

21  you mean by character?

22       A    Yes, I can elaborate on the issue of

23  character.  You know, how close do you want year-round

24  residences.  That's one of the main things zoning asked

25  from a standpoint that's applied elsewhere in town.  In

1    the non-R10 zone we have certain provisions on what we

2    want properties to be there, too.  In certain areas we

3    have a minimum, basically.  For broad ranging basis we

4    basically have 40 and 80,000 square feet in the rest of

5    the town.  That's what I mean by character, what we

6    would like the town to look like.  And that is one of

7    the provisos of zoning, one of the things we oversee.

8    And in this particular case, we said we're going to

9    revert back to the end of the line zone.  We never

10   heard any objections or no one had ever come forward --

11   we did hear okays to that.  Of course we never heard

12   anyone come forward and say let's change it to R5,

13   let's change it to R3.  So we stuck to the underlying

14   zone.

15       Q    And referring to what the community would

16   look like, I understand that the commission adopts

17   zoning regulations that establishes the standards in

18   which a new development would occur, but the R10 zone

19   was largely developed at the time this policy was

20   adopted in 1995, wasn't it?

21       A    Yes.

22       Q    So the character wouldn't be in the character

23   of the way these buildings were going to look and the

24   roads would look, but the character simply comes down

25   to whether or not these properties were going to have

1    people in them during certain months of the year.

2    Isn't that true?

3        A    I don't think that really came into being.

4    The issue, once again, was, I'll repeat, we came to the

5    conclusion that we would like to have year-round

6    single-family houses on 10,000 square feet of property

7    and that we weren't going to interfere with the aspects

8    of seasonal property, but for a year-round basis, we

9    came and thought about it and we looked at what a

10   sister town had done, we followed their process, not

11   blindly, and we came up saying we wanted 10,000 square

12   feet.

13       Q    Were these regulations adopted in 1995 for

14   the purpose of environmental protection?

15       A    We did discuss those matters.  I don't know

16   if that was a driving overcompelling factor, but there

17   were considerations with regard to exactly how dense we

18   wanted year-round residences to be relative to allowing

19   those discharges to the environment on a very tight

20   basis to see if they would -- I think the term that I

21   had heard used was, you know, winter recovery period.

22   So there was an aspect of that, yes.

23       Q    Who did you hear the term winter recovery

24   from?

25       A    I don't recall right now.

1    Q    Do you recall whether the Zoning Commission

2  received any environmental studies or any environmental

3  reports as to whether or not the restriction against

4  off-season use would serve the environment?

5    A    I know we discussed the matter.  I don't

6  believe we committed any studies to take place.  I

7  don't recall seeing other studies.  It doesn't mean

8  that we didn't receive them.

9    Q    Would your minutes of a public hearing

10  ordinarily reflect the documents that were submitted

11  to the commission during the course of the public

12  hearing?

13    A    Oh, yes, they would.  They would all be

14  exhibits.

15    Q    Referring to the minutes of the 1995 public

16  hearing, there is a reference to some exhibits.  Is

17  that correct?

18    A    Okay.  I see a reference to a number of

19  exhibits, yes.

20    Q    Would you expect that those would be the only

21  exhibits that were submitted during that course of the

22  public hearing?  In other words, that the exhibits that

23  were submitted during that public hearing were

24  identified as exhibits in the minutes?

25    A    These were actually submitted, it looks like

1   most of these were submitted in advance of our public

2   hearing because it looks like the character of these

3   exhibits dealt with the submittals we make prior to

4   public hearing as required by, I believe, state

5   statutes.  And they were like to the Old Lyme Planning

6   Commission, the CRERPA, Southeastern Connecticut

7   Council of Governments, River Gateway Commission, DEP,

8   Lyme and Old Lyme as abutting towns.  So it looks like

9   that's what these were in this particular case.  I

10  don't see a submittal of any technical papers that

11  might be similar to what you asked the question about.

12      Q    I'll just very quickly show you some

13  documents and see if you recall having ever received

14  them as a member of the Zoning Commission of the town

15  of Old Lyme.

16          That's a Dames & Moore report listed as TR-4.

17              MR. RADSHAW:  TR-3.

18  BY MR. SLATER:

19      Q    TR-4.  I have TR-3 in my hand which is also a

20  Dames & Moore report.

21      A    I may have seen them.  I don't recall that

22  right now.  I certainly recall hearing people talk

23  about these, and of course, they look like -- let me

24  see -- they look like they were provided to the WPCA.

25  Our minutes would certainly indicate whether we

1    discussed these at our meetings.  I do recall hearing

2    about Dames & Moore.  I don't recall exactly what we

3    did with regard to them.

4        Q    As you sit here today, are you certain that

5    you heard about the Dames & Moore report in your

6    capacity as a member of the Zoning Commission as

7    opposed to simply being a citizen in the town?

8        A    I think more as a member of the Zoning

9    Commission.

10           Is there some difference between these?

11              MR. RADSHAW:  Don't worry.  You don't

12           get to ask any questions.

13    BY MR. SLATER:

14        Q    I'll ask you the same question with respect

15    to whether you received and reviewed a report by

16    Malcolm Pirnie?

17        A    I've certainly heard his name.

18              MR. RADSHAW:  Just so the record is

19           clear, that document is TR-6.

20        A    I don't recall reviewing this report.  I know

21    I've heard the name Malcolm Pirnie.  Yes, I do recall

22    hearing that name.  I would have to refer back to the

23    minutes to determine if we ever discussed these in a

24    substantive technical manner at our meetings.

25        Q    If these reports were reviewed and relied on