2

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - -X
SOUTH LYME PROPERTY OWNERS          :
ASSOCIATION, INC., CHARLES AND      :
VICTORIA PARSONS AND JOAN BYER,     :
        Plaintiffs                 :
                                    :
VS                                  :  3:00CV97(EBB)
                                    :
TOWN OF OLD LYME, TOWN OF OLD       :
LYME ZONING COMMISSION,             :
ERIC FRIES, GEORGE JAMES,           :
JANE MARSH, THOMAS RISOM,           :
WALTER SEIFERT, SHARON COLVIN AND   :
MARILYN OZOLS,                      :
        Defendants                 :
- - - - - - - - - - - - - - - -X

Deposition of THOMAS C. RISOM taken at the
offices of Halloran & Sage, 225 Asylum
Street, Hartford, Connecticut, before
Audra Quinn, RPR, Licensed Shorthand Reporter
#106, and Notary Public, in and for the State
of Connecticut on July 11, 2003, at
10:15 a.m.



DEL VECCHIO REPORTING SERVICES, LLC
PROFESSIONAL SHORTHAND REPORTERS

117 RANDI DRIVE                100 PEARL ST., 14th FL.
MADISON, CT 06443              HARTFORD, CT 06103-4506
  203 245-9583                     800 839-6867

```
1            (THEREUPON, THE REFERRED TO
2            QUESTION WAS READ BACK.)
3       A    I'm troubled by the word reduce. I would say
4  that's not what I understand our charge to be.
5  BY MR. SLATER:
6       Q    Why not?
7       A    Because I'm not sure that there is an
8  environmental impact. If you change -- substituted the
9  word prevent from reduce, I would agree with it.
10      Q    So it's your testimony that you believe the
11 waste water generated within the town of Old Lyme does
12 not cause environmental impacts?
13      A    That is my statement.
14      Q    What do you base that statement on?
15      A    That there has been no evidence since the
16 WPCA was formed and none prior to that that I am aware
17 of that indicated that there was pollution caused by
18 the subsurface disposal systems in the town of Old
19 Lyme.
20      Q    Are you familiar with reports prepared by the
21 town by the firm by the name of Malcolm Pirnie?
22      A    I'm familiar with it.
23      Q    Do you know whether those reports were
24 prepared -- strike that.
25           Do you know when the Malcolm Pirnie reports
```

1  were prepared?
2      A    It's my understanding that the Malcolm Pirnie
3  report was issued preliminarily in 1979 and finally in
4  1981.
5      Q    Do you know who hired Malcolm Pirnie to
6  investigate -- strike that.
7           Do you know what the scope of Malcolm
8  Pirnie's work involved?
9      A    I do not.
10     Q    Do you know generally what it entailed?
11     A    I do not.
12     Q    Do you know that it entailed evaluation of
13 waste water concerns regarding waste water management
14 for the town of Old Lyme?
15     A    I know that.
16     Q    Do you know who hired -- who in the town of
17 Old Lyme hired Malcolm Pirnie and why?
18     A    I do not and no.
19     Q    I believe you may have already testified that
20 the firm -- that the Water Pollution Control Authority
21 initially hired was Dames & Moore.  Is that correct?
22     A    No.  It was the Septage Study Committee hired
23 Dames & Moore.
24     Q    And that report was issued prior to the
25 formation of the Water Pollution Control Authority?

```
 1   situation.  I would say the individual beach
 2   communities, for instance, in the town of Old Lyme, or
 3   the Rogers Lake area or the Rogers Lake East Shores
 4   area, all of which have identifiable size, and
 5   solutions could be implemented for each of those little
 6   pockets.
 7       Q    So applying that understanding of sewer, that
 8   is eliminating the idea that a single family property
 9   owner would build a sewer plant in their backyard --
10       A    Wait.  Can I interrupt?
11       Q    Let me finish my question and then clarify.
12       A    Because I didn't say that.
13       Q    In my follow-up questions when I use the term
14   sewer, I'm referring to that kind of a system serving a
15   larger number.
16            I actually lost my train of thought.
17            Isn't it true that the -- is it true that the
18   Septage Committee concluded that that type of sewer is
19   an inappropriate solution for waste water management in
20   the town of Old Lyme?
21       A    No.  I would not use the term inappropriate.
22       Q    What term would you use?
23       A    Unnecessary.
24       Q    When did that committee conclude that it was
25   unnecessary?
```

1   A   That the --

2   Q   The Septage Committee?

3   A   The Septage Study Committee, I said I
4   believed that the Septage Study Committee felt that a
5   large number structural solution, a sewer as we've
6   agreed is the definition, was unnecessary was its
7   impetus to go forward with a Sewer Avoidance Program.
8   So early on would be the time frame.

9   Q   Would it be fair to say that it was that same
10  impetus that the Septage Committee was formed in the
11  first place?

12  A   I would say there was an intuitive belief to
13  that end that caused the Septage Study Committee to be
14  formed to validate that intuition.

15  Q   What did the Septage Committee do to validate
16  that disposition?

17  A   They hired Dames & Moore to construct the
18  frame work by which a future organization, the WPCA,
19  would evaluate individual lots and groups of lots for
20  the most appropriate waste water treatment system,
21  period.

22  Q   Why wasn't Dames & Moore hired to study the
23  potential effectiveness and cost of a sewer system?

24  A   I don't believe, and because I was not an
25  officer of the Septage Study Committee, I cannot speak

1   reasons or compliance may require extraordinary
2   expenditures and site modifications. It goes on to say
3   that, yes.
4       Q   Is it your understanding that there are many
5   properties in Old Lyme whose on-site septic systems
6   cannot be brought into compliance with the public
7   health code?
8       A   No.
9       Q   It is not your understanding?
10      A   That's correct.
11      Q   Is it your belief that -- can you describe
12  what your understanding is in terms of the ability of
13  properties in the town of Old Lyme to comply with
14  public health code?
15      A   In the town of Old Lyme, there are homes,
16  there are buildings, there are dwellings on lots which
17  will have and do have a very difficult time disposing
18  of their waste water on site. There are not many. I
19  think I can even count them. Those systems have
20  available -- I'm sorry, those lots have available to
21  them systems which could be considered in my earlier
22  definition of sewer, say an individual or multifamily
23  system, meaning three or four homes, which the town was
24  willing to work with the homeowners on using
25  properties, using either public properties or communal

1  properties and handle these isolated cases
2  individually. But because of the small number of
3  repairs which cannot comply with the health code, we
4  had solutions, and I'm going back now to that time
5  frame of mid 1990s. In 2003 there are numerous
6  solutions to that problem and pending legislation in
7  the Connecticut House and State will enable any
8  homeowner to avail themselves of those technologies.
9  So I will say that there were some number of lots in
10 Old Lyme that could not comply, and now there's a much
11 smaller number due to increasing technology.
12     Q    Do you remember the Planning and Zoning
13 Commission -- strike that.
14          In the complaint in this case the plaintiffs
15 have described regulations that were adopted by the Old
16 Lyme Planning and Zoning Commission in 1995 as to
17 impose limitations against off season use of certain
18 residential properties in Old Lyme as the 1995
19 regulations. Are you familiar with the regulations I'm
20 talking about?
21     A    No, because I don't believe they exist.
22     Q    You don't believe that there's a zoning
23 regulation that places any restriction on off season
24 use of residential properties in Old Lyme?
25     A    Let me clarify it so we don't play the game.

1  commission, the Zoning Commission, had no part in those
2  determinations. We just acted on enforcement thereof
3  and assisting the homeowner or educating the homeowner
4  as to their situation.
5     Q   Do you recall changing the uses allowed in a
6  residential zone as part and parcel of the regulations
7  adopted in 1995?
8     A   Not specifically.
9     Q   Was the protection of environmental resources
10 from pollution caused by waste water generated by
11 residential homes in Old Lyme a basis for adopting the
12 regulations in 1995 --
13    A   No.
14    Q   -- in your understanding?
15    A   No.
16    Q   Had the Planning and Zoning Commission
17 received any reports or studies regarding the
18 relationship between on-site treatment of waste water
19 and environmental protection?
20    A   The Zoning Commission did not that I recall.
21    Q   Are you aware of what other commissions were
22 aware, received such a report, if any?
23    A   The health office would have, but I don't
24 know that for a fact.
25    Q   Back to Dames & Moore and the Septage

1  Committee. Are you aware of any other written reports
2  submitted to the Septage Committee or the Water
3  Pollution Control Authority other than the reports that
4  we've entered into as exhibits in this deposition?
5      A    We have hundreds of reports written to the
6  WPCA, so I'd ask you to be more specific.
7      Q    By Dames & Moore?
8      A    No. Total. You said any other.
9      Q    I thought that I had asked just about Dames &
10 Moore.
11     A    Maybe you did.
12          No. If the question is exclusive to Dames &
13 Moore, the answer is no.
14     Q    You noted that there was a page of a document
15 that was mistakenly given to you at the back of the
16 Dames & Moore report, and it's a page of a newspaper
17 article that suggests that the Water Pollution Control
18 Authority was established during 1995. Have you ever
19 seen that article?
20     A    I probably have, yes. Am I in it?
21          MR. SLATER: I'll introduce that as
22          TR-5.
23     (THEREUPON, PLAINTIFF'S EXHIBIT NO. TR-5,
24          COPY OF NEWSPAPER ARTICLE,
25          WAS MARKED FOR IDENTIFICATION.)