UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
------------------------------X
SOUTH LYME PROPERTY OWNERS      :
ASSOCIATION, INC., CHARLES      :
AND VICTORIA PARSONS            :
AND JOAN BYER,                  :
                               :
          Plaintiffs,           :
                               :
     v.                         :    No. 3:00cv97(EBB)
                               :
TOWN OF OLD LYME, TOWN OF        :
OLD LYME ZONING COMMISSION,      :
ERIC FRIES, GEORGE JAMES,        :
JANE MARSH, THOMAS RISOM,        :
WALTER SEIFERT, SHARON           :
COLVIN AND MARILYN OZOLS,        :
                               :
          Defendants.           :
------------------------------X
```

<u>RULING ON MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS TOWN OF OLD
LYME, TOWN OF OLD LYME ZONING COMMISSION AND MARILYN OZOLS</u>

_____The Plaintiffs in this action challenge the adoption and enforcement of certain seasonal use restrictions in the 1995 amendments to the Town of Old Lyme Zoning Regulations.  The Plaintiffs claim that the amended regulations violate Connecticut General Statutes §§ 8-2 and 8-2h, Article I, §§ 8 and 10 of the Connecticut Constitution, the Fifth and Fourteenth Amendments to the United States Constitution, and 42 U.S.C. § 1983.  The Plaintiffs also claim that the Town has violated the Connecticut Environmental Protection Act ("CEPA"), codified at Conn. Gen. Stat. §§ 22a-16 and 22a-18.  The Plaintiffs commenced this action in

1

Connecticut Superior Court in the Judicial District of New London. On January 19, 2000, the Defendants removed the action to this Court pursuant to 28 U.S.C. §§ 1441, 1443, and 1446, invoking jurisdiction under 28 U.S.C. §§ 1331 and 1343(3). Defendants Town of Old Lyme, Town of Old Lyme Zoning Commission and Marilyn Ozols ("Defendants") have moved for summary judgment on all counts. For the following reasons, the Defendants' motion (Doc. No. 106) is granted in part and denied in part.

FACTUAL BACKGROUND

The Court sets forth only those facts deemed necessary to an understanding of the issues raised in, and decision rendered on, this Motion. The following factual summary is based on the Plaintiffs' First Amended Complaint ("Compl." (Doc. No. 24)), the Defendants' Local Rule 56 Statement of Material Facts ("Defs.' Rule 56 Statement," Doc. No. 108), and accompanying affidavits, depositions and exhibits, the Defendants' Memorandum in Support of Motion for Summary Judgment ("Defs.' Mem in Opp." Doc. No. 107) and documents cited therein, the Plaintiffs' Local Rule 56 Statement of Material Facts ("Pls.' Rule 56 Statement," Doc. No. 124) and accompanying affidavits, depositions and exhibits, the Plaintiffs' Memorandum in Opposition to Certain Defendants' February 20, 2007 Motion for Summary Judgment ("Pls.' Mem. in Opp.," Doc. No. 122) and documents cited therein, and a hearing that was conducted from April 11 to April 13 of 2000 on Plaintiffs' motion for a

preliminary injunction.  Consequently, this factual summary does not represent factual findings of the Court.

The Plaintiff South Lyme Property Owners Association, Inc. ("Association") is comprised of approximately 350 property owners in Old Lyme.  (Defs.' Rule 56 Statement, ¶¶ 1,4.)  The Association was formed for the purpose of invalidating the zoning regulations challenged in this lawsuit.  (Compl. ¶¶ 6-7.)  Plaintiffs Charles and Victoria Parsons are or have been the owners of 11 Brookside Avenue, Old Lyme, Connecticut and are members of the Association. (Id. ¶ 2; Compl.  ¶ 8.)  Plaintiff Joan Byer is the owner of 61 Breen Avenue, Old Lyme, Connecticut and is also a member of the Association. (Compl. at ¶ 9.)

Defendant Town of Old Lyme ("Town") is a Connecticut municipal corporation.  (Compl. ¶ 2.)  Defendant Old Lyme Zoning Commission ("Commission") is the municipal agency designated by the Town to administer the Zoning Regulations of the Town. (Compl. ¶¶ 2-3.) Defendant Marilyn Ozols was the Zoning Enforcement Officer ("ZEO") of the Town at all times relevant to this action and was empowered to enforce the zoning regulations adopted by the Commission. (Compl. ¶¶ 4-5.)  Defendants Eric Fries, George James, Jane Marsh, Thomas Risom, Walter Seifert and Sharon Colvin, who move for summary judgment separately (see Doc. No. 102), are or were members of the Commission at all times relevant to this action.  (Compl. ¶ 4.)  Each of the individual defendants is sued both in his or her

individual and official capacities. (Compl. ¶ 48.)

<u>The Challenged Regulations</u>

The properties at issue in this case are located in the "R-10" residential zoning district. (Compl. ¶¶ 3, 13, 24, 25.) Prior to 1992, the Old Lyme Zoning Regulations ("Pre-1992 Regulations") did not contain any provision restricting the use of an R-10 single-family dwelling, or any other use in a residential district, to a particular time of year or season. (<u>See</u> Pre-1992 Regulations, Art. II, § A.1.). The Pre-1992 Regulations defined a "seasonal dwelling" as a building "designed, used, or intended for seasonal use." (<u>Id.</u> Art. I, § C.57.) The Pre-1992 Regulations also defined "seasonal use" as use of a lot between April 1 and November 15. (<u>Id.</u> Art. I, § C.58). However, the Pre-1992 Regulations did not apply these definitions to the regulations governing prohibited and nonconforming[1] uses and buildings,[2] and, therefore, the Pre-1992

_____

[1]A "nonconforming" lot, use, or structure is one that is prohibited by a zoning regulation or amendment but which existed lawfully on the date the regulation prohibiting the lot, use or structure became effective, and, therefore, may lawfully be continued. (<u>See</u> Ruling on Plaintiffs Motion for Preliminary Injunction (Doc. No. 21) at 3-4.) <u>See also</u> Conn. Gen. Stat. § 8-2(a); 1992 Regulations, Art. I, § 8.1.1.

[2]Three Connecticut Superior Court cases interpreted these Pre-1992 Regulations in zoning enforcement actions brought against property owners to prevent the use of residential dwellings between November 15 and April 1. In each case, in the context of determining whether the year-round use of a seasonal property constituted an extension or expansion of a pre-existing nonconforming use, the court found that there were no prohibitions in the zoning regulations against the year-round use of seasonal dwellings because, although the regulations include

Regulations did not restrict seasonal or year-round use in any particular zone.  (See Article I, § E.1.)

In 1992, the Commission adopted new zoning regulations ("1992 Regulations") amending the sections governing nonconforming uses and nonconforming buildings on nonconforming lots to prohibit winter occupancy and winterization of "seasonal uses" on nonconforming lots.[3]  (Art. I, §§ 8.7, 8.8.)  The 1992 Regulations

definitions of seasonal use, they do so without restricting that use.  See Arcata v. Zoning Board of Appeals, 1993 WL 394500, at *6 (Conn. Super. Ct. Sept. 21, 1993); Habicht v. Zoning Board of Appeals, 1993 WL 284791, at *7 (Conn. Super. Ct. July 22, 1993); French v. Zoning Board of Appeals, 1993 WL 284789, at *7 (Conn. Super. Ct. July 22, 1993).

[3] The 1992 Regulations provided, in relevant part, as follows:

8.7  Nonconformity - Use: The following provisions and limitations shall apply to a nonconforming use of land, building or other structure:

8.7.1    Enlargement:  No nonconforming use of land shall be enlarged, extended or altered, and no building or other structure or part thereof devoted to a nonconforming use shall be enlarged, extended, reconstructed or structurally altered, except where the result of such changes is to reduce or eliminate the nonconformity.  *This prohibition specifically includes the occupancy of a seasonal use beyond the period of April 1 to November 15 and the winterization, refurbishment or remodeling of a seasonal dwelling to accommodate other than seasonal use.*

 [...]

8.8 Nonconformity - Improvements: The following provisions and limitations shall apply to nonconforming buildings and other structures and site development:

8.8.1    Enlargement:   . . . No building or other structure located on a lot which does not conform to the requirements of these Regulations regarding lot area, shape and

continued to define "seasonal use" and "seasonal dwelling" in their definitions section, but these definitions did not cross-reference any particular zones or districts. Therefore, the 1992 Regulations did not place any seasonal restrictions on the use of property in a residential district. To the contrary, the 1992 Regulations listed single-family dwellings as a permitted use in residential districts, including R-10, without reference to the time of year. (See Art. II, § 21.1, A-1.)

In 1995, the Commission again amended the Regulations ("1995 Regulations"). Most significantly for this dispute, the Commission amended Schedule A-1 of the Regulations, which governs the permitted uses of properties in residential zones. Under Schedule A-1 of the 1995 Regulations, year-round use of single-family dwellings in residential zones is permitted subject to the "additional standards" set out in Paragraph 21.2, which regulates the conversion of seasonal use dwellings to year-round use as follows:

> a. No dwelling located in the Town of Old Lyme which on the effective date hereof is a seasonal use dwelling shall be converted to a year-round use dwelling unless an application for such conversion has been approved by the Zoning Enforcement Officer . . . under the application requirements and standards set forth in

---

frontage, building bulk and coverage or off-street parking shall be enlarged or extended. *These prohibitions specifically include the occupancy of a seasonal use beyond the period of April 1 to November 15 and the winterization, refurbishment or remodeling of a seasonal dwelling to accommodate other than seasonal use.*

(emphasis added).

6

subparagraph c. hereof.

     b.  For the purpose of administration of this section, the Zoning Enforcement Officer . . . may designate from time to time those properties on which there has been an affirmative determination that there is located thereon a seasonal use dwelling. . . . The absence of such designation shall merely mean no determination has been made by the Zoning Enforcement Officer of the Town of Old Lyme, and shall not be deemed to be evidence that a dwelling is a year-round use dwelling.

     Nothing in this Regulation shall be deemed to preclude a landowner from contesting such designation by demonstrating to the Zoning Enforcement Officer that the designated seasonal use dwelling was a lawfully pre-existing non-conforming use, or prior to January 1, 1992 was a lawfully existing single detached dwelling for one family, located on a lot with not more than one such dwelling, and that such dwelling was continuously maintained as a year-round use dwelling thereafter ...

Subparagraph c then sets out the requirements for an application for conversion of a seasonal use to year-round use. Among other requirements, an application for conversion will only be approved if the lot contains a minimum of 10,000 square feet, if there is no more than one dwelling unit on the lot, if the lot is served by a year-round water supply and on-site sewage disposal system both of which must comply with applicable Connecticut Health Department standards, and if the building's heating and electrical systems and insulation comply with the applicable minimum standards for a year-round dwelling. (Art. II, § 21.2.5 (c)).

The limitations on conversion from seasonal to year-round use are the basis of the Plaintiffs' challenge to the 1995 Regulations. In particular, the Plaintiffs complain that the 1995 Regulations prevent conversion to year-round use of some owners' property

solely because their lots are smaller than 10,000 square feet. (Compl. ¶ 28.)  The challenged Regulations prohibit conversion to year-round use of these properties despite the fact that the sewage disposal and water systems on the properties may be in compliance with the Connecticut minimum standards for year-round residence and the fact that the properties are fully accessible by roads which serve the year-round use properties in the area.  (Compl. ¶ 10; Pls.' Mem. in Opp. at 2.)

The parties offer very different versions of how the challenged regulations came to be adopted.  The Defendants claim that the minimum size requirement was adopted in response to concerns about public health, safety and welfare.  (Defs.' Mem. in Supp. at 17-18.)  Jane Marsh, who served on the Town Planning Commission in the 1980s and then moved to the Zoning Commission around 1990, testified that the 10,000 square foot requirement was adopted out of concern that on-site septic systems in the community near the shoreline had been constructed at too high a density. (Tr. 4/12/00 at 56-58.)  Some members of the Commission have testified that the Town and Commission adopted the seasonal use restrictions because they thought that the restrictions would reduce contamination of wells and pollution to Long Island Sound. (E.g., id.; see also Pls.' Rule 56 Statement Ex. B at 18 (Deposition of Jane Marsh) (stating that it is "obvious" that resting septic systems in the winter will reduce pollution).)  Ms. Marsh testified that the 1995 Regulations were consistent with a Plan of Town Development ("Plan") adopted in 1990 by the Town Planning Commission.  (Tr. 4/12/00 at 85.)  The Plan identified

8

environmental risks related to overcrowding of septic systems in the beach area. (Defs' Rule 56 Statement Ex. I at 4, 11.) The Town submitted the Plan to the Connecticut Department of Environmental Protection ("CEDP") and it was approved by the agency. (Tr. 4/12/00 at 87-88.) The CEDP "strongly endorse[d]" the Plan's proposed restrictions on expanded use of dwellings in beach areas so as to minimize the environmental impact. (Id. at 87.)

The Plaintiffs, however, contest the notion that the Town and Commission were motivated by environmental concerns when they limited the conversion to year-round use in the beach areas. The Plaintiffs claim that the 1995 Regulations are part of a long-term effort to prevent the "establishment of year-round residency" in the beach communities of Old Lyme. (Pls' Mem. in Opp. at 2.) Plaintiffs claim that as early as the 1970s and 1980s, before any concerns about pollution from septic tanks arose, the Town had attempted to restrict use of smaller lots in the beach areas. (Id.; Compl. ¶¶ 13, 17, 29, 30, 31; Pls' Rule 56 Statement at 5, ¶ 2) According to the Plaintiffs, the Town had a policy of designating some lots in the beach areas for seasonal use well before the 1990 Plan of Town Development, and well before the CDEP brought attention to the problems of pollution from densely populated shoreline communities. (Pls' Rule 56 Statement at 5, ¶ 2.) According to the Plaintiffs, the Defendants' efforts to restrict seasonal use are motivated by a desire to preserve a certain character in the community and by resistance to the establishment of winter residency in the beach areas by "persons in

a lower socioeconomic status." (Pls.' Mem in Opp. at 25; Pls.'
Rule 56 Statement at 5, ¶ 2; see also id. Ex. B at 12-14, 23-30
(Deposition of Jane Marsh) (describing the "different feeling" and
changes in "quality of life" that would result from increased year-
round use in a community); id. Ex. L at 74-75 (Deposition of Eric
Fries) (explaining that the Commission's rationale in passing the
1995 Regulations was that "there's a lot of character issues that
we have considered relative to what's acceptable for a cottage
versus what's acceptable for a year-round residence").) The
Plaintiffs claim that the Defendants have limited the seasonal use
restrictions to beach areas, and have not applied those
restrictions to other parts of Old Lyme, because the Defendants
want to prevent the "beach people," who traditionally live in the
area only during the summer months, from becoming year-round
residents. (Pls.' Mem. In Opp. at 20-21; see also Pls.' Rule 56
Statement at 5, ¶ 2.)

        The Plaintiffs further claim that seasonal use restrictions in
the 1995 Regulations do not address environmental problems caused
by on-site septic systems. They argue that the Town and Commission
have taken an inconsistent position in choosing to permit crowded
beach communities to exist without public sewage treatment services
during the summer months while simultaneously claiming that
restrictions on winter use are an effective way of eliminating the
risk of pollution from densely constructed on-site septic systems.
(Pls.' Rule 56 Statement at 6, ¶ 4.) The Plaintiffs claim that the
Commission did not consider any environmental report or study prior
to adopting the 1995 Regulations. (Id. at 7, ¶ 6 see also id. Ex.

10

F at 56 (Deposition of Commission member George James) (explaining that "[i]t's a supposition" that restricting winter use will reduce pollution and admitting that the Commission has "no scientific evidence one side or another").)   They also claim, based on a report commissioned by the Association, that there is no evidence of any environmental benefit from seasonal use restrictions. (Id., Ex H.) The Plaintiffs further allege that the Town has willfully neglected to resolve pressing environmental problems in the beach areas by pursuing zoning restrictions instead of implementing the necessary sewer system.   (Compl. ¶¶ 53-62.)

Enforcement of the Challenged Regulations

The 1995 Regulations essentially establish a permit system whereby any property designated for seasonal use must obtain a permit for conversion from seasonal to year-round use.  In order to implement the permit system for conversion the Town must first establish which existing properties are seasonal use and which are year-round use.   Article II, § 21.2.5, of the 1995 Regulations authorizes the ZEO to issue these seasonal determinations but does not set out standards or procedures for the ZEO to follow in making this determination.  As enforced, the Regulations allow a property owner to challenge a seasonal use designation by demonstrating that he or she used the property on a year-round basis prior to 1992, and, therefore, that he or she has a lawful nonconforming use.[4]

_____

[4]The Defendants claim that § 8.8.1 of the 1992 Regulations originally prohibited the enlargement or conversion of seasonal properties to year-round properties on non-conforming lots, and, therefore, that 1992 is the relevant benchmark for determining whether a nonconforming year-round use existed and should be

Sometime after the Regulations were adopted, ZEO Defendant Marilyn Ozols implemented a procedure to evaluate the status of existing properties on a systematic basis, starting with the properties in the beach communities. (Tr. 4/12/00 at 149-51.) She began by making a preliminary determination of seasonal or year-round use based on a review of a given lot's zoning file and other available town records, which include assessor's cards, health department determinations, and building permit applications. (Id. at 150-54.) None of these documents necessarily contain information that accurately reflects whether or not the owner actually used the property in the winter during the relevant years. (Ruling on Pls.' Mot. for Prelim. Inj., Doc. No. 21, at 22-24.). Based on this review, the ZEO made a preliminary determination and sent a notice to the property owner informing the owner that he or she had sixty days to provide additional information to contest the ZEO's finding. (Tr. 4/12/00 at 150-51; Tr. 4/13/00 at 72-75.) The additional information accepted by ZEO Ozols was generally limited to independent documentation showing year-round use prior to 1992. For example, she accepted electric bills, oil delivery statements, mail carrier records, rental leases, and school report cards (Tr. 4/13/00 at 80-81.) The Commission instructed ZEO Ozols that testimonial evidence such as statements of property owners regarding their actual use of the property before 1992 and corroborating affidavits from neighbors or others with knowledge of the owner's use of the property were insufficient to change a

---

grandfathered.

12

preliminary determination of seasonal use.  (Id. at 107-9.)

DISCUSSION

A.   STANDARD OF REVIEW

     The standard for summary judgment is well established.  A
moving party is entitled to summary judgment if it demonstrates
that there is no genuine issue of material fact and that it is
entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).
An issue of fact is "material" if it "might affect the outcome of
the suit under the governing law", while an issue of fact is
"genuine" if "the evidence is such that a reasonable jury could
return a verdict for the nonmoving party." Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); see
also Konikoff v. Prudential Ins. Co. of America, 234 F.3d 92, 97
(2d Cir. 2000).  Upon motion, and following adequate time for
discovery, Rule 56(c) requires that summary judgment be entered
against a party "who fails to make a showing sufficient to
establish the existence of an element essential to that party's
case, and on which that party will bear the burden of proof at
trial." Celotex Corp v. Catrett, 477 U.S. 317, 322, 106 S. Ct.
2548, 2552 (1986).  This showing may be made by "pleadings,
depositions, answers to interrogatories, and admissions on file,
together with affidavits, if any." Fed R. Civ. P. 56(c).  The
evidence of the non-moving party is to be believed, Anderson, 477
U.S. at 255, 106 S. Ct. at 2513, and "the inferences to be drawn
from the underlying facts . . . must be viewed in the light most
favorable to the party opposing the motion." United States v.
Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 994 (1962).

However, the non-movant may not rest upon the mere allegations or
denials of its pleading, see Fed R. Civ. P. 56(e), and "must do
more than simply show that there is some metaphysical doubt as to
the material facts." Matsushita Electric Industrial Co., Ltd. v.
Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356
(1986). Instead, the non-moving party "must offer some hard
evidence showing that its version of the events is not wholly
fanciful." D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir.
1998).

B.    THE PLAINTIFF ASSOCIATION'S STANDING

Under the doctrine of "associational standing" an association
or organization has standing to sue on behalf of its members when:

> (a) its members would otherwise have standing to sue in
> their own right; (b) the interests it seeks to protect
> are germane to the organization's purpose; and (c)
> neither the claim asserted nor the relief requested
> requires the participation of individual members in the
> lawsuit.

Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333,
343 (1977) 97 S. Ct. 2434, 2441 (1977). The first requirement is
satisfied when at least one member of the association has Article
III standing to sue in his or her own right. Fair Housing in
Huntington Committee Inc. v. Huntington, 316 F.3d 357, 363-64 (2d
Cir. 2003) (citing Warth v. Seldin, 422 U.S. 490, 511, 95 S. Ct.
2197 (1975)). The second requirement is satisfied when
the "association's lawsuit would, if successful, reasonably tend to
further the general interests that individual members sought to
vindicate in joining the association and ... the lawsuit bears a

reasonable connection to the association's knowledge and experience." Building and Const. Trades Council of Buffalo v. Downtown Development, Inc., 448 F.3d 138, 149 (2d Cir. 2006). Unlike the first two requirements, the third requirement of the associational standing doctrine is strictly prudential in nature. See United Food and Commercial Workers Union Local 751 v. Brown Group, 517 U.S. 544, 553, 116 S. Ct. 1529, 1536 (1996) ("once an association has satisfied Hunt's first and second prongs...it is difficult to see a constitutional necessity for anything more")(citation omitted). "Hence the third prong of the associational standing test is best seen as focusing on ... matters of administrative convenience and efficiency, not on elements of a case or controversy within the meaning of the Constitution." Id.

1.  The Requirement That One Member of the Association Has Standing To Sue In His Or Her Own Right

The Defendants argue that no member of the Association has standing in his or her own right to claim that the Defendants' enforcement of the 1995 Regulations violated the requirements of procedural due process. (Defs.' Mem. in Supp. at 7.) The Defendants argue that members of the Association lack standing to sue on these claims because they have not exhausted their administrative remedies, which, the Defendants claim, should include appeals to the Zoning Board of Appeals ("ZBA") and administrative appeals to the Connecticut state courts. (Id.)

Generally, a plaintiff with a cause of action under 42 U.S.C.

§ 1983 is not required to exhaust administrative or state court remedies.  Patsy v. Board of Regents of Fla., 457 U.S. 496, 516, 102 S. Ct. 2557, 2568 (1982).  The Defendants do not cite a single case in which a court has required a § 1983 plaintiff to exhaust administrative or state remedies before bringing suit.  Rather, the Defendants quote from a discussion in Zinermon v. Burch, 494 U.S. 113, 126-28, 10 S. Ct. 975 (1990), referring to "special case[s]" of procedural due process analysis in which it is appropriate to dismiss a § 1983 claim brought by a plaintiff who has not exhausted state postdeprivation remedies.  See id. at 128, 10 S. Ct. at 985.  Such cases are limited to claims alleging official conduct that can be characterized as "random" and "unauthorized."  Id. at 138, 10 S. Ct. at 990  (citing Parratt v. Taylor, 451 U.S. 527, 101 S. Ct. 1908 (holding that a claim brought by a prisoner whose mail was negligently lost should be dismissed)); Hudson v. Palmer, 468 U.S. 517, 104 S. Ct. 3194 (1984)(holding that a claim brought by a prisoner alleging that his property had maliciously been destroyed by prison employees should be dismissed)).  In these limited cases, dismissal of the § 1983 claim is appropriate because no improved procedure would prevent the kind of deprivation at issue.  Because "random" and "unauthorized" actions cannot be predicted, the state postdeprivation remedies "are the only remedies the State could be expected to provide" in these cases.  Id. at 128, 138, 10 S. Ct. at 985, 990.

Plaintiffs allege that the arbitrary manner in which the Commission and the ZEO enforced 1995 Regulations violated the Plaintiffs' procedural due process rights. (Compl. ¶¶ 50-52.) The actions of the Commission and the ZEO in denying year-round use status to the Plaintiffs' properties cannot be categorized as "random" or "unauthorized." Instead, Plaintiffs attack "an established state procedure." <u>See</u> <u>Kraebel v. New York City Dept. of Housing Preservation and Development</u>, 959 F.2d 395, 404 (2d Cir. 1992). Therefore, the rule cited by the Defendants from <u>Zinermon</u> is inapplicable and the Plaintiffs are not required to have exhausted state administrative postdeprivation remedies before bringing their § 1983 claim. Some members of the Association have standing in their own right to bring the procedural due process claims.

2.    <u>The Requirement That The Interests The Association Seeks To Protect Are Germane To Its Purpose</u>

The Defendants do not argue that the Association fails to satisfy the second requirement of associational standing. The Association was formed to protect the interests of property owners harmed by the 1995 Regulations and the manner in which the Regulations have been implemented. (Compl. ¶ 6.) Therefore, the interests the Plaintiff Association seeks to protect in this action are germane to its purpose.

3.    <u>The Requirement That Neither The Claim Asserted Nor The Relief Requested Require The Participation Of The Association's Individual Members In The Lawsuit</u>

17

The Defendants argue that the Plaintiffs' claim for monetary relief would require the participation of the Association's individual members in the lawsuit. Unlike their argument about the first requirement of the associational standing doctrine, the Defendants seem to intend for this argument to apply to all of the Plaintiffs' federal claims. (Defs.' Mem. in Supp. at 10.) Generally, an association seeking damages on behalf of its members cannot claim associational standing. See United Food and Commercial Workers Union Local 751 v. Brown Group, Inc., 517 U.S. 544, 554, 116 S. Ct. 1529, 1535 (1996). This is because the question of damages generally requires "individual proof." See Bano v. Union Carbide Corp., 361 F.3d 696, 714 (2d Cir. 2004) (quoting Warth v. Seldin, 422 U.S. 490, 515-16, 95 S. Ct. 2197 (1974)). The Plaintiffs counter that the Association will seek only declaratory and injunctive relief regarding the constitutionality of the challenged regulations and their enforcement, and that it will seek only declaratory relief regarding the issue of whether the challenged regulations constitute a regulatory taking of its members' property. (Pls.' Mem. in Opp. at 13.) Plaintiffs state that the Association will not seek monetary damages related to the alleged taking of any particular member's property. (Id. at 13-14.) Since the Plaintiffs do not argue that the Association has standing to sue for monetary relief, the Court construes the damages claim in the

18

prayer for relief to be limited to the individual plaintiffs.

As noted above, the third requirement for associational standing requires the Court to focus on "matters of administrative convenience and efficiency."  The Court does not foresee that the remaining claims by the Association are likely to cause problems in this regard.  The Defendants seem to argue that the takings claim may require individualized proof for the Association's members' deprivation of property.  (Defs.' Mem. in Supp. at 9.)  However, the Plaintiffs have decided that their takings claim will take the form of a facial challenge to the Regulations.  (Pls.' Mem. in Opp. at 24.)  In order to succeed in a facial challenge "the challenger must establish that no set of circumstances exists under which the [government action] would be valid." United States v. Salerno, 481 U.S. 739, 745, 107 S. Ct. 2095 (1987).  Because the success of this claim does not depend on the application of the Regulations to any particular property owner, the kind of ad hoc factual inquiry for each member of the Association envisioned by the Defendants will not be necessary.  See Rent Stabilization Ass'n v. Dinkins, 5 F.3d 591, 595-97(2d Cir. 1993) (holding that an association of landlords did not have associational standing to bring an as-applied takings challenge to a rent control law because the court would have to determine each landlord's individual return on investment based on "a host of individualized financial data").

The Court therefore finds that the Plaintiff Association has

standing to pursue its claims.

C.   PLAINTIFF CHARLES PARSONS' STANDING TO SUE

The Defendants argue that Plaintiff Charles Parsons lacks standing because he "is not an owner of record at this time" and, therefore, all of his claims must be dismissed. (Defs.' Mem. in Supp. at 10-11.)  After this suit was initiated Charles Parsons apparently transferred his interest in 11 Brookside Drive to his wife, Plaintiff Victoria Parsons, and then transferred that interest "back and forth numerous times." (Defs.' Rule 56 Statement, Ex. D at 24-25.)  When the Defendants' Motion for Summary Judgment was filed, Charles Parsons therefore had no ownership interest in the property. (Id.)  The Plaintiffs respond that Mr. Parsons has standing because he owned the property "during years in which he was denied use of his property for several months of the year." (Pls.' Mem. in Opp. at 15.)

In arguing that Mr. Parsons has standing, the Plaintiffs focus on his takings claim and do not address his standing to pursue his other claims.  In a claim of a taking by eminent domain, the right to compensation belongs to the owner at the time of the taking and that right is not transferred to a subsequent owner. Palazzolo v. Rhode Island, 533 U.S. 606, 628, 121 S. Ct. 2448, 2463 (2001). "A challenge to the application of a land-use regulation, by contrast, does not mature until ripeness requirements have been satisfied." Id. at 627, 121 S. Ct. at 2463. Therefore, the owner at the time

20

a regulatory takings claim ripens has standing.  Id.

The Plaintiffs' takings claim constitutes a facial challenge to the Regulations.  (Pls.' Mem. in Opp. at 24.)  As discussed below, facial challenges "are generally ripe the moment the challenged regulation or ordinance is passed."  Suitum v. Tahoe Reg'l Planning Agency, 520 U.S. 725, 117 n.10, 117 S. Ct. 1659 (1997).  Therefore, in determining Mr. Parsons' standing to bring his takings claim, the relevant inquiry is into whether he owned the property when the 1995 Regulations were passed.  The current ownership of the property is irrelevant.

D.    EXHAUSTION OF THE PLAINTIFFS' DUE PROCESS CLAIMS

The Defendants argue that summary judgment is proper with respect to the individual Plaintiffs' due process claims because they have not exhausted their state administrative remedies. (Defs.' Mem. in Supp. at 11-12.)  This is apparently a different argument from the Defendants' argument under Zinermon that Plaintiffs should be required to have exhausted their administrative remedies before bringing § 1983 claims alleging violations of their procedural due process rights.  The Defendants now argue that the Plaintiffs "could have availed themselves of a state forum to review the constitutionality of the defendants' actions, but chose not to do so."  (Id. at 12.)  The Defendants fail to cite any case holding that plaintiffs are required to seek constitutional review in a state forum.  Furthermore, the

21

administrative remedies suggested by the Defendants are not a "practical avenue" or a "realistic alternative" for the Plaintiffs to contest the ZEO's determinations.  See Plano v. Baker, 504 F.2d 595 at 598 (2d Cir. 1974).  Administrative agencies generally do not have the power to grant the injunctive, declaratory or monetary relief that the Plaintiffs seek.  Furthermore, the "constitutional issues raised by this case...fall within the expertise of the courts, not the expertise of administrators." Id. at 599 (citing Ray v. Fitz, 468 F.2d 586 (2d Cir. 1972)).  Therefore, the Court denies the Defendants' Motion for Summary Judgment on this ground.

E.   THE CONSTITUTIONAL REQUIREMENTS OF PROCEDURAL DUE PROCESS

     The Plaintiffs challenge the Commission's seasonal use determinations on the grounds that the procedures used by ZEO Ozols fail to satisfy the minimum requirements of due process.  In its Ruling on the Plaintiffs' Motion for a Preliminary Injunction, the Court found that the Plaintiffs had demonstrated a likelihood of success on the merits on this claim.  (Doc. No. 21.)  Nonetheless, the Defendants now argue that the Court should grant summary judgment for them on this issue.  (Defs.' Mem. in Supp. at 13-17.)

     To support their due process claim, Plaintiffs must first establish the existence of a constitutionally cognizable property interest. See Board of Regents v. Roth, 408 U.S. 564, 569, 576-77, 92 S. Ct. 2701, 2708-09 (1972); Furlong v. Shalala, 156 F.3d 384, 393 (2d Cir. 1998); Donato v. Plainview-Old Bethpage Cent. Sch.

Dist., 96 F.3d 623, 628-29 (2d Cir. 1996), cert. denied, 519 U.S. 1150, 117 S. Ct. 1083 (1997).  While the Constitution protects property interests, it does not create them.  "Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." Furlong, 156 F.3d at 393) (citing Board of Regents, 408 U.S. at 577).  In granting the Plaintiffs' Motion for a Preliminary Injunction, the Court found that, under Connecticut law, lawfully established nonconforming uses constitute vested property rights entitled to constitutional protection.  (Doc. No. 21 at 20.)  In arguing for summary judgment, Defendants do not contest this finding.  (See Defs.' Mem. in Supp. at 13-14.)  Therefore, the Court finds that the Plaintiffs seek to protect a constitutionally protected property interest.

Next, the Court must address the question of what process is due.  Procedural due process is not a fixed concept, but rather is "flexible and calls for such procedural protections as the particular situation demands." Morrissey v. Brewer, 408 U.S. 471, 481, 81 S. Ct. 1743, 1748 (1972).  In evaluating due process claims when the alleged deprivation is the result of an administrative action, the Court must balance the three factors set out in Mathews v. Eldridge, 424 U.S. 319, 334-35, 96 S. Ct. 893, 903 (1976).  These factors are 1) the private interest affected by the challenged action, 2) the risk of erroneous deprivation of that

interest through the challenged procedure and the probable value of alternative safeguards, and 3) the government's interest, including its interest in avoiding the burden that an alternative procedure would entail. Id.; see also Abdullah v. INS, 184 F.3d 158, 164 (2d Cir. 1999).

As to the first factor, the Defendants concede that Plaintiffs have a "significant property interest in the use of their homes" and that they suffer a "serious deprivation" as a result of the seasonal use limitation. (Defs.' Mem. in Supp. at 14.)

As to the second factor, Defendants argue that they have "corrected" for the risk of erroneous deprivation inherent in the procedures challenged in Plaintiffs' complaint. (Id. at 14.) The question of whether or not the "corrected" procedures comply with the minimum requirements of due process is not at issue here.[5] For the reasons discussed in the Court's Ruling on Plaintiff's Motion for Preliminary Injunction, the Court again finds that the challenged procedure for determining year-round use status involves a high risk of erroneous deprivation. (See Doc. No. 21 at 22-26.) It is undisputed that the question of whether an owner actually previously used his or her property during the winter months is dispositive of whether the owner has a lawful nonconforming use.

---

[5]Furthermore, in the context of ruling on the Defendants' Motion to Dissolve the Preliminary Injunction, the Court has expressed concern about the risk of erroneous deprivation resulting from the new procedures. (Doc. No. 44 at 12-13.)

(Id. at 22.)   However, the ZEO's preliminary determination was
based on a review of town records that simply do not contain
information about an owner's previous winter use of his or her
property.  (Id. at 22-24.)  While an owner is allowed to challenge
this preliminary determination, the challenged procedures limit the
kind of evidence he or she may bring to certain kinds of
documentary evidence that many people do not keep in their records.
(Id.)  The owner was barred from using affidavits and testimony of
neighbors who had actual knowledge of his or her use of the
property.  (Id.)  Such a procedure presents a glaring risk of
erroneous deprivation and does not provide a property owner with an
opportunity to be heard "at a meaningful time and in a meaningful
manner."  Mathews, 424 U.S. at 333 (quoting Armstrong v. Manzo,  380
U.S. 545, 552, 85 S. Ct. 1187, 1191 (1965)).

     The Court next considers the third Matthews-factor.  Having
seen fit to "correct," or at least modify, the Commission's
original procedures, the Defendants have difficulty arguing
successfully that they have a significant interest in continuing to
use the challenged procedures or in avoiding the burden of
alternative procedures.   The Defendants devote much of their
argument to an attempt to demonstrate that the registration system
proposed by the Plaintiffs as an alternative procedure would be
overly burdensome.  (Defs.' Mem. in Supp. at 14-17.)  As proposed
by the Plaintiffs, such a system would require property owners to
register their nonconforming uses by a specified date in order to

25

avoid losing their nonconforming uses.  The ZEO would then review these registrations to determine whether each registrant had a valid nonconforming use.  The advantage of a registration system is that, for owners who timely register, the burden is on the municipality to prove that an owner does not have a preexisting use, thus reducing the number of erroneous deprivations. Such registration systems are used in other municipalities in the state. The Defendants contend that such a procedure would be overly burdensome because the ZEO would be required to act within "a reasonable time period, usually 30 days." (Defs.' Mem. in Supp. at 15.)  The Defendants claim that the Old Lyme ZEO, who has limited resources, would be unable to review the predicted number of registrations within this time frame.  (Id.)  In response, Plaintiffs argue that the reasonable time frame would not necessarily be limited to 30 days and that a much longer time frame could be used.  Furthermore, as the Plaintiffs point out, under the challenged procedures, the ZEO must review every single property in the R-10 zone.  (Defs.' Mem. in Supp. at 18.)  In contrast, under a registration system, the ZEO would only need to review the properties that had been registered as nonconforming uses.  Since not every property owner is entitled to nonconforming use status, not all properties would be registered.  Therefore, under a registration system, the ZEO would likely be required to review fewer properties.  The Court is not persuaded that a registration system that set an appropriate schedule for the ZEO's review, or some other system, would be significantly more burdensome for the Town than the current approach.

The Defendants' arguments regarding the registration system do not show that the governmental interest in the challenged procedures outweighs the Plaintiffs' interest in the year-round use of their properties and the glaring risk of erroneous deprivation inherent in the challenged procedures. Because a genuine issue of material fact remains as to whether the procedures violated Plaintiffs' procedural due process rights, the Court denies summary judgment on these claims.

F.    THE CONSTITUTIONAL REQUIREMENTS OF EQUAL PROTECTION

Plaintiffs claim that the 1995 Regulations deprive the Plaintiffs of the equal protection of the laws. (Compl. ¶ 51.) The Plaintiffs do not claim that the government actions they challenge burden any fundamental rights or discriminate against a suspect classification. Therefore, the classification the Plaintiffs challenge is subject only to a minimal level of scrutiny under the "rational basis" test. Story v. Green, 978 F.2d 60, 63-64 (2d Cir. 1992). In order to prevail on their equal protection claim, the Plaintiffs must show that the classification they challenge is not "rationally related to a legitimate state interest." New Orleans v. Dukes, 427 U.S. at 303 (1976); Hodel v. Indiana, 452 U.S. 314, 331-32 (1981). Because the challenged government action does not "employ suspect classifications or impinge on fundamental rights," the "law carries with it a presumption of rationality that can only be overcome by a clear showing of arbitrariness and irrationality." Hodel, 452 U.S. at 331. Furthermore, the government's actual motive in enacting a law or regulation is not dispositive under rational basis review; a law

will be upheld as long as the government can articulate a legitimate purpose to which the law or regulation is rationally related. United States R.R. Retirement Bd. v. Fritz, 449 U.S. 166, 179, 101 S. Ct. 453, 461 (1980) ("Where, as here, there are plausible reasons for Congress' action, our inquiry is at an end. It is, of course, constitutionally irrelevant whether this reasoning in fact underlay the legislative decision") (internal quotations omitted); see also F.C.C. v. Beach Communications, Inc., 508 U.S. 307, 315, 113 S. Ct. 2096, 2102 (1993) ("[T]hose attacking the rationality of the legislative classification have the burden to negative every conceivable basis which might support it") (internal quotation omitted).

In spite of these controlling cases holding that the government's actual purpose in taking the challenged action is irrelevant, the Plaintiffs argue that they can establish their equal protection claim by showing that the Commission had "improper motives" and that the Commission's action was "motivated by animus." (Defs.' Mem. in Supp. at 20.) Plaintiffs contend that the 1995 Regulations are part of a decades-long string of attempts to prevent the establishment of permanent residences in the beach communities in Old Lyme, and that the Town only adopted a public health and safety rationale for its zoning actions as a pretext after outright restrictions on year-round use failed. (Id. at 21-22; Pls.' Rule 56 Statement at 5, ¶ 2.) The Plaintiffs argue that the Commission never actually considered any evidence of the environmental benefit of seasonal use restrictions based on lot size before adopting the 1995 Regulations. (Pls.' Rule 56

28

Statement at 5, ¶ 1; <u>see also</u> <u>id.</u> Ex N at 64-65.)  The Plaintiffs claim that none of the environmental studies and reports reviewed by the Town found any basis for a correlation between seasonal use restrictions and pollution.  (<u>Id.</u> at 7, ¶ 6.)[6]

In support of their argument that they may establish an equal protection violation by showing improper motive on the part of the Defendants Town and Commission, the Plaintiffs cite language from <u>Harlen Assocs. v. Inc. Vill. of Mineola</u>, 273 F.3d 494, 500 (2d Cir. 2001), stating that a plaintiff may survive a motion for summary judgment by showing "either that there was no rational basis for the unequal treatment received...or that the denial of the application was motivated by animus."  The context for this statement was the <u>Harlan</u> court's discussion of "class of one" equal protection claims.  A "class of one" claim is available to "individuals who allege no specific class membership but are nonetheless subjected to invidious discrimination at the hands of government officials." <u>Id.</u> at 499 (citing <u>LeClair v. Saunders</u>, 627 F.2d 606, 608-10 (2d Cir. 1980)); <u>see also</u> <u>Olech v. Vill. of Willowbrook</u>, 528 U.S. 562, 564 120 S. Ct. 1073, 1047 (2000) (per curiam) (recognizing that "class of one" claims may be brought "where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment").

"Class of one" claims lie "in a murky corner of equal

_____

[6]In fact, the Dames and Moore study commissioned by the Town apparently refers in passing to limiting seasonal use as a means to prevent the overloading of septic systems.  (<u>See</u> Pls.' Rule 56 Statement, Ex. H at 28.)

protection law in which there are surprisingly few cases and no
clearly delineated rules to apply." Le Clair v. Saunders, 627 F.2d
606, 608 (2d Cir. 1980).  It is clear from theses cases, however,
that such claims are generally raised when a plaintiff challenges
administrative or executive action, alleging instances of selective
enforcement in which a government official acting under lawful
authority treats the plaintiff differently from similarly situated
individuals out of malice. For example, "class of one" claims have
been raised in cases in which an individual's application for a
zoning permit is denied while similarly situated individuals'
applications are granted. See Millar v. Ojima, 354 F. Supp. 2d
220, 227 (E.D.N.Y. 2005) (citing Harlen Assocs., 273 F.3d at
499-503)and Crowley v. Courville, 76 F.3d 47, 52-53 (2d Cir. 1996);
Zahra v. Town of Southold, 48 F.3d 674, 684 (2d Cir.1995)). "Class
of one" claims also arise in employment cases where disciplinary
rules are alleged to have been enforced selectively out of animus
towards an individual.  See Millar , 354 F. Supp. 2d at 227-28
(citing Cobb v. Pozzi, 363 F.3d 89, 110 (2d Cir. 2004) and Giordano
v. City of New York, 274 F.3d 740, 751 (2d Cir. 2001)).

     The Plaintiffs' claims do not fall into any of these
categories.  To the contrary, the Plaintiffs' claim that the 1995
Regulations themselves discriminate against a class of property
owners.  The Plaintiffs have not brought to the Court's attention
any cases in which a "class of one claim" has been used to
challenge a duly enacted law or regulation that is alleged to
discriminate against a class.  The Plaintiffs do not explicitly
argue that they have brought a "class of one" claim, and they could

not argue successfully that they should be allowed to use this doctrine so as to prove their equal protection claim with evidence of the Commission's allegedly discriminatory motives. The Plaintiffs cannot circumvent the clear limitations on rational basis review discussed above in this manner. The Defendants' actual motives in adopting the 1995 Regulations are not relevant to the equal protection claim. The Court need only determine whether the seasonal use restrictions in the 1995 Regulations are rationally related to some conceivable legitimate municipal purpose.

The Defendants assert that the challenged Regulations are rationally related to "public health, safety and welfare" and assert that the Court "has held as much." (Defs.' Mem. in Supp. at 18.) The Court has not "held as much" since this is the first occasion on which the Court has had occasion to rule on the Plaintiffs' equal protection claim. Presumably, the Defendants refer to a passage of the Court's Ruling on Plaintiffs' Motion for Summary Judgment in which the Court said that it did not "dispute the public health and safety concerns underlying the 1995 Regulations." (See Doc. No. 21 at 26.) However, this statement does not reflect a finding made by the Court since the Plaintiffs had conceded only for the purpose of that Motion that the 1995 Regulations were validly adopted for a legitimate purpose. (Id. at 2; Tr. 4/13/00 at 3-10.) That Motion aside, the Plaintiffs do contend that the Regulations are not rationally related to a public health, safety and welfare purpose. (Compl. ¶ 51.)

In their Memorandum in Support of Summary Judgment, the

31

Defendants do not actually identify the public health and safety purpose to which they claim the 1995 Regulations are rationally related.  Examination of their Rule 56 Statement and attached exhibits reveals that various Town and Commission officials have, in the past, claimed that environmental protection is one of the purposes of the challenged seasonal use restriction.  Ms. Marsh, without claiming any kind of expertise on the subject, testified that she thought that a high density of on-site septic systems presented a risk of pollution, and that this concern motivated the proposals for seasonal use restrictions in the Town Plan of Development (Tr. 4/12/00 at 56-60.)  This Plan was later endorsed by the CDEP, though the Agency did not comment extensively on the alleged environmental benefits from seasonal use restriction. (Id. at 86-87.)  The minutes of the Zoning Commission meetings prior to the adoption of the 1995 Regulations do not reflect any substantive discussion about the environmental benefits of seasonal use restrictions based on lot size.  (See id., Ex. J1-3.)  Brian Curtis, a consulting engineer who testified for the Defendants at the Hearing on the Motion for Preliminary Injunction, testified that a 10,000 square foot lot is insufficient to support an on-site septic system for year-round use (Id. Ex B3 at 46-47.)  He also testified that a 26,000 square foot lot would be required in the "best" soil conditions.  However, Mr. Curtis also admitted that resting an on-site septic system for several months of the year might actually reduce the effectiveness of the system in "renovating" pollutants. (4/14/00 Tr. at 45.)  Mr. Curtis also was unable to say whether the R-10 lots with less than 10,000 square

32

feet would be sufficient to support an on-site septic tank if occupied between April 15 and November 1.  Mr. Curtis' testimony was therefore inconclusive regarding the question of whether the seasonal use restriction is rationally related to environmental concerns. Other reports and experts the Commission allegedly relied on have not been made available to the Court.  The Plaintiffs, on the other hand, cite a study they have commissioned concluding that there is inadequate scientific support for the policy of seasonal use restrictions.  (Pls.' Rule 56 Statement, Ex. H.)

    Reducing pollution from densely populated communities that rely on on-site septic systems appears to the Court to be a legitimate municipal purpose.  It is less apparent to the Court, however, that zoning regulations which allow for extremely crowded beach areas for six and one-half months of the year while prohibiting occupancy of smaller lots for the rest of the year are a reasonable means of promoting this interest.  Under rational basis review, "a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." Beach Communications, 508 U.S. at 315 (1993).  However, despite the strong presumption in favor of the validity of the zoning Regulations, the Court cannot grant summary judgment on the basis of the factual showing the Defendants have made.  They have not presented any evidence or argument tending to show that "speculation" that a seasonal use restriction will resolve pollution issues is "rational."  (See also Pls.' Rule 56 Statement, Ex. F at 56 (Deposition of Commission member George James) (explaining that "[i]t's a supposition" that restricting

winter use will reduce pollution and that the Commission has "no scientific evidence one side or another").)   The Defendants have not shown "that there exists no factual dispute on the basis of which a reasonable factfinder could conclude" that the seasonal use restriction is not "clearly arbitrary and unreasonable." <u>See</u> <u>New York State Trawlers Ass'n v. Jorling</u>, 16 F.3d 1303, 1309 (2d Cir. 1994).  On this record, the Court therefore denies summary judgment for the Defendants on this issue.

G.    <u>RIPENESS OF THE SUBSTANTIVE DUE PROCESS CLAIMS</u>

The Defendants argue that the Plaintiffs' claim that the 1995 Regulations constitute a taking of their property without "just compensation" is not ripe for review by this Court.  The Defendants cite <u>Williamson County Reg'l Planning Comm'n v. Hamilton Bank</u>, 473 U.S. 172, 186, 105 S. Ct. 3108, 3116 (1985), in which the Supreme Court held that a federal takings claim is not ripe until the plaintiff has 1) obtained a "final decision" from the zoning authorities and 2) utilized procedures provided for by the state to obtain just compensation.  The Supreme Court noted that central to the question about whether a regulatory taking has occurred is an inquiry into "the economic impact of the challenged action and the extent to which it interferes with reasonable investment-backed expectations." <u>Id.</u> at 191 (citing <u>Penn Cent. Transp. Co. v. City of New York</u>, 438 U.S. 104, 124, 98 S. Ct. 2646, 2659 (1978)).  The Supreme Court reasoned that it would be difficult for a court to conduct this inquiry with respect to a specific piece of property until the zoning authority has arrived at final decisions regarding the application of the zoning regulations to the property in

34

question and any requests for variances made by the property owner.
<u>Id.</u>

 The concerns articulated by the Supreme Court in <u>Williamson County</u> are relevant to as-applied challenges to land-use regulations; in those cases a court is required to consider the extent to which a particular application of a regulation interferes with an owner's "reasonable investment-backed expectations" in a particular property. These concerns do not apply to facial challenges to zoning regulations. A facial takings challenge claims that the "mere enactment" of the challenged regulation "deprived [the owner] of economically viable use of [his] property." <u>Hodel v. Virginia Surface Min. and Reclamation Ass'n</u>, 452 U.S. 264, 296, 101 S. Ct. 2352, 2370 (1981) (citing <u>Agins v. Tiburon</u>, 447 U.S. 255, 260, 100 S. Ct. 2138, 2141 (1980)). In a facial challenge, the claimant "must establish that no set of circumstances exists under which the [challenged action] would be valid." <u>General Elec. Co. v. New York State Dep't of Labor</u>, 936 F.2d 1448, 1456 (2d Cir. 1991) (quoting <u>United States v. Salerno</u>, 481 U.S. 739, 745, 107 S. Ct. 2095, 2100 (1987). Facial challenges do "not depend on the extent to which the [owner is] deprived of the economic use of [his or her] particular pieces of property or to the extent to which [he or she is] compensated." <u>Yee v. City of Escondido</u>, 503 U.S. 519, 534, 112 S. Ct. 1522, 1532 (1992). For this reason, facial challenges "are generally ripe the moment the challenged regulation or ordinance is passed." <u>Suitum v. Tahoe Regional Planning Agency</u>, 520 U.S. 725, 117 n.10 S. Ct. 1659 (1997); <u>see also</u> <u>Kittay v. Giuliani</u>, 252 F.3d 645, 646-47 (2d Cir.

2001).

Plaintiffs assert that their takings claim is a facial challenge. (Pls.' Mem. in Opp. at 24-25.) Plaintiffs allege that the 1995 Regulations deprive the Plaintiffs of "any reasonable use of their property" between November 15 and April 1 or each year simply because of the size of the Plaintiffs' lots. (See Compl. ¶ 28.) This constitutes a facial challenge because the Plaintiffs "claim that the mere enactment of [the Regulations] constitutes a taking," and do not "claim that the particular impact of [the Regulations] on a specific piece of property requires compensation." See Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 494, 107 S. Ct. 1232, 1246 (1987).

Insofar as the Plaintiffs allege that a prohibition on the year-round use of R-10 lots smaller than 10,000 square feet deprives an owner of the economically viable use of his or her property under all circumstances, the Plaintiffs have stated a facial challenge, and, therefore, their claim is ripe for review.

H.  QUALIFIED IMMUNITY

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727 (1982). A plaintiff must establish all three steps of a three-part analysis in order to show that a defendant is not entitled to qualified immunity. Harhay v. Ellington, 323 F.3d 206, 211-12 (2d Cir. 2003). First, the Court must "determine whether plaintiff has

alleged a violation of a constitutional right." <u>Id.</u>  Second, assuming that such a right has been violated, the plaintiff must establish that right was "clearly established" at the time of the violative conduct.  A right is "clearly established" when "[t]he contours of the right [are] ... sufficiently clear that a reasonable official would understand that what he is doing violates that right.... [T]he unlawfulness must be apparent." <u>McEvoy v. Spencer</u>, 124 F.3d 92, 97 (2d 1997)(quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039 (1987)).  Third, the Court must determine whether the Defendants' actions were objectively reasonable.  <u>Harhay</u>, 323 F.3d at 211-12.

With respect to the first step of the analysis, the Defendants contend that ZEO Ozols did not violate "anyone's substantive due process or equal protection rights" in her enforcement of the 1995 Regulations, and therefore, they argue, did not violate anyone's "clearly established" rights.  (Defs.' Mem. in Supp. at 27.)  This argument is puzzling because the Plaintiffs allege that Defendant Ozols' arbitrary procedures in making seasonal use determinations violated their *procedural* due process rights, rather than their substantive due process or equal protection rights.  (Compl. ¶ 46, 49, 35-39; <u>see also</u> Pls.' Mem. in Opp. at 37.)  In any case, the Court does not doubt that the Plaintiffs have alleged that a constitutionally protected property right was been violated by the ZEO's defective seasonal use determination procedures.  (<u>See</u> Ruling On Motion for Preliminary Injunction at 18-19.)

Second, the Defendants argue that the right was not "clearly established" because there "was no established case law that would

have given ZEO Ozols fair warning that her actions were unlawful."
(Defs.' Mem. in Supp. at 27.)    In claiming that they were
wrongfully denied year-round use status as a result of Defendant
Ozols' arbitrary procedures, the Plaintiffs allege that they have
been deprived of the right to a nonconforming use without a
meaningful opportunity to be heard.    The right to use one's
property without seasonal restriction is surely "clearly
established." "It is well settled that enforcement of an otherwise
valid zoning ordinance violates the Constitution ... if ... the
decision of the particular zoning body is arbitrary, ... or if the
ordinance is applied or enforced with a discriminatory intent or
purpose." Brady v. Town of Colchester, 863 F.2d 205, 217 (2d Cir.
1988) (quoting Scudder v. Town of Greendale, 704 F.2d 999 , 1002
(7th Cir. 1983)).    The unlawfulness of the arbitrary preliminary
determination procedure alleged to have been implemented by ZEO
Ozols, as well as the arbitrariness of barring owners from
challenging these determinations with the only evidence at their
disposal, would have been apparent to a reasonable official.
Therefore, the Plaintiffs have alleged a violation of a "clearly
established" right.

Third, the Defendants argue that Defendant Ozols' conduct was
objectively reasonable in light of the Old Lyme Land Use Office's
limited resources. (Defs.' Mem. in Supp. at 27-28.) Regardless of
the issue of limited resources, it is hard to imagine how a
reasonable ZEO would have relied on records from the Town Hall that
did not contain relevant information in order to make seasonal use
determinations. As the court has noted previously, these records

38

were simply unhelpful in determining whether there was a pre-existing nonconforming use.  The risk of erroneous deprivation was glaring.  Furthermore, a reasonable official, knowing that many people do not maintain records of bills and other such documentary evidence, would not have foreclosed an owner who challenged a preliminary determination from presenting sworn testimonial evidence from persons with actual knowledge of the relevant facts.

"For a defendant to secure summary judgment on the ground of qualified immunity, he must show that no reasonable jury, viewing the evidence in the light most favorable to the Plaintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law." Ford v. Moore, 237 F.3d 156, 162 (2d Cir. 2001) (citing Lennon v. Miller, 66 F.3d 416, 420 (2d Cir. 1995).  The Defendants have not met this burden, and, therefore, the Court denies summary judgment on this issue.

I.  PUNITIVE DAMAGES

The Plaintiffs' Claim for Relief includes a claim for "Exemplary and Punitive Damages as provided by law." (Compl. at 18.)  Municipalities and municipal agencies are generally immune from punitive damages, as are municipal officials sued in their official capacity.  City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 271, 101 S. Ct. 2748 (1981); see also Yorktown Medical Laboratory, Inc. v. Perales, 948 F.2d 84, 88-89 (2d Cir. 1991). Therefore, the Defendants are correct that Defendants Town and Commission are immune from claims for punitive damages.  Defendant Ozols is also immune from punitive damages insofar as she is sued in her official capacity.

However, municipal officials sued in their individual capacities are not immune from punitive damages. <u>New Windsor Volunteer Ambulance Corps, Inc. v. Meyers</u>, 442 F.3d 101, 122 (2d Cir. 2006) (citing Smith v. Wade, 461 U.S. 30, 55-56, 103 S. Ct. 1625, 1640 (1983)). The Plaintiffs have sued the individual Defendants in both their individual and official capacities. (Compl. ¶ 48.) To establish individual liability in a § 1983 action, "it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." Kentucky v. Graham, 473 U.S. 159, 166, 105 S. Ct. 3099, 305 (1985). The Plaintiffs have alleged that Defendant Ozols deprived them of a constitutionally protected right while acting under color of state law. Therefore, she may be subject to punitive damages.

J.   <u>SUPPLEMENTAL JURISDICTION OVER PENDANT STATE CLAIMS</u>

The Defendants argue that, if the Court grants their motion for summary judgment with respect to the federal claims against them, the Court should then decline to exercise supplemental jurisdiction over the Plaintiffs' pendant state law claims. (Defs.' Mem. in Supp. at 29.) Because the Court has not dismissed any of the federal claims, it does not consider this argument.

K.   CONNECTICUT ENVIRONMENTAL PROTECTION ACT CLAIMS

In Count III of their First Amended Complaint, the Plaintiffs seek injunctive relief pursuant to the Connecticut Environmental Protection Act, codified at Conn. Gen. Stat. §§ 22a-14 et seq. The Plaintiffs allege that, due to soil conditions in the Town and the concentration of the Town's residential lots on the shoreline of Long Island Sound, on-site septic systems are inadequate to treat

septage in the beach areas.  (Compl. ¶¶ 54-55; see also Pls.' Mem.
in Opp. at 34-35.)  The overuse and overcrowding of septic systems,
the Plaintiffs allege, results in the pollution of Long Island
Sound.  (Compl. ¶ 55.)  Plaintiffs allege that the most effective
way of eliminating this risk to the environment is treatment by way
of a municipal sewer facility.  (Id. ¶ 56.)  The Town is one of
only four "shoreline communities" in Connecticut that does not
provide such sewer services to its residences.  (Compl. ¶ 57.)

Specifically, the Plaintiffs allege that the Town has
violated Conn. Gen. Stat § 22a-16 by failing to implement a sewer
system to combat pollution.  Section 22a-16 provides, in relevant
part, that

> ... any person, partnership, corporation, association,
> organization or other legal entity may maintain an action
> in the superior court for the judicial district wherein
> the defendant is located, resides or conducts
> business...for declaratory and equitable relief against
> the state, any political subdivision thereof, any
> instrumentality or agency of the state or of a political
> subdivision thereof, any person, partnership,
> corporation, association, organization or other legal
> entity, acting alone, or in combination with others, for
> the protection of the public trust in the air, water and
> other natural resources of the state from unreasonable
> pollution, impairment or destruction ...

In Keeney v. Town of Old Saybrook, 676 A.2d 795 (Conn. 1996), the
Supreme Court of Connecticut held that a municipality could be
liable under this statute for failing to build a sewage treatment
facility.  The court concluded that a municipality could be liable
even "without affirmatively causing pollution if the municipality
has intentionally failed to abate a public nuisance."  Id. at 809.
While a municipality's intentional failures to act may result in

41

liability, it will not be liable for its negligent failure to act. Id. The court defined an intentional act or failure to act as follows

> It is the knowledge that the actor has at the time [the actor] acts or fails to act that determines whether the invasion resulting from [its] conduct is intentional or unintentional. It is not enough to make an invasion intentional that the actor realizes or should realize that [its] conduct involves a serious risk or likelihood of causing the invasion. [The actor] must either act for the purpose of causing it or *know that it is resulting or is substantially certain to result from [the actor's] conduct.*

Id. at 811 (emphasis in original) (quoting 4 Restatement (Second) Torts § 825, comment c); see also id. at 812 ("We conclude that a municipality may be liable for a public nuisance that it intentionally creates through its prolonged and deliberate failure to act to abate that nuisance.")

In moving for summary judgment on these claims,[7] the Defendants claim that the Town *has* acted to address the relevant environmental concerns.  They point out that the Town formed a

---

[7]According to the title of this section of the Defendants' Memorandum, the Defendants contend that the Plaintiffs have failed to state a claim upon which relief may be granted. (Defs.' Mem. in Supp. at 29.)  Were this indeed a motion to dismiss for failure to state a claim, the court would be required to analyze the facts under a far more demanding standard. However, since Defendants make this argument in the context of a motion for summary judgment, since the argument refers to facts presented in the Defendants Rule 56 Statement and its exhibits, and since the Defendants do not limit their argument to facts alleged in the Plaintiffs' Complaint, the Court assumes that the Defendants have moved for summary judgment under Fed. R. Civ. P. 56, and not for dismissal for failure to state a claim under Fed. R. Civ. P. 12(b)(6).

Water Pollution Control Authority; that the Town adopted the 1995 Regulations partly in order to ameliorate problems caused by the density of on-site septic systems near the shoreline; and that the Town developed programs to monitor and maintain on-site septic systems. (Defs.' Mem. in Supp. at 30.) All of these steps were consistent with the Town Plan of Development adopted by the Town Planning Committee in 1990. (Defs.' Rule 56 Statement, Ex. I.) The Plan provided for the creation of a "sewer avoidance" program with the goal of preventing health and safety problems without building a public sewer and water system. (Id. at 11.) The Plan provided for zoning action that would prevent an increase in density of septic systems; the section of the Plan titled "Public Utilities - Public Health and Safety" provided for zoning action that would prohibit the "expansion or winterization of seasonal dwellings unless all relevant health and building codes can be met." (Id. at 12.) In 1990, the Connecticut Department of Environmental Protection endorsed the Plan. Given that the CDEP approved of a plan that contained a sewer avoidance program, one cannot conclude that the Town and its officials knew or were "substantially certain" that the decision not to install a sewer system would lead to pollution, or that any of the Defendants intended to pollute the Long Island Sound by failing to build a public sewer system. In response, the Plaintiffs have made no showing that the Town and its officials knew that their Plan would

lead to "unreasonable pollution."  Nor have the Plaintiffs shown that the Town received, in the years since the Plan was adopted, information alerting officials to the dangers of continuing to follow the Plan's sewer avoidance policy.  The Plaintiffs simply assert that the "sewer avoidance" program is a "deliberate effort" to avoid resolving the Town's pollution issues.  (Pls.' Mem. in Opp. at 34-25.)  "Mere allegations or denials" of this sort are insufficient to survive a motion for summary judgment.  No reasonable jury could find that the Town intentionally allowed pollution of Long Island Sound by failing to build a sewer system.

The Defendants' motion for summary judgment as to Count III is therefore granted.

CONCLUSION

Summary judgment is granted for the Defendants as to Count III of the Complaint.  Summary judgment is denied for all other counts. The Motion (Doc. No. 106) is GRANTED in part and DENIED in part.


SO ORDERED.


_____/s/_____
ELLEN BREE BURNS
SENIOR U.S. DISTRICT JUDGE


Dated at New Haven, Connecticut this 1st day of February 2008.